# EXHIBIT 4

## STATE OF ALASKA DEPARTMENT OF NATURAL RESOURCES
## DIVISION OF LAND

[X] Northern Region
3700 Airport Way
Fairbanks, AK 99709
(907) 451-2705

[ ] Southcentral Region
3601 C Street, Suite1080
Anchorage, AK 99503-5937
(907) 269-8552

[ ] Southeast Region
400 Willoughby, #400
Juneau, AK 99801
(907) 465-3400

### LAND USE PERMIT
### Under AS 38.05.850

**ADL 415854**

Golden Valley Electric Association, Inc., is issued this permit to use the following described land:

The Rex/South route for the Northern Intertie as described in BLM's Draft EIS figure 3.9-1 for a 150 foot wide public utility right-of-way.

Generally, the Rex/South Route begins at Healy substation and continues about five miles north, along the Usibelli Coal Mine access road to a point just north of Lignite Creek. From Lignite Creek, the route travels northeast to Walker Dome, where it heads north and passes to the west of Rex Dome, a total distance of approximately 12 miles. From Rex Dome, the route continues north about 30 miles to a point near the City of Nenana (which lies four miles to the northwest), then heads east generally paralleling the south side of the Tanana River for approximately 45 miles. At this point, the route is due south of Fairbanks, where it then crosses the Tanana River and terminates at the proposed South Fairbanks Substation.

This permit is issued for the purpose of authorizing early entry for construction and survey of a Public Utility Right-of-Way Permit for utility purposes. The development of the site authorized by this permit shall be limited to the area and improvements specified in the permit application. This permit applies to state land under the jurisdiction of the Division of Land.

**This permit is issued subject to: payment of the use fee in the amount of $26,000.00 (see Special Stipulation No. 12); posting of bond in the amount of $60,000.00 (see Special Stipulation No. 5); proof of insurance in the amount of $1,000,000 with a $2,000,000 annual aggregate (see Special Stipulation No. 6); and compliance with the attached Special Stipulations in addition to those noted on Page 2 of this document.**

This permit is **not a property right.** It is a **temporary** authorization, **revocable by the state with or without cause.** This permit is effective beginning February 22, 1999, and ending on February 21, 2004, unless sooner terminated at the state's discretion.

| | | |
|---|---|---|
| *Nancy Welch* | Northern Region Manager | 3/5/99 |
| Signature of Authorized State Representative | Title | Date |
| *Michael P. Kelly* | President & CEO | March 1, 1999 |
| Signature of Permittee or Authorized Representative<br>Michael P. Kelly | Title | Date |
| P.O. Box 71249 | Fairbanks          Alaska | 99707-1249 |
| Permittee's Address | City                  State | Zip |
| (907) 456-1178          (907) 451-5647 | Steven Haagenson | |
| Home Phone          Work Phone | Contact Person | |

*Permittee is responsible for maintaining a current address with the division during the life of this authorization.
*Permittee is responsible for obtaining authorizations required by other agencies for the permitted activity

Land Use Permit
ADL 415854
Page 2

1. This Land Use Permit conveys no interest or property right in state land. This permit may be reissued upon application by the permittee at the state's discretion. This permit is revocable immediately, with or without cause. If revoked without cause, the permittee will be allowed 30 days within which to remove the permittee's possessions and vacate the premises. If revoked for breach of any condition, the permittee shall immediately vacate the premises. This permit is not transferrable. It is issued to authorize specific activities requested by the applicant and that are not included in the category of "generally allowed uses."

2. This Land Use Permit is subject to the following provisions:

    a.    Activities employing wheeled or tracked vehicles shall be conducted in such a manner as to minimize surface damage.

    b.    Existing roads and trails shall be used wherever possible. Trail widths shall be kept to the minimum necessary. Trail surface may be cleared of timber, stumps, and snags. Due care shall be used to avoid excessive scarring or removal of vegetative ground cover.

    c.    All activities shall be conducted in a manner that will minimize disturbance of natural drainage systems, that will not cause a change in character, pollution, or siltation of streams, lakes, ponds, water holes, seeps, and marshes, and that will not disturb fish and wildlife resources. Cuts, fills, or other activities causing any of the above disturbances, if not repaired immediately, are subject to any corrective action as may be required by the director.

    d.    Unless specifically authorized by this permit, the director prohibits the disturbance of vegetation within 300 feet of any waters located in specially designated areas as prescribed in 11 AAC 96.010(2) except at designated stream crossings. These special designations are noted on the State of Alaska land status plats.

    e.    All activities shall be undertaken in a manner which causes the least possible interference with other authorized uses of state lands.

    f.    Trails and campsites shall be kept clean. All garbage and foreign debris shall be eliminated by removal, burning, or burial, unless otherwise authorized.

    g.    All survey monuments, witness corners, reference monuments, mining claim posts, and bearing trees shall be protected against destruction, obliteration, or damage. Any damaged or obliterated markers shall be reestablished in accordance with accepted survey practices of the division.

    h.    Every reasonable effort shall be made to prevent, control, or suppress any fire in the permitted area. Uncontrolled fires shall be reported immediately.

    i.    Holes, pits, and excavations shall be filled, plugged, or repaired. Holes, pits and excavations necessary to verify discovery on prospecting sites, mining claims, and mining leasehold locations may be left open but shall be maintained so as to minimize erosion and siltation and shall be consistent with public safety and welfare.

    j.    No person may engage in mineral exploration activity on land open to such use, the surface of which has been granted or leased to third parties by the State of Alaska, or on land in which the state has received the reserved interest of the United States until good-faith attempts have been made to agree with the surface owner or lessee on a settlement for damages which may be caused by such activity. If agreement cannot be reached, or lease or surface owner cannot be found within a reasonable time, operations may be commenced on the land only after specific approval of the director, and after making adequate provision for full payment of any damages which the surface owner or lessee may suffer.

    k.    Entry on all lands under prospecting permit, lease, or claim, by other than the holder of the permit, lease, or claim, or his authorized representative, shall be made in a manner which will prevent unnecessary or unreasonable interference with the rights of the permittee, lessee, or claimant.

3. In the case of a permit authorizing early entry, pending issuance of a final authorization, permittee agrees to remove any improvements and to rehabilitate the area to a condition acceptable to the director if the final lease/right-of-way permit is not issued or the permittee fails to complete the lease/right-of-way process within one year of the date of the execution of this entry authorization. Permittee also understands that early entry is undertaken at his/her own risk in the event that the final authorization is not issued.

4. Permittee and permittee's contractors, subcontractors and all personnel shall indemnify the State of Alaska and hold it harmless from any and all claims, suits, loss, liability and expense for injury to or death of persons and damage to or loss of property arising out of or in connection with permittee's entry on and use of this land.

## ATTACHMENT B. SPECIAL STIPULATIONS

1. **Authorized Officer.** The Authorized Officer for the Department of Natural Resources is the Northern Regional Manager or designee of the Division of Mining, Land and Water. The Authorized Officer may be contacted at 3700 Airport Way, Fairbanks, Alaska 99709, or (907) 451-2740. The Authorized Officer reserves the right to modify these stipulations or use additional stipulations as deemed necessary.

2. **Indemnification.** Permittee assumes all responsibility, risk and liability for all activities of permittee, its employees, agents, invitees, contractors, subcontractors, or licensees directly or indirectly conducted in connection with this permit, including environmental and hazardous substance risks and liabilities, whether accruing during or after the term of this permit. Permittee shall defend, indemnify, and hold harmless the State of Alaska, its employees, and agents from and against any and all suits, claims, actions, losses, costs, penalties, and damages of whatever kind or nature, including all attorney's fees and litigation costs, arising out of, in connection with, or incident to any act or omission by permittee, its employees, agents, invitees, contractors, subcontractors, or licensees, unless the sole proximate cause of the injury or damage is the negligence or willful misconduct of the State or anyone acting on the State's behalf. Within 15 days permittee shall accept any such cause or action or proceeding upon tender by the State. This indemnification shall survive the termination of the permit.

3. **Valid Existing Rights.** This authorization is subject to all valid existing rights in and to the land under this authorization. The State of Alaska makes no representations or warranties whatsoever, either expressed or implied, as to the existence, number, or nature of such valid existing rights.

4. **Reservation of Rights.** The Division reserves the right to grant additional authorizations to third parties for compatible uses on or adjacent to the land under this authorization.

5. **Performance Guaranty.** The permittee shall provide a surety bond or other form of security acceptable to the Division in the amount of $ 60,000 payable to the State of Alaska. Such performance guaranty shall remain in effect for the term of this authorization and shall secure performance of the permittee's obligations hereunder. The amount of the performance guaranty may be adjusted by the Authorized Officer upon approval of amendments to this authorization, changes in the development plan, upon any change in the activities conducted or performance of operations conducted on the premises. If permittee fails to perform the obligations under this permit within a reasonable time, the State may perform permittee's obligations at permittee's expense. Permittee agrees to pay within 20 days following demand, all costs and expenses reasonably incurred by the State of Alaska as a result of the failure of the permittee to comply with the terms of this permit. The provisions of this permit shall not prejudice the State's right to obtain a remedy under any law or regulation. If the authorized officer determines that the permittee has satisfied the terms and conditions of this authorization the performance guaranty may be released. The performance guaranty may only be released in a writing signed by the Authorized Officer.

6. **Insurance.** The permittee shall secure or purchase at its own expense, and maintain in force at all times during the term of this permit, the following policies of insurance to protect both the permittee and the permittor (the State, its officers, agents and employees). Where specific limits are shown, it is understood that they shall be the minimum acceptable limits. If the permittee's policy contains higher limits, the State shall be entitled to coverage to the extent of such higher limits. Certificates of Insurance must be furnished to the Authorized Officer prior to occupancy. The certificate must provide for a 60-day prior notice to the State in the event of cancellation, nonrenewal or material change of conditions. Failure to furnish satisfactory evidence of insurance, or lapse of the policy, are material breaches of this permit and shall be grounds, at the option of the State, for termination of the permit. All insurance policies shall comply with, and be issued by, insurers licensed to transact the business of insurance under Alaska Statute, Title 21.

Commercial General Liability Insurance. Such policy shall have minimum coverage limits of $1,000,000 per occurrence with a $2,000,000 annual aggregate. The policy shall be written on an "occurrence" form and shall not be written as a "claims-made" form unless specifically reviewed and agreed to by the Division of Risk Management, Department of Administration. The State must be named as an additional named insured on the policy with respect to the operations of the permittee on or in conjunction with the permitted premises, referred to as ADL 415854.

7. **Preference Right.** No preference right for use or conveyance of the land is granted or implied by this authorization.

8. **Public Trust Doctrine.** The Public Trust Doctrine guarantees public access to, and the public right to use, navigable and public waters and the land beneath them for navigation, commerce, fishing, and other purposes. This authorization is issued subject to the principles of the Public Trust Doctrine regarding navigable or public waters. The Division of Mining, Land and Water reserves the right to grant other interests consistent with the Public Trust Doctrine.

9. **Termination.** This permit does not convey an interest in state land and as such is revocable immediately, with or without cause.

10. **Survey.** The permittee shall submit an as-built survey acceptable to the standards of the Division of Mining, Land and Water prior to the expiration of this early entry authorization.

11. **Term.** The right-of-way permit will be issued for a term of thirty years and will be subject to renewal. Periodic review will be required after the twentieth year and at regular intervals thereafter, not to exceed ten years.

12. **Use Fee.** Under the state fee schedule in 11 AAC 05.010(e)(13), a public utility right-of-way will be assessed a one-time fee of 10 cents per linear foot. Based on the information provided to DL, the estimated one-time use fee is $26,000. Since this fee is based on linear feet, any adjustments to the fees as a result of survey will be assessed upon approval of the survey by DL and prior to the issuance of the final ROW permit. The DL reserves the right to assess an annual use fee based on current fee schedules or a fair market value appraisal if the owner/operator of the transmission line ceases to qualify as a nonprofit cooperative association organized under AS 10.25.

13. **Inspection.**
    a) Authorized representatives of the State of Alaska shall have reasonable access to the subject parcel for purposes of inspection.
    b) The permittee may be charged fees under 11 AAC 05.010(a)(7)(M) for routine inspections of the subject parcel, inspections concerning non-compliance, and a final close-out inspection.
    c) To minimize environmental impacts while maintaining standard operating guidelines, GVEA will visually inspect the route by helicopter twice per year, typically in March and September. Operations and maintenance problems identified on the Tanana Flats will typically be addressed by a small repair crew flown out to the tower site(s) by helicopter before spring thaw or after fall freeze up. With the exception of emergency repair situations, maintenance operations on the Tanana Flats will be avoided or modified during critical periods to minimize impacts on wildlife.

14. **Compliance with Governmental Requirements; Recovery of Costs.** Permittee shall, at its expense, comply with all applicable laws, regulations, rules and orders, and the requirements and stipulations included in this authorization. Permittee shall ensure compliance by its employees, agents, contractors, subcontractors, licensees, or invitees.

15. **Other Authorizations.** The issuance of this authorization does not alleviate the necessity of the permittee to obtain authorizations required by other agencies for this activity.

16. **Violations.** This authorization is revocable immediately upon violation of any of its terms, conditions, stipulations, nonpayment of fees, or upon failure to comply with any other applicable laws, statutes and regulations federal, state or municipal. Should any unlawful discharge, leakage, spillage, emission, or pollution of any type occur due to permittee's, or its employees', agents', contractors', subcontractors', licensees', or invitees' act or omission, permittee, at its expense, shall be obligated to clean the area to the reasonable satisfaction of the State of Alaska.

17. **Maintenance.** The State assumes no responsibility for maintenance of improvements constructed on state land or liability for injuries or damages attributable to that construction.

18. **Change of Address.** Any change of address must be submitted in writing to the Authorized Officer.

19. **Access.**
    a)    All operations must be conducted in a manner that will ensure minimum conflict with other users of the area. There shall be no interference with free public use of state lands and waters.
    b)    Public access may not be restricted without prior approval of the Authorized Officer.
    c)    No permanent access will be constructed in the Tanana Flats. Winter access for construction will occur only after there is a minimum of 12 inches of snow on the ground and a 12-inch depth of ground frost. There will be no blading or disturbance of the vegetation mat.

20. **Destruction of Markers.** All survey monuments, witness corners, reference monuments, mining claim posts, bearing trees, and unsurveyed lease corner posts shall be protected against damage, destruction, or obliteration. The permittee shall notify the Authorized Officer of any damaged, destroyed, or obliterated markers and shall reestablish the markers at the permittee's expense in accordance with accepted survey practices of the Division of Mining, Land and Water.

21. **Fuel and hazardous substances.** No fuel or hazardous substances are to be stored on the subject parcel. Prior written approval from the Authorized Officer is required for a change in this restriction. Such approval may include additional stipulations and a change in the amount required for the performance guarantee.

22. **Notification.** The permittee shall immediately notify DNR and DEC by phone of any unauthorized discharge of oil to water, any discharge of hazardous substances (other than oil), and any discharge of oil greater than 55 gallons on land. All fires and explosions must also be reported. The DNR 24 hour spill report number is (907) 451-2678; the Fax number is (907) 451-2751. The DEC spill report number is (800) 478-9300. DNR and DEC shall be supplied with all follow-up incident reports.

23. **Resource Protection.** Prior to construction, all personnel will be instructed on the protection of ecological, paleontological, and cultural resources. To assist in this effort, the construction contract will address federal and state laws regarding vegetation (including wetlands), wildlife (including protected species), and cultural resources, as well as stressing the importance of these resources and the purpose and necessity of protecting them.

24. **Cultural Resources.** The Alaska Historic Preservation Act (AS 41.35.200) prohibits the appropriation, excavation, removal, injury, or destruction of any state-owned historic, prehistoric (paleontological) or archaeological site without a permit from the commissioner.
    In accordance with state and federal regulations, land managers will coordinate with the State Historic Preservation Office (SHPO). Cultural resources will continue to be considered during project implementation in areas that are classified as having cultural resource potential by the land managers and the SHPO. This will involve surveys to inventory and evaluate cultural resources within the ROW and any impacted areas outside of the ROW, such as access roads and construction equipment yards. In consultation with the appropriate land managing agencies and the SHPO, specific mitigation measures will be developed

and implemented to mitigate any identified adverse impacts. These may include project modifications to avoid adverse impacts, monitoring of construction activities, and data recovery studies. In the event of inadvertent discoveries of cultural or paleontological resources during construction, such construction will be stopped until the resources are evaluated by a qualified specialist and the Office of History and Archaeology in the Division of Parks and Outdoor Recreation (907) 269-8721 and shall be notified immediately.

25. **Fuel Hazard Reduction.** Prior to construction, site-specific fuel hazard reduction criteria will be developed by ADNR Division of Forestry and the BLM Alaska Fire Service (AFS) to protect the power line while allowing for burn through. These criteria will suggest the minimum amount of clearing or other treatment needed to protect the line from fire.

26. **Construction Camp Location.** No construction camps will be established along the ROW. Construction crews are expected to be able to find housing within communities along the Parks Highway, particularly in Healy, Nenana, and Fairbanks. Construction crews will be transported to work sites daily using appropriate vehicles.

27. **Construction Waste.** All construction-related waste, including trash and litter, garbage, other solid waste, petroleum products, and other potentially hazardous materials, will be properly handled in accordance with state and federal regulations and permit requirements and removed to a permitted disposal facility.

28. **Marking Construction Limits.** The areal limits of construction activities and access will be clearly marked. No permanent discoloring agents will be applied to rocks or vegetation to indicate survey or construction activity limits.

29. **Alignment.** The ROW will be aligned in coordination with appropriate landowners and managers, including mining and military operations, to minimize the potential adverse effects on current and future land uses.

30. **Construction Equipment.** To minimize potential environmental impacts during construction, vehicle trips along the ROW will be kept to a minimum. To the extent practicable, construction equipment will be left within the project area rather than driven out on a daily basis. Servicing of equipment will be done within state and federal guidelines.

31. **Vegetation Clearing.**
   a)   Clearing of streamside vegetation (as approved by the authorized officer) will only be done to the extent necessary to allow access for construction and maintenance equipment and to provide clearance for wires. Clearing within these areas will be conducted by hand.
   b)   To allow for safety and engineering concerns, all trees higher than 10 feet may be cleared within 75 feet of the centerline. Clearing to ground level up to 150 feet either side of the centerline will be allowed in areas where large stands of black spruce occur and a danger from forest fires is expected. These areas will be identified in consultation with the State Division of Forestry and the Alaska Fire Service. The vegetative mat must remain intact.
   c)   In the Tanana Flats, periodic maintenance of cleared segments within the ROW will be limited to winter time activities when there is 12 inches of snow on the ground and 12 inches of ground frost.
   d)   The edges of the ROW, where cleared, can be undulated to help the cleared areas blend with surrounding vegetative patterns.
   e)   Where possible, the ROW will use natural openings in the vegetation and reduce the need for clearing.
   f)   Brush cutting and clearing in wetland areas will be conducted by hydroaxe or hand.

32. **Vegetation Screening.** Use of the transmission line ROW for access to remote areas will be discouraged by leaving brush within the ROW. Where the ROW crosses streams or trails, a screen of vegetation will be maintained to reduce access to the ROW from these areas.

33. **Visual Impacts.** At river and trail crossings, towers will be placed in a manner that will minimize visual impacts. Clearing will be minimized and existing vegetation (excluding tall trees) left within the ROW, where deemed appropriate for mitigation of visual impacts. Care will also be taken to minimize long, straight ROWs, skylining of structures, and other situations which increase visual impacts in areas that are considered to have high visual sensitivity.

34. **Tree salvage.** All trees will be felled and left in place. The appropriate agency will make a determination if a significant salvage value exists and if salvage of the trees will be necessary.

35. **Surface Restoration.** In construction areas where ground disturbance is significant or where recontouring is required, surface restoration would occur as required by the land owner or land management agency. The method of restoration would consist of returning disturbed areas back to their natural contour and revegetating with native species.

36. **Existing Access.** In areas where soils and vegetation are particularly sensitive to disturbance, existing access roads will not be widened or otherwise upgraded for construction and maintenance, except where repairs are necessary to make existing roads passable. If authorization for existing access does not exist, then appropriate permits will be obtained.

37. **Stream Crossings.**
    a)   To minimize disturbance to vegetation, drainage patterns, stream channels, and streambanks, new access will be built to the extent practicable at right angles to streams and washes. Crossings of incised streams will be done in a manner which avoids disturbance or sloughing of stream banks. Temporary bridges (structural, snow, or ice) will be employed where bank damage cannot be avoided.
    b)   Stream crossings on the Tanana Flats will be accomplished by constructing an ice bridge across the stream or by placing and removing a temporary bridge, such as an open truck bed, across the stream and removing it after construction.
    c)   River crossings will be marked to assure military and civilian aviation safety. Towers from the Tanana River crossing to Salchaket, and as needed from Salchaket to Nenana, will be marked with color/IR reflectors on the south side of the towers. Towers at the Tanana River crossing will be painted red and white, and marked with strobe lights.
    d)   Construction activities near anadromous fish streams will be timed to avoid salmon runs.

38. **Structure Placement.** Structures will be placed so as to avoid sensitive features as much as possible, including riparian areas, water courses, and cultural sites. The structures will be located 200 feet from named or designated streams where possible; however, at the Tanana River crossing, structures may need to be sited within 200 feet of the Tanana River.

39. **Guy Wires.** The lower 10 feet of guy wires on all towers will be marked with devices to enhance their visibility.

40. **Metal Finishes.** Dulled metal finishes will be used on all towers, and on the wires where applicable.

41. **Radio and TV Interference.** GVEA will respond to complaints of radio or television interference generated by the transmission line by investigating the complaints and implementing appropriate mitigation measures.

42. **Aviation Warnings and Handouts.** GVEA will notify the general aviation public of the presence of the new intertie and ensure that the project is noted on the appropriate Federal Aviation Administration (FAA) aeronautical charts. Special emphasis will be placed on the towers and wires crossing the Tanana and Nenana Rivers. Handouts with a detailed description of the power line routing showing tower size and location of towers over 100 feet will be provided. These handouts would be made available in all flight service stations and fixed base operators at airports throughout the state. Handouts will be placed at aerial ports of entry where aircraft normally clear customs coming from Canada. These handouts will be supplied for a 2-year period after construction.

43. **Wildlife Mitigation.**
   a)   Raptor surveys will be conducted in identified areas of concern along the selected route prior to construction to document Golden Eagle, Bald Eagle, and other raptor nest locations within 330 feet of the ROW.

   b)   A 330-foot buffer zone will be identified around all Bald Eagle and Golden Eagle nests. Construction or ground clearing will not be allowed within this buffer zone. Human activities will not be allowed within or through this buffer zone during the nesting period.

   c)   Construction or ground clearing will not occur within 2.0 miles of all active Peregrine Falcon nests.

   d)   Except for emergency repairs, construction and maintenance activities will not occur from April 15 through June 15 within ROW Segments 7, 16, and 22. Helicopter construction activities will avoid active swan nests from May 1 through August 31 along the entire ROW by a minimum distance of 1.0 mile.

   e)   Transmission line design will minimize the potential for Trumpeter Swan and Sandhill Crane collisions by ensuring that: a) transmission line wires (other than the static line) will be strung on one horizontal plane rather than in multiple, vertical stacks; b) phase wires will be of the same diameter; and c) wires will be well marked where they cross major rivers. Wire in other areas identified as having a high potential for conflicts with Trumpeter Swans and other waterfowl will be marked.

   f)   Aerial Markers will be installed on static wires at spans that cross the Nenana, Tanana, and other named rivers. These markers will be used in other areas when deemed necessary to reduce hazards to aviation and birds.

   g)   GVEA will conduct a 3-year post-construction monitoring study on selected portions of the transmission line to evaluate bird collision mortality along selected portions of marked and unmarked segments of the transmission line, in consultation with the BLM, USFWS, USARAK, and ADF&G. Following the 3-year monitoring effort, GVEA and the agencies will evaluate the study and determine the need for additional marking devices. GVEA will be required to implement additional mitigation as needed based on the results of the study. Any additional monitoring will be the responsibility of the concerned agency.

44. **Thermosyphons.** Where necessary, thermosyphons will be used at foundations to stabilize ground temperatures in areas of warm permafrost.

# APPENDIX A
## STIPULATIONS

Stipulation 1.
Prior to construction, all field personnel will be instructed on the protection of ecological, paleontological, and cultural resources. To assist in this effort, the construction contract will address federal and state laws regarding vegetation (including wetlands), wildlife (including protected species), and cultural resources, as well as stressing the importance of these resources and the purpose and necessity of protecting them.

Performance Criteria:
Instructional classes will be held when the contractors are identified and prior to the beginning of construction activities. All contractors will attend these meetings prior to starting work. The A.O. will determine the time, place, and content of the instruction.

Timing:
Instructional activities will take place prior to commencement of construction activities. New contractors hired after construction commences will receive these instructions prior to starting work.

Effectiveness Criteria:
All contractors will attend these meetings before being allowed to proceed. Contractors hired after construction commences will be required to attend training classes prior to starting work.

Stipulation 2.
In accordance with state and federal regulations, land managers will coordinate with the State Historic Preservation Office (SHPO). Cultural resources will continue to be considered during project implementation in areas that are classified as having cultural resource potential by the land managers and the SHPO. This will involve surveys to inventory and evaluate cultural resources within the ROW and any impacted areas outside of the ROW, such as access roads and construction equipment yards. In consultation with the appropriate land managing agencies and the SHPO, specific mitigation measures will be developed and implemented to mitigate any identified adverse impacts. These may include project modifications to avoid adverse impacts, monitoring of construction activities, and data recovery studies. In the event of inadvertent discoveries of cultural or paleontological resources during construction, such construction will be stopped until the resources are evaluated by a qualified specialist.

Performance criteria:
A cultural resources survey and plan will be prepared for the entire route of the powerline. Any potential impacts identified will be mitigated through monitoring, recovery, or project modification. Project construction or maintenance activities will cease immediately upon discovery of cultural or paleontological resources until they are evaluated by a qualified specialist.

Timing:
Cultural and paleontological resources will be protected continuously during construction and during all maintenance activities after construction is completed.

Effectiveness criteria:
Construction and maintenance activities do not result in the loss of any cultural or paleontological resources.

Stipulation 3.
Prior to construction, site-specific fuel hazard reduction criteria will be

developed by ADNR Division of Forestry and the BLM Alaska Fire Service to
protect the power line while allowing for burn through.  These criteria will
ggest the minimum amount of clearing or other treatment needed to protect
.e line from fire.

Performance criteria:
1.  ADNR, Division of Forestry, Alaska Department of Fish and Game, BLM
Northern Field Office, and BLM Alaska Fire Service will identify areas of
dense black spruce that will require clearing to ground level.
2.  Specific areas identified in the fuel hazard reduction plan will be
periodically cleared after construction to maintain protection for the power
line while allowing for burn through of the right-of-way without causing
damage.

Timing:
Fuel hazard reduction plan development, review and approval prior to
construction; implementation monitored during construction and maintenance;
performance evaluation following construction.

Effectiveness criteria:
The wildland fire intensities and durations will not be sufficient to cause
substantial conductor, insulator, and tower failure along the transmission
line, while allowing fire to burn through.


Stipulation 4.
No construction camps will be established along the ROW.  Construction crews
are expected to be able to find housing within communities along the Parks
Highway, particularly in Healy, Nenana, and Fairbanks.  Construction crews
will be transported to work sites daily using appropriate vehicles.

Performance criteria:
C  )s for housing construction personnel will not be allowed.  Construction
c.  /s will be transported to and from the construction site on a daily basis
in a manner which will not cause vegetative mat or soil disturbance.

Timing:
This requirement will be monitored and enforced during the construction phase
of the project.  Any future long term maintenance will be conducted pursuant
to this stipulation.

Effectiveness criteria:
The A.O. will conduct on site inspections to ensure no camps are constructed.
Inspection will also be accomplished to ensure transportation activities are
not causing vegetative mat or soil disturbance.

Stipulation 5
All construction-related waste, including trash and litter, garbage, other
solid waste, petroleum products, and other potentially hazardous materials,
will be properly handled in accordance with state and federal regulations and
permit requirements and removed to a permitted disposal facility.

Performance criteria:
All waste, whether solid, petroleum, or potentially hazardous will be
backhauled on a regular basis and disposed of according to state and federal
regulations.  No stockpiling of trash will be allowed on site.

Timing:
Timing for this requirement is during the construction phase of the project
and during any maintenance activities.

Effectiveness criteria:
The A.O. will inspect the construction site to ensure all waste is removed.

St_  ilation 6.

000011

The areal limits of construction activities and access will be clearly marked. No permanent discoloring agents will be applied to rocks or vegetation to dicate survey or construction activity limits.

Performance criteria:
Flourescent vinyl flagging, water soluble paint, or other appropriate non permanent methods will be used to mark the limits of construction activities, including access roads.  Remarking, if required, will be done in the same manner.

Timing:
Timing for this requirement is prior to and during construction.

Effectiveness criteria:
Post-construction monitoring will verify non permanent markings were used to delineate work limits and access areas.

Stipulation 7.
The ROW will be aligned in coordination with appropriate landowners and managers, including mining and military operations, to minimize the potential adverse effects on current and future land uses.

Performance criteria:
Alignment of the right-of-way may be adjusted to alleviate impacts to the military mission and mining operations.  Adjustments in the alignment will be determined by the authorized officer.

Timing:
Any necessary right-of-way alignment adjustments will be determined through field survey prior to construction.

Effectiveness criteria:
final alignment of the right-of-way will be reviewed by the appropriate ncy to ensure all concerns have been addressed.

Stipulation 8.
To minimize potential environmental impacts during construction, vehicle trips along the ROW will be kept to a minimum.  To the extent practicable, construction equipment will be left within the project area rather than driven out on a daily basis.  Servicing of equipment will be done within state and federal guidelines.

Performance criteria:
Construction equipment will not be allowed daily access to and from the construction area.  Equipment will be left in place when construction is not occurring.  Maintenance will be done on site to the extent practicable.

Timing:
Timing of this stipulation is during construction.

Effectiveness criteria:
The A.O. representative will monitor construction activities to ensure vehicles are being left in the project area during construction.

Stipulation 9.
Clearing of streamside vegetation (as approved by the authorized officer) will only be done to the extent necessary to allow access for construction and maintenance equipment and to provide clearance for wires.  Clearing within these areas will be conducted by hand.

Performance criteria:
1.  Clearing of streamside vegetation will be done only at the approval of the authorized officer and only to the extent necessary to allow access for
c   truction equipment and provide clearance for wires.
2   Clearing of streamside vegetation (within 100 feet of the stream) will be

done by hand.

ming:
...iming of this stipulation is during construction.

Effectiveness criteria:
1.  Field verification that streamside vegetation is cleared only at the approval of the A.O. and only to the extent necessary to allow access for construction equipment and provide wire clearance.
2.  Verification that clearing is done by hand.

Stipulation 10.
Use of the transmission line ROW for access to remote areas will be discouraged by leaving brush within the ROW.  Where the ROW crosses streams or trails, a screen of vegetation will be maintained to reduce access to the ROW from these areas.

Performance criteria:
All vegetation cut during the construction of the line will be left in place. Brush will not be cut at its intersection with creeks and existing access trails.

Timing:
Timing of this stipulation is during construction.

Effectiveness criteria:
The line will be constructed in a manner which does not facilitate new access to remote areas.

Stipulation 11.
At river and trail crossings, towers will be placed in a manner that will minimize visual impacts.  Clearing will be minimized and existing vegetation (   luding trees above 10 feet) left within the ROW, where deemed appropriate f   mitigation of visual impacts. Care will also be taken to minimize long, straight ROWs, skylining of structures, and other situations which increase visual impacts in areas that are considered to have high visual sensitivity.

Performance criteria:
1.  All transmission line towers/structures will be a minimum distance of 200 feet from river and trail crossings, except at the Tanana River crossing.
2.  Clearing will be minimized within the ROW and existing vegetation (excluding trees above 10 feet) will be left except where required by stipulation 3.
3.  Long, straight corridors will be minimized, and skylining of structures avoided in foreground views from sensitive viewing locations especially:  Link 9, Milepost 12.3-13.3; Link 16, Milepost 25.5-31.0; and Link 22, Milepost 24.2-25.6.

Timing:
Prior to start and during construction.

Effectiveness criteria:
1.  Verification in the field that that all transmission line towers/structures will be a minimum distance of 200 feet from the above specified river and trail crossings, except at the Tanana River crossing.
2.  Verification that powerline ROW clearing is not visually prominent.

Stipulation 12.
All trees will be felled and left in place.  The appropriate agency will make a determination if a significant salvage value exists and if salvage of the trees will be necessary.

Performance criteria:
Al   rees cut during construction will be left in place.  Marketable timber may   e salvaged if of significant value and if such salvage can be done in an

environmentally safe manner.

ning:
.ming for this stipulation is during construction

Effectiveness criteria:
Verification in the field that all cut brush and trees are left within the right-of-way or any salvage operation is done in an environmentally sound manner.

Stipulation 13.
In construction areas where ground disturbance is significant or where recontouring is required, surface restoration would occur as required by the land owner or land management agency. The method of restoration would consist of returning disturbed areas back to their natural contour and revegetating with native species.

Performance criteria:
Surface restoration will be conducted as required by the managing agency or the land owner. Disturbed areas will be returned to their natural contour. Any revegetation required by the A.O. will be done with native species.

Timing:
Timing for this stipulation is during construction.

Effectiveness criteria:
Field verification of proper restoration and revegetation.

Stipulation 14.
In areas where soils and vegetation are particularly sensitive to disturbance, existing access roads will not be widened or otherwise upgraded for construction and maintenance, except where repairs are necessary to make e ting roads passable. If authorization for existing access does not exist, t. appropriate permits will be obtained.

Performance criteria:
1. No widening of existing roads is allowed in areas where soils and vegetation are particularly sensitive to disturbance. Repairs may be made to the roadbed to the extent necessary to allow passage.
2. Appropriate permits will be obtained as required where access does not exist.

Timing:
1. The timing for maintenance on existing roads is prior to and during construction as appropriate.
2. Any required permits will be obtained prior to construction.

Effectiveness criteria:
1. Field verification that access improvements do not result in disturbance to sensitive soils or vegetation.
2. Verification that all required permits have been obtained.

Stipulation 15.
To minimize disturbance to vegetation, drainage patterns, stream channels, and streambanks, new access will be built to the extent practicable at right angles to streams and washes. Crossings of incised streams will be done in a manner which avoids disturbance or sloughing of stream banks. Temporary bridges (structural, snow, or ice) will be employed where bank damage cannot be avoided.

Performance criteria:
Access required for construction activities will be placed at right angles to stream crossing where practicable. No construction will take place at incised st ms which would cause sloughing of its banks. If construction is nec sary in these areas, appropriate bridges (determined by the A.O.) will be

constructed to minimize impacts.

ming:
..ming of this stipulation is during construction and maintenance activities.

Effectiveness criteria:
Stream crossings will be conducted in a manner which minimized impacts to the banks and fish habitat. Field examination by the A.O. will determine how crossings are accomplished.

Stipulation 16.
Structures will be placed so as to avoid sensitive features as much as possible, including riparian areas, water courses, and cultural sites. The structures will be located 200 feet from named or designated streams where possible; however, at the Tanana River crossing, structures may need to be sited within 200 feet of the Tanana River.

Performance criteria:
1. Structures will be located to avoid riparian areas.
2. No impacts will be allowed on cultural sites.
3. No structure will be installed within 200 feet of streams or other water bodies unless deemed necessary by the A.O.

Timing:
Timing of this stipulation is during construction.

Effectiveness criteria:
The A.O. will determine if sensitive features exist and the appropriate placement of structures to avoid impacts to these features.

Stipulation 17.
The lower 10 feet of guy wires on all towers will be marked with devices to ￼ ince their visibility.

Performance criteria:
The lower 10 feet of guy wires will be marked to enhance visibility in order to reduce potential impacts to recreationists and terrestrial wildlife.

Timing:
The guy wires will be marked as they are installed during construction.

Effectiveness criteria:
Guy wires are marked as determined by the A.O. to avoid impacts to recreationists and wildlife.

Stipulation 18.
Dulled metal finishes will be used on all towers, and on the wires where applicable.

Performance criteria:
1. All transmission line towers/structures, except at the Tanana River crossing, will have dulled non-reflective or self-weathering finishes.
2. Non-specular transmission wires will be installed in the following locations: Link 9, Milepost 12.3-13.3; Link 16, Milepost 25.5-31.0; and Link 22, Milepost 24.2-25.6.

Timing:
Prior to start of and during construction.

Effectiveness criteria:
1. Verification in the field that no new glare is created by above ground facilities within the transmission line ROW and that they blend into the surrounding landscape.
2. Verification in the field that no new glare is created by above ground fa..lities within the transmission line ROW from key observation points.

000015

Stipulation 19.
GVEA will respond to complaints of radio or television interference generated
by the transmission line by investigating the complaints and implementing
appropriate mitigation measures.

Performance criteria:
Complaints of interference will be investigated by GVEA. Appropriate
mitigation will be implemented and repairs made if required.

Timing:
Timing for this stipulation will be during the operation of the line after
construction.

Effectiveness criteria:
Investigation of complaints will be handled by GVEA in accordance with
industry guidelines.

Stipulation 20.
To minimize environmental impacts while maintaining standard operating
guidelines, GVEA will visually inspect the route by helicopter twice per year,
typically in March and September. Operations and maintenance problems
identified on the Tanana Flats will typically be addressed by a small repair
crew flown out to the tower site(s) by helicopter before spring thaw or after
fall freeze up. With the exception of emergency repair situations,
maintenance operations on the Tanana Flats will be avoided or modified during
critical periods to minimize impacts on wildlife.

Performance criteria:
1. GVEA will conduct twice yearly overflight inspections typically occurring
in March and September.
2. Any maintenance required in the Tanana Flats will be conducted by small
ground crews flown in to the site before spring thaw or after fall freeze up.
     Except for emergency repairs, maintenance operations will be avoided
during periods deemed critical by the A.O. to minimize impacts to wildlife.

Timing:
Inspection and maintenance operations occur post construction.

Effectiveness criteria:
1. Inspection flights occur typically during March and September.
2. Maintenance operations on the Tanana Flats are conducted by small ground
crews, flown to the site.
3. Maintenance operations do not occur during periods of time deemed critical
to wildlife management (see stipulation 28).

Stipulation 21.
GVEA will notify the general aviation public of the presence of the new
intertie and ensure that the project is noted on the appropriate Federal
Aviation Administration (FAA) aeronautical charts. Special emphasis will be
placed on the towers and wires crossing the Tanana and Nenana Rivers.
Handouts with a detailed description of the power line routing showing tower
size and location of towers over 100 feet will be provided. These handouts
will be made available in all flight service stations and fixed base operators
at airports throughout the state. Handouts will be placed at aerial ports of
entry where aircraft normally clear customs coming from Canada. These
handouts will be supplied for a 2-year period after construction.

Performance Criteria:
GVEA will prepare handouts that include maps showing the location of the
project, and information regarding tower heights. The handouts will be
distributed for a two year period to the locations specified in the
stipulation. Crossings of the Tanana and Nenana Rivers, and any towers over
100 feet in height will be clearly depicted.
2. GVEA will work with the FAA to ensure that the aeronautical charts are

000016

updated to include the location of the project.

Timing:
     These actions will begin after survey and design is completed, and prior to tower placement.
2.   The actions will continue for two years after construction is completed.

Effectiveness Criteria:
1.   GVEA will check the specified locations quarterly to ensure that the handouts are available in sufficient quantities.  Additional handouts will be sent to any location where needed, or when requested by the facility.  Reports will be filed quarterly with the A.O. showing the contacts made and the results of the contacts.
2.   FAA aeronautical charts will be checked by the A.O. to ensure the information regarding the transmission line has been properly placed on the appropriate charts.

Stipulation 22.
 No permanent access will be constructed in the Tanana Flats.  Winter access for construction will occur only after there is a minimum of 12 inches of snow on the ground and a 12-inch depth of ground frost.  There will be no blading or disturbance of the vegetation mat.

Performance Criteria:
1.   Construction will not occur if there is less than 12 inches of snow on the ground.  If natural snow is not available then artificial snow can be made and used.
2.  Construction will not occur if there is less than 12 inches of ground frost.
3.   There will be no blading of soil or disturbance to the vegetation mat.

Timing:
The timing of this stipulation will be during construction and post construction and will include construction and maintenance activities.

Effectiveness Criteria:
1.   The A.O. will determine when the conditions regarding snow cover and ground frost are appropriate for construction and maintenance activities to occur.
2.   The A.O. will conduct regular on-site compliance inspections to insure that blading of the soil and disturbance to the vegetative mat is not occurring.

Stipulation 23.
Stream crossings on the Tanana Flats will be accomplished by constructing an ice bridge across the stream or by placing and removing a temporary bridge, such as an open truck bed, across the stream and removing it after construction.

Performance Criteria:
1.   Stream crossings in the Tanana Flats will be done only when there is a snow, ice, or temporary bridge in place.
2.   Any temporary bridge used will be removed after construction or prior to breakup, which ever is first.

Timing:
The timing of this stipulation will be during construction and post construction and will include construction and maintenance activities.

Effectiveness Criteria:
1.   The A.O. will determine the location of all snow, ice, or temporary bridges.
2.   The A.O. will determine when any temporary bridge needs to be removed after construction or before breakup.

ipulation 24.

ver crossings will be marked to assure military and civilian aviation safety.  Towers from the Tanana River crossing to Salchaket, and as needed from Salchaket to Nenana, will be marked with color reflectors on the south side of the towers.  Towers at the Tanana River crossing will be painted red and white, and marked with white strobe lights.

Performance Criteria:
1.  Appropriate markers will be placed on the line at river crossings designated by the BLM (see stipulation 30),
2.  Towers located between the Goose Island crossing and Salchaket will be marked with reflectors on the south side of the structure.  Towers from Salchaket to Nenana will be marked where needed for aviation safety.
3.  Towers at the Tanana River crossing will be painted red and white, and marked with white strobe lights.

Timing:
This activity will be completed during construction and post construction if tower replacement occurs.

Effectiveness Criteria:
1.  Marker balls or other appropriate devices are installed at all river crossings designated by the A.O.
2.  Reflectors are installed on the south side of all towers from Goose Island to Salchaket, and on towers between Salchaket and Nenana as specified by the A.O.
3.  The towers at the Tanana River crossing are painted red and white and white operating strobe lights have been installed to mark the towers.

Stipulation 25.
R tor surveys will be conducted in identified areas of concern along the s cted route prior to construction to document Golden Eagle, Bald Eagle, and other raptor nest locations within 330 feet from the edge of the ROW.

Performance Criteria:
1.  A preconstruction survey will be conducted to identify Golden Eagle, Bald Eagle, Peregrine Falcon and other raptor nest sites.
2.  The preconstruction survey will be conducted by qualified biologists approved by the BLM.
3.  Monitoring will focus on the Tanana and Nenana Rivers, especially for Bald Eagle, Peregrine Falcon and other raptors, and any segments along the Alaska Range, especially for Golden Eagle.  The qualified biologist will identify any other areas that may require inclusion in the survey.
4.  GVEA will submit the preconstruction survey report to the BLM.

Timing:
This activity will occur prior to construction.

Effectiveness Criteria:
1.  An acceptable report will be submitted to the BLM prior to construction.

Stipulation 26.
A 330-foot buffer zone will be identified around all Bald Eagle and Golden Eagle nests. Construction or ground clearing will not be allowed within this buffer zone.  Human activities will not be allowed within or through this buffer zone during the nesting period.

Performance Criteria:
1.  330 foot buffer zones will be established based on the report required by stipulation 25.
2.  o construction or ground clearing activities will occur within the

defined buffer zones.
3.  Human activities will not occur within the buffer zones during the nesting
    iod (see stipulation 28).

Timing:
Buffer zones will be identified prior to construction.  Avoidance of the
buffer zones will occur during construction and during post construction
maintenance activities.

Effectiveness Criteria:
1.  Construction and ground clearing activities did not occur within the
buffer zones.
2.  Human activities did not occur within the buffer zones during the nesting
period.

Stipulation 27.
Construction or ground clearing will not occur within 2.0 miles of all active
Peregrine Falcon nests.

Performance Criteria:
1.  Based on the report required by stipulation 25, two mile wide buffer zones
will be established around any American Peregrine Falcon nesting sites.
2.  All construction and maintenance activities will be prohibited within the
buffer zone during the nesting period.  The nesting period includes the period
from nest initiation through fledging (see stipulation 28).

Timing:
The two mile wide buffer zones will be delineated prior to construction
activities.  Prohibition of construction activities will occur during
construction and post construction maintenance activities.

Effectiveness Criteria:
1   The two mile wide buffer zones were defined prior to construction
activities.
2.  No construction and maintenance activities occurred within the buffer
zones during the nesting period.

Stipulation 28.
Except for emergency repairs, construction and maintenance activities will not
occur from April 15 through June 15 within ROW Segments 9, 16, and 22.
Helicopter construction activities will avoid active swan nests from May 1
through August 31 along the entire ROW by a minimum distance of 1.0 mile.

Performance Criteria:
1.  Construction and maintenance activities will not occur on Segments 9, 16,
and 22 from April 15 through June 15.
2.  Helicopter construction activities will not be conducted within one mile
of active swan nests during the period of May 1 through August 31.  This will
be in effect for the entire ROW.
3.  Emergency repairs may be conducted within these time frames if methods and
mitigation of impacts are first approved the the A.O.

Timing:
This stipulation will be in effect prior to construction, during construction,
and for monitoring and maintenance activities after construction.

Effectiveness Criteria:
1.  Construction and maintenance activities did not occur on segments 9, 16,
and 22 during the period of April 15 through June 15.
2.  On the entire length of the ROW helicopter activities did not occur within
one mile of active swan nests during the period of May 1 through August 31.
3.  Emergency repairs within these time frames were conducted with the
a̱  val of the A.O. to mitigate for impacts to nesting birds.

Stipulation 29.

...nsmission line design will minimize the potential for Trumpeter Swan and
...ndhill Crane collisions by ensuring that :(a) transmission line wires (other
than the static line) will be strung on one horizontal plane rather than in
multiple, vertical stacks; b) phase wires will be of the same diameter; and c)
wires will be well marked where they cross major rivers.  Other areas
identified as having a high potential for conflicts with Trumpeter Swans and
other waterfowl will be marked.

Performance Criteria:
1. Based on a one year pre-construction study to monitor bird activity and
flight patterns adjacent to the intertie ROW, bird diverters will be placed on
the static wires to minimize potential for avian collisions with the
transmission line.
2.  The study will be conducted by qualified biologists approved by the BLM.
3.  The placement of bird diverters will be approved by the BLM prior to
implementation.
4.  Bird diverters to be installed will be of the bird flight diverter type,
such as the BFD-4, and be staggered on the lines such that the markers appear,
on approach to the line, to be 5m apart, as described on pages 55 and 66: in
Avian Power Line Interaction Committee (APLIC). 1994.  Mitigating Bird
Collisions with Power Lines: The State of the Art in 1994.  Edison Electric
Institute.  Washington, D.C.

Timing:
The one year study will be completed before construction.  The bird diverters
will be installed during construction.  If the three year post-construction
monitoring study indicates additional areas where diverters are needed,
additional markers will be installed after construction.

Effectiveness Criteria:
1.  Bird diverters were installed based upon the pre-construction study.
2.  The type of diverters specified were installed.
3.  Additional or different type diverters were installed where needed as
described by the findings of the three year monitoring study (stipulation 31).
Transmission line design will minimize the potential for Trumpeter Swan and
Sandhill Crane collisions by ensuring that: a) transmission line wires (other
than the static line) will be strung on one horizontal plane rather than in
multiple, vertical stacks; b) phase wires will be of the same diameter; and c)
wires will be well marked where they cross major rivers.  Other areas
identified as having a high potential for conflicts with Trumpeter Swans and
other waterfowl will be marked.

Stipulation 30.
Aerial Markers will be installed on static wires at spans that cross the
Nenana, Tanana, Wood and other named rivers.  These markers will be used in
other areas when deemed necessary to reduce hazards to aviation and birds.

Performance Criteria:
1.  Appropriate aerial markers will be placed on static wires that span rivers
and where deemed necessary by the A.O.
2.  This will include markers appropriate for aviation safety and additional
markers to decrease hazards to birds.

Timing:
Aerial markers will be installed during construction and maintained for the
life of the project.  If after construction, unmarked areas are creating
hazards to aviation and birds, further marking will be necessary.

Effectiveness Criteria:
Appropriate aerial markers were installed at all locations specified by the
A.

Stipulation 31.

A will conduct a 3-year post-construction monitoring study on selected
tions of the transmission line to evaluate bird collision mortality along
marked and unmarked segments of the transmission line, in consultation with
the BLM, USFWS, USARAK, and ADF&G. Following the 3-year monitoring effort,
GVEA and the agencies will evaluate the study and determine the need for
additional marking devices. GVEA will be required to implement additional
mitigation as needed based on the results of the study. Any additional
monitoring will be the responsibility of the concerned agency.

Performance Criteria:
1. GVEA will implement a contract for a three year monitoring study.
2. The study will be conducted by qualified biologists approved by the BLM.
3. The plan for the study will be approved by the BLM prior to
implementation.
4. The results of the study will be given to BLM with recommendations related
to additional mitigation if necessary, and a determination whether collision
rates fall within acceptable thresholds for swans, cranes, other waterfowl,
passerines, and shorebirds.

Timing:
This stipulation will be in effect after construction.

Effectiveness Criteria:
1. A three year contract was issued by GVEA for a collision and mortality
study testing the effectiveness of the mitigation for the project.
2. The study was conducted by qualified biologists that had been approved by
the BLM.
3. The plan for the study was approved by BLM prior to implementation.
4. The results of the study were given to the BLM in a manner that allowed
decisions regarding additional mitigation and a determination of whether or
n  collisions were within acceptable thresholds for these species.

Stipulation 32.
To allow for safety and engineering concerns, all trees higher than 10 feet
may be cleared within 75 feet of the centerline. Clearing to ground level up
to 150 feet either side of the centerline will be allowed in areas where large
stands of black spruce occur and a danger from forest fires is expected.

Performance Criteria:
1. Clearing will be selective and only vegetation taller than 10 feet will be
cleared from the ROW except at tower locations, areas of dense black spruce,
and where vegetation is cleared to allow equipment access for construction.
2. Clearing of vegetation under 10 feet in height will only occur in areas
designated by the BLM A.O., and will include tower locations and the
construction access route.

Timing:
This stipulation will be in effect during construction and during post
construction maintenance activities.

Effectiveness Criteria:
1. Clearing was selective, and only vegetation taller than 10 feet was
cleared except in areas designated by the BLM.


C.  Additional Mitigation Measures Developed in the EIS.


The following mitigation measures were developed during the EIS process and
are not part of GVEA's design features. The following mitigation measures
wi  be brought forward as stipulations in the ROW grant.

Stipulation 33.
Where necessary, thermosyphons will be used at foundations to stabilize ground
temperatures in areas of warm permafrost.

Performance Criteria:
Thermosyphons will be utilized in those areas where the temperature of the
permafrost is found to be 30 degrees or warmer, based on geotechnical
recommendations.

Timing:
Thermosyphons will be installed during construction, and maintenance will
occur post construction for the life of the project.

Effectiveness Criteria:
1.   The A.O. will determine where thermosyphons will be required after
reviewing the geotechnical recommendations.
2.   The A.O. will ensure compliance by on-site inspections during the
construction phase of the project.

Stipulation 34.
In the Tanana Flats, periodic maintenance of cleared segments within the ROW
will be limited to winter time activities when there is 12 inches of snow on
the ground and 12 inches of ground frost in the soil.

Performance Criteria:
1. Prior to maintenance activities, GVEA will contact the A.O. at least two
weeks prior to the commencement of the maintenance activities.
2.   The A.O. will determine if the conditions of one foot of snow cover and
one foot of ground frost are met and if activities can begin.

Timing:
The timing of this stipulation will occur post construction for the life of
the project.

Effectiveness Criteria:
GVEA will not maintain any of the clearing in the Tanana Flats unless the A.O.
has determined that the conditions are appropriate for the maintenance to
proceed.

Stipulation 35.
The edges of the ROW, where cleared, can be undulated to help the cleared
areas blend with surrounding vegetative patterns.

Performance Criteria:
Where clearing of the ROW is necessary, the edges will be "feathered" to
minimize the linear visual prominence of the ROW.

Timing:
During construction.

Effectiveness Criteria:
Verification in the field that the edges of the ROW do not significantly
contrast with adjacent landscape

Stipulation 36.
Where possible, the ROW will use natural openings in the vegetation and reduce
the need for clearing.

Performance Criteria:
1.   The A.O. will work with GVEA in the siting of the transmission line and
access to be used for construction and maintenance.
2.   The A.O. will direct access through natural openings where possible.

Timing:
The timing of this stipulation will occur during construction of the project.

000022

Effectiveness Criteria:
GVEA will not deviate from the access delineated by the A.O.

Stipulation 37.
Brush cutting and clearing in wetland areas will be conducted by hydroaxe or hand.

Performance Criteria:
GVEA will have all brush cutters approved by the A.O. prior to use on the project.

Timing:
This stipulation will be in effect during construction and for post-construction clearing activities.

Effectiveness Criteria:
GVEA will only use clearing equipment previously approved by the A.O. for the clearing and clearing maintenance activities associated with the project.

Stipulation 38.
Construction activities near anadromous fish streams will be timed to avoid salmon runs.

Performance Criteria:
Construction activities will occur in the winter after the appropriate amount of snow and frost in the ground occurs.

Timing:
This stipulation is in effect during construction and post construction maintenance activities.

Effectiveness Criteria:
Construction and maintenance activities occurred at appropriate times.

Stipulation 39.
The ROW should be located at least .75 miles from the boundary of the Larry Drop Zone to ensure jumper safety.

Performance Criteria:
1.  GVEA will engineer and design the project to accommodate the .75 mile restriction around the Larry Drop Zone.

Timing:
This stipulation will be in effect prior to and during construction.

Effectiveness Criteria:
The A.O. will coordinate with the Army to ensure that the project location allows a .75 mile buffer around the Larry Drop Zone.


Additional Stipulations Required by U.S. Army.
U.S. Army Nonobjection No. DACA85-9-99-16 contained eight additional stipulations pertaining to GVEA's use of the Right-of-Way. Additional coordination between BLM, GVEA, and the Army will take place prior to construction activities to insure proper conformance with the Army stipulations.  The additional stipulations (a. through i.) are listed below.

a:  GVEA is responsible for placing signs south of the Tanana River near the Fort Wainwright boundary notifying the public that motorized vehicles, including all terrain vehicles (ATV's) and snowmobiles, are prohibited from using the powerline right-of-way.  Additional signs are to be placed along the military reservation boundary to inform the public that they are entering a military installation and are subject to USARAK regulations.

b:    This stipulation concerned interagency coordination and is not applicable to GVEA.

c.    GVEA will make a concerted effort to allow natural vegetation to remain undisturbed near the location where the power line traverses the Tanana River shoreline.  This will preclude attracting individuals using recreational vehicles and aid in preventing unauthorized access onto Fort Wainwright military lands.

d:    GVEA's access to and use of the power line right-of-way area, as described in Exhibit A, shall be restricted to personnel and activities authorized in writing by the Army (Commander, U.S. Army Pacific).  Prior to granting authorization, the Army may impose such terms and conditions on use that it deems reasonable and appropriate, including, but not limited to, ordnance characterization and clearance in accordance with (f) below, personnel safety briefings, waivers, and reporting requirements.

e:    GVEA acknowledges that the power line right-of-way area contains ordnance and explosives (OE) that pose a potential safety hazard to those entering upon the premises.  GVEA covenants and agrees to: (1) notify any persons entering upon the power line right-of-way area under this right-of-way grant of the potential safety hazard and (2) ensure that such persons have written authorization from the Army, as provided for in (d) above.

f:    GVEA covenants and agrees that it will be responsible, at its sole cost, for all OE survey and clearance work required by the Army as a condition to authorizing GVEA's entry, construction, and other activities upon the power line right-of-way area.  Prior to conducting OE characterization and clearance work, GVEA shall obtain prior written approval of said characterization and clearance plans and the disposal techniques to be employed from the Commander, U.S. Army Pacific.

g    Notwithstanding any approval by the Army, in the event GVEA or its successors or assigns undertakes any OE survey, clearance, or disposal work under (f) above, GVEA covenants and agrees to indemnify and hold harmless the United States, its officers, agents and employees, from and against all suits, claims, demands or actions, liabilities, judgements, costs and attorneys' fees arising out of, or in any manner predicated upon the OE survey, clearance, or disposal work conducted by GVEA, its successors or assigns or the agents, employees or contractors thereof.

h:    GVEA will locate the alignment of the power line no further south than one kilometer of the southern oxbows of the Tanana River.

i:    There will be no continuous linear excavations within the right-of-way that parallel the configuration of the power line.

000024

# EXHIBIT 5

FILE COPY


## AGREEMENT
## SUBCONTRACT No.   2002-01

This Agreement is between **Global Power & Communications, LLC** (hereinafter "GPC") and **Cruz Construction, Inc.** (hereinafter "Subcontractor").

**Effective Date of Agreement:**    December 3, 2001

**Termination Date of Agreement:**  April 30, 2003

**Scope of Work Summary:** The "Project" is know as the Northern Intertie Project 230 kV Transmission Line, GVEA Contract NI-8, Tanana Flats Section whereas the subcontractor will construct and maintain approximately 78 miles of ice roads during construction seasons 2001-2002 & 2002-2003.

**Pricing Method:** Lump Sum not to exceed $

### Contractor Information:

Company     Global Power & Communications, LLC
Address     6700 Arctic Spur Road
City, St, Zip  Anchorage, Alaska 99518

Telephone No.:    907-646-3204
Facsimile No.:    907-646-3207

Contract Representative
Mike Gearhart

Technical Contact:
_____
_____

### Subcontractor Information:

Contact:
Dana M. Cruz VP
Cruz Construction, Inc.
HCO4 Box 9323
Palmer, Alaska 99645

Telephone:    907-746-3144
Facsimile:    907-746-5557

Subcontractor's Tax I.D. No:    92-0136415

Alaska Business License:     134176 (expires December 2002)

Alaska Contractor's License No:      22860 (expires December 2002)

Subcontractor's Payment Remittance Address:   Cruz Construction, Inc.
HCO1 Box 9323
Palmer, Alaska 99645

**Owner:** Golden Valley Electric Association, Inc.

**Contract Documents:** The Contract Documents comprise the Subcontract and consist of the following:

A.  This Agreement
B.  The plans, specifications, terms and conditions, and changes and clarifications to the prime contract and the contract between CONTRACTOR and the Prime Contractor as of this date.
C.  Change Orders
D.  Contract Amendments

Contractor and Subcontractor agree as follows:

1.    **Scope of Work and Prosecution Thereof**
      Subcontractor will provide materials, equipment, qualified and capable personnel with the expertise to perform work in accordance with contract documents. Subcontractor will commence work upon written notification to do so from CONTRACTOR, will prosecute and complete the work expeditiously, efficiently, in a good workmanlike manner, and in strict accordance with the Contract Documents and with CONTRACTOR's latest schedule, and will include all items necessary for the proper execution and completion of the work which is described as follows: The subcontractor will build and maintain for two winter construction seasons approximately 78 miles of ice roads. For the purpose of measurement ice road construction includes 8 miles along the Rex Trail, 5 miles along the Cosna Access Road known as the Winter Trail and 65 miles along the transmission line trail. Ice Road construction and maintenance includes building and maintaining an ice road sufficient in width and strength to be used for the passage of heavy pile driving equipment, pickup trucks and loaded semi-tractor trailer material transportation equipment. Equipment will weigh in the excess of 70 tons. As ice road construction passes tower locations, tower pads will be established and maintained at all tower locations. Work scope includes mobilization of equipment and personnel on or about the first week in December 2001 (the first year) and December 2002 (the second year) with ice road construction started by December 6, 2001 and December 11, 2002 respectively. Ice road construction and maintenance will continue to approximately April 1 of each year. Work is weather dependent, which is further defined as weather conditions with temperatures below freezing which will enable ice road construction and maintenance to be successful. The attached ice road schedule indicates milestone dates required to successfully complete subcontractor's Work Scope. The work schedule attached is incorporated herein and is a part of the subcontractor's Scope of Work. This schedule starts ice road construction beginning at the Rex Trail and Cosna Winter Road, built simultaneously to gain access to the transmission line right-of-way. At the intersecting point of the Rex Trail and the transmission line trial, ice road construction will continue south to the project end and north along the transmission line trail to its intersection with Cosna Winter Road. Simultaneously ice road construction will be built from the intersection of Cosna Winter Road and the transmission line trail north to and including the Tanana River Ice Bridge further described as the northern end of the project. All ice road construction is scheduled to be complete by the last week of January 2002 for the first year's work and the first week of February 2003 in the second year.

      Subcontractor warrants that all materials and equipment supplied will conform to the Contract Documents and will be in new condition, of good quality and workmanship, free from defects, fit for their intended uses, and in strict compliance with applicable laws, rules, and regulations. Any portion of the Work found defective, non-compliant with the Contract Documents shall be immediately removed, replaced or corrected by Subcontractor without additional cost or risk to CONTRACTOR or Owner and without prejudice to any other rights or remedies of CONTRACTOR or Owner provided by law or equity. All guarantees and warranties of materials or equipment furnished by or through Subcontractor shall survive inspection, test and acceptance, and shall be for the benefit of CONTRACTOR and Owner.

      The Contract Documents are complimentary and what is required by any one shall be as binding as if required by all. Work not covered in the Contract Documents will not be required unless it is consistent therewith and is reasonably inferable therefrom as being necessary to produce the intended results.

2.    **Subcontract Price and Payments**
      CONTRACTOR agrees to pay the Subcontract Price to Subcontractor for complete, timely, and satisfactory performance of its work as accepted by Owner. The Subcontract Price is comprised of a Lump Sum amount with progress payments as follows, which shall

constitute full and complete compensation for any and all costs, expenses, overhead, and profit related to the Work:

The Subcontractor will be compensated as per the schedule of values indicated below, not to exceed             for Work during the 2001-2002 winter construction season.

Schedule of Values 2001-2002 Work Season
Mobilization -             Mobilization to be considered complete when personnel, materials and equipment are located at the Nenana job site.

Progress payment number (1) may be invoiced for             when 33% or 26 miles of ice roads, bridges and working pads are complete.
Progress payment number (2) may be invoiced for             when an additional 33% or 26 miles of ice roads, bridges and working pads are complete.
Progress payment number (3) may be invoice for             when the final 33% or 26 miles of ice roads, bridges and working pads are complete.
The final progress payment, number (4) of             will be made when all required ice roads, bridges and working pads are maintained throughout April 1, 2002.

The Subcontractor will be compensated as per the below mentioned schedule of values not to exceed             for Work during the 2002-2003 winter construction season.

Schedule of Values 2002-2003 Work Season
Mobilization -             Mobilization to be considered complete when personnel, materials and equipment are located at the Nenana job site.

Progress payment number (1) may be invoiced for             when 33% or 26 miles of ice roads, bridges and working pads are complete.
Progress payment number (2) may be invoiced for             when an additional 33% or 26 miles of ice roads, bridges and working pads are complete.
Progress payment number (3) may be invoice for             when the final 33% or 26 miles of ice roads, bridges and working pads are complete.
The final progress payment, number (4) of             will be made when all required ice roads, bridges and working pads are maintained throughout April 1, 2003.

Total not to exceed price for this contract is

Subcontractor shall, submit invoices as mentioned above, along with all applicable substantiating documentation as may be required, at completion of the above milestones to:

> Accounts Payable
> Global Power & Communications, LLC
> 6700 Arctic Spur Road
> Anchorage, Alaska 99518

CONTRACTOR's Contract number, as identified herein, must be conspicuously reflected on each invoice. Furthermore, each invoice must include, as a minimum: the period included in the current billing; the amount billed in the current billing period; and an itemization of the billed amount for the current billing period.

Progress payments, less retention of __0__%, will be made to Subcontractor for CONTRACTOR and Owner-accepted work. Payment will be made to Subcontractor for work satisfactorily performed and accepted by Owner and CONTRACTOR, including changes, within 30 days after receipt of invoice. Final payment of the balance due will be made to Subcontractor no later than 30 days after receipt of Subcontractors invoice by CONTRACTOR for Owner accepted, Subcontractor's work. Subcontractor agrees to

furnish, when required by the Contract Documents, or CONTRACTOR, affidavits, receipts, lien waivers, warranties, guarantees, and similar documents, in a form satisfactory to CONTRACTOR, prior to receipt of any payment.

3.  **Time, Schedule, and Delays**
    Time is of the essence under this Subcontract. Subcontractor will provide CONTRACTOR with any requested scheduling information in a form acceptable to CONTRACTOR and shall conform to CONTRACTOR's progress schedules, including any changes made by CONTRACTOR or Owner in the scheduling of work.
    In the event that Subcontractor is delayed for any reason, including acts of CONTRACTOR, any claim for delay must be made in writing to CONTRACTOR within 5 days of the commencement of the delay; otherwise it will be deemed waived.

4.  **Changes**
    When CONTRACTOR orders in writing, Subcontractor, without nullifying this Agreement, will make all ordered changes in the work which are within the general scope of this Agreement. Adjustments in Subcontract Price or in CONTRACTOR's progress schedule, if any, resulting from such changes will be allowed only upon prior written authorization and must be based upon daily work records showing the actual costs of materials and labor. These daily work sheets must be satisfactory to CONTRACTOR and must be approved each day by signature of CONTRACTOR's Superintendent. In the absence of signed work sheets, no payment will be made for extra or changed work.

5.  **Damage to Work**
    All loss or damage to work will be borne by the party or parties resulting causing such loss or damage.

6.  **Termination**
    CONTRACTOR may terminate this Subcontract for cause for, among other things, Subcontractor's: disregard for the safety of its employees; failure to conduct operations in an environmentally sound manner; disregard or violation of any law; failure to provide adequate skilled workers, equipment, or materials; failure to pay subcontractors or suppliers; failure to prosecute the work expeditiously and efficiently; or any other material breach of this Subcontract. If CONTRACTOR terminates this Subcontract, Subcontractor will be entitled to recover payment for work authorized by CONTRACTOR and satisfactorily performed to date by Subcontractor, subject to the payment terms set forth in this Agreement.

7.  **Indemnity**
    To the fullest extent permitted by law, Subcontractor will defend, indemnify and hold harmless CONTRACTOR and Owner and their employees, officers, and agents from any and all claims, damages, causes of action, losses, expenses (including attorney's fees), and liabilities of every kind and nature, including those for bodily injury, sickness, death, property damage, loss or destruction, caused in whole or in part by any act or omission of Subcontractor or any of its employees, agents, subcontractors, or third parties, arising out of or in any way connected with Subcontractor's performance under this Subcontract. This indemnification will extend to claims occurring after this Subcontract is terminated and will apply regardless of any active or passive negligent act or omission of Owner or CONTRACTOR, or their employees, officers, or agents, except that Subcontractor will not be obligated to indemnify any party for claims arising from the sole negligence or willful misconduct of CONTRACTOR, its employees, officers, or agents.

8.  **Insurance**
    Prior to starting work Subcontractor, at its expense, will obtain and maintain insurance on all of its operations, in a form and with carriers acceptable to CONTRACTOR, and in amounts acceptable to CONTRACTOR. including the following coverages:

a.   Workers' Compensation Insurance and Employer's Liability Insurance in accordance with the laws of the state where Work is performed with limits for Employer's Liability in the minimum amount of $1,000,000.

b.   Commercial General Liability Insurance, including Contractual Liability, with minimum coverage of a combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability.

c.   Business auto liability insurance covering all owned, non-owned and hired automobiles, specifically endorsed to cover as "owned automobiles" Owners or CONTRACTOR owned or leased vehicles furnished for Subcontractor's use, with a minimum coverage of a combined single limit of $1,000,000 per occurrence for bodily injury and property damage liability.

9.   **Compliance With Laws**

Subcontractor will comply, and secure compliance by its subcontractors and suppliers, with all federal, state, and local laws, regulations, statutes, ordinances, codes, directives, stipulations, and other legal authorities (hereinafter collectively "Laws") now in force or hereafter in effect which are applicable to the performance under this contract. All work, labor, services, or materials necessary to comply with these Laws will be furnished by Subcontractor without additional compensation.

10.   **Health, Safety, Environmental**

Subcontractor agrees that the prevention of accidents to workmen and the environment is the responsibility of the Subcontractor, Contractor and all persons involved in the project. Subcontractor will comply and assure compliance by its employees and subcontractors with all applicable health, safety and environmental Laws, CONTRACTOR's Safety and Health Program, and related standards developed during the progress of the work by CONTRACTOR or Owner.   If requested and upon additional compensation, the Subcontractor will submit a safety and/or environmental plan for review and approval by CONTRACTOR. The review or approval of any safety or environmental plan will not release Subcontractor or in any way diminish its liability, by way of indemnity or otherwise, as assumed by it under this Subcontract.

Subcontractor will comply and assure compliance by its employees and subcontractors with the requirements of DOT/RSPA/FHWA Drug and Alcohol Testing and Substance Abuse Provisions.

When so ordered, Subcontractor will stop any part of the work which CONTRACTOR deems unsafe or environmentally unsound until corrective measures satisfactory to CONTRACTOR have been taken. Upon request by CONTRACTOR, Subcontractor will submit for inspection such health, safety and environmental records as CONTRACTOR believe necessary to assure safe and environmentally sound operations by Subcontractor.

11.   **EEO/Affirmative Action**

During performance, Subcontractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, age, or national origin. Subcontractor will comply, and assure compliance by its employees and subcontractors, with all equal employment opportunity and affirmative action Laws and any other related requirements set forth in the Contract Documents.

12.   **Utilization Of Alaskan Residents/Native Hire**

Owner is committed to the use, whenever possible, of qualified local Alaskan residents, Alaskan native residents, and more specifically North Slope Borough residents when the work is being performed on the North Slope of Alaska.  Therefore, Subcontractor shall make every reasonable effort to recruit, employ and train, where applicable, Alaskan, Alaskan native and North Slope Borough resident labor in performance of work under this Agreement.

For the purposes of this Agreement, the term "Alaskan Resident' shall mean a person whose permanent residence is in the State of Alaska.

Subcontractor shall maintain those records necessary to assure accurate accounting of the manpower utilized to perform work under this Agreement.

**13. Assignments**
Subcontractor will not subcontract any part of the work, or assign any of its rights, or delegate any of its obligations under this Subcontract without the prior written approval of CONTRACTOR.

**14. Choice of Law and Forum**
The rights and obligations of the parties will be governed by the laws of the State of Alaska. Any litigation or arbitration arising out of or relating to this Subcontract will be brought in a forum of competent jurisdiction only in Anchorage, Alaska.

**15. Entire Agreement**
This Agreement is the entire agreement between CONTRACTOR and Subcontractor and supersedes any prior written or oral representations. Subcontractor is bound to CONTRACTOR under this Subcontract on the same terms CONTRACTOR is bound to Owner by the prime contract, including any guarantees and warranties. In the event of any conflict between the terms of this Subcontract and those of the prime contract, this Subcontract will control.

**16. Special Provisions and Exhibits**
The following Special Provisions and Exhibits are attached hereto, incorporated herein, and made a part hereof: Tanana Flats Project Construction Schedule

**Contractor**
**Global Power & Communications, LLC**

Signature _____ Date 12/7/01

Michael Gearhart

**General Manager**
Title

**Subcontractor**
**Cruz Construction, Inc.**

Signature _____ Date 12-07-01

David C. Cruz_____

President, Cruz Construction, Inc._____
Title