DAVID W. MÁRQUEZ
ATTORNEY GENERAL

Venable Vermont, Jr.
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Ave., Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5190
Fax: (907) 258-0760
Email: TWC_EFC@law.state.ak.us

Attorney for Trooper Jake Covey, Trooper Patrick Nelson

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DON M. KUBANYI, JIMMY KUBANYI, ) <br> AILEEN WELTON, ELIZABETH ) <br> TUZROYLUK, DORIS KUBANYI, ) <br> VICTOR KUBANYI, BOBBY KUBANYI, ) <br> ARLETTE KUBANYI, and BRIAN ) <br> BAGGETT, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> GOLDEN VALLEY ELECTRIC ) <br> ASSOCIATION, DAVE CRUZ, ) <br> individually and d/b/a/CRUZ ) <br> CONSTRUCTION, BLACK & VECH ) <br> CORPORATION, JAKE COVEY, and ) <br> PATRICK NELSON ) <br> ) <br> Defendants. ) <br> _____ ) | Case No. 4:04-cv-0026-RRB <br><br><br> **DEFENDANTS COVEY'S <br> AND NELSON'S MOTION <br> FOR SUMMARY JUDGMENT** |

Plaintiff Don Kubanyi has made a 42 U.S.C. § 1983 excessive force claim

against two Alaska State Troopers who arrested him on March 1, 2003. In response to a

report that a drunken man had threatened to shoot some construction workers at a remote site, Alaska State Troopers Jake Covey and Patrick Nelson responded to a location on the Rex Trail, some six or seven miles off the Parks Highway. While the officers were talking to the assembled construction workers and investigating the initial report, Kubanyi came from out of the darkness. When he refused to cooperate by showing his hands or lying on the ground, and made repeated obviously drunken statements of "Fuck you" to the officers' attempt to determine his intention or his level of threat, Covey and Nelson subdued him by means of a Taser and pepper spray. The physical arrest lasted about 51 seconds, from the initial discharge of the Taser through the takedown and struggle, to the clicking of the first handcuff on Kubanyi.

The officers now move for summary judgment on the grounds that 1) the amount of force used by the officers was "objectively reasonable" and thus there was no constitutional violation, and 2) even if there was a constitutional violation, the officers are entitled to qualified immunity because they could reasonably believe that the amount of force they used was appropriate under the circumstances.

Kubanyi's brother-in-law, Brian Baggett, was also on the scene and approached the officers from the darkness while they were placing Kubanyi in a patrol vehicle. Baggett is also a plaintiff here; he has also brought a 42 U.S.C. § 1983 claim, but the basis of his claim is not immediately apparent. No force was used on Baggett; he was ordered to show his hands and get down on his knees so that the officers could determine the level of threat that he represented to them and the other construction workers, and to neutralize that threat if

there was any. Baggett was briefly pat searched for weapons. This entire "confrontation" took about a minute before Baggett joined the officers and the construction workers near their vehicles to discuss the potential trespass claims. On the assumption that Baggett is making a claim for an unconstitutional detention, the officers move for summary judgment because 1) there was no constitutional deprivation in this brief detention and pat search; and 2) if there was a constitutional violation, the officers are entitled to qualified immunity because their actions were objectively reasonable under the circumstances.

## I.    FACTS

### A.    The complaint about a threatened shooting.

On March 1, 2003, Alaska State Troopers Jacob Covey and Patrick Nelson were assigned to attend the Nenana Tripod Days in Nenana, Alaska. Exhibit A, Deposition of AST Jacob Covey, p. 10, attached. After the festival, they were heading south on the Parks Highway at about Mile 260, in separate cars [toward their assigned posts in Cantwell and Healy]. Exh. A, p. 11. They received a call from trooper dispatch [in Fairbanks] to go to Mile 281 to meet a complainant there about a claim of a threat to shoot someone. Exh. A, p. 11. They turned around, headed back north, and in a few minutes met with Dave Cruz at Mile 281 or so, where the Rex Trail intercepts the Parks Highway. Exh. A, p. 11.

### B.    The investigation leads to Seven Mile Lake and Don Kubanyi.

Cruz told the troopers that Don Kubanyi was "having land issues" with Cruz's construction crew, and was threatening to shoot his workers out there [Seven Mile Lake, out the Rex Trail from the Parks Highway]. Exh. A, p. 12; Exhibit B, Deposition of Dave Cruz,

p. 30, attached.  Cruz took the threat seriously, Exh. B, p. 30, as did Covey immediately upon hearing of it.  Exh. A, p. 12.

Cruz led the troopers [out the Rex Trail] to the Seven Mile Lake area, where Don Kubanyi and his family had a native allotment, and where Cruz's workers were waiting for them.  Exh. B, p. 31; Amended Complaint, ¶ 18.  On arrival at the scene, Covey, who was the lead officer on this complaint, began conducting interviews with the construction workers who had witnessed the threat.  Exh. A, pp. 13, 23; Exh. B, p. 33; Exhibit C, Deposition of Patrick Nelson, p. 29, attached.  The troopers learned that Kubanyi was intoxicated when he made the threat earlier and that he might have access to a weapon, which was on one of the snow machines that was with him at the time he made the threat.  Exh. A, p.13; Exh. C, p. 26. [The snow machine with the rifle on it belonged to Kubanyi's brother-in-law, Brian Baggett, who was trapping that weekend out of the family's cabin at Seven Mile Lake].  The troopers learned that there was a trespass issue at the heart of the matter, Exh. C, p. 29, but they were mainly concerned about the potentially volatile mixture of alcohol and firearms, along with the already-reported threat to shoot someone.  Exh. C, pp. 26, 29-30.

## C.    The arrest of Don Kubanyi.

While the troopers were conducting their investigation by interviewing the construction crew, someone said "Here comes your guy now."  Exh. A, p. 23; Exh. B, p. 33; Exh. C, p. 30.  Don Kubanyi came out of the dark, walking toward the assembled troopers and workers.  Exh. A, p. 23; Exh. C, p. 31.  Everyone there felt the potential danger: the construction workers took cover behind their trucks, Exh. B, p. 33; and Covey advanced onto

the lake with his handgun drawn and held at the low guard position. Exh. A, p. 23; Exh. C, p. 31. Because Covey needed to evaluate the threat potential represented by Kubanyi, who earlier was intoxicated and made threats to shoot the workers, he shouted "State Troopers – stay right there – stop movin' – hold your hands out to the side…turn around." Exhibit D, Affidavit of AST Jacob Covey, ¶ 3, attached; Exh. A, p. 23.

Covey had a tape recorder on the exterior of his uniform and had it turned on during the interview with Cruz at the Parks Highway, and then again during the interviews with the workers at Seven Mile Lake. Exh. D, at ¶ 3. He and Nelson have listened to the tape, and certified that the relevant transcribed portion is an accurate reflection of what was said and recorded at the scene. Exh. D, ¶ 3; Exhibit E, Affidavit of Patrick Nelson, ¶ 3, attached. The tape is as follows from the point at which Kubanyi was seen coming toward the troopers:

| | |
|---|---|
| Unknown: | Here comes your guy now. |
| Unknown: | Yeah that's him all right. |
| AST Covey: | State Troopers – stay right there – stop movin' – hold your hands out to the side…turn around… |
| Don K.: | What the fuck for? |
| AST Covey: | Turn around. |
| Don K.: | Ah fuck you! |
| Don K.: | What are you guys…shoot me - |
| AST Covey: | Lay down on the ground for me. |
| Don K.: | Fuck you! |
| AST Covey: | Lay down on the ground! |
| Don K.: | I ain't lyin on the ground! |
| AST Covey: | Lay down on the ground…you're under arrest |
| Don K.: | Fuck you! |
| AST Nelson: | You're under arrest! |
| AST Nelson: | Lay down or you will be controlled with 10,000 volts of electricity. Lay down! |

| | |
|---|---|
| Don K.: | Why? |
| AST Nelson: | I'm going to ask you one more time…lay down! |
| Don K.: | Why?  Tell me why. |
| | Tell me why. |
| | Just tell me why [clicking of tazer] |
| AST Nelson: | Get on the ground!  Get on the ground! |
| Don K.: | Fuck you! |
| AST Nelson: | Get on the ground!  Get on the ground! [struggle sounds – tazer sound] |
| Don K.: | Hey…why    the    fuck…ow   –    God damn…ah…ah…ah… |
| AST Nelson: | Stop resisting! [tazer sounds] |
| Don K.: | I'm done, I'm done, I'm done! |
| | I'm done, I'm done…ah…ah…ah…ah…[tazer sounds] I'm done!  What's wrong here…what's wrong [heavy breathing] what is the problem? |
| AST Nelson: | You got a couple more counts on you too buddy – you got assault on a peace officer now too. [cuff sounds] Keep your head down on the fuckin ground!  You're not going to move another fuckin muscle! |
| Don K.: | Ok I'm not, I'm not. |
| AST Covey: | Bend your arms…[cuff sounds] stand up! |
| Don K.: | Help me [breathing heavy] |
| AST Nelson: | Stand up! |
| Don K.: | Okay! |
| AST to AST: | You okay – yeah |
| Don K.: | My eyes are hurtin', okay? |
| AST Nelson: | Yep your eyes are gonna hurt…not going to stop hurting either… |
| Don K.: | Okay [breathing] |
| Don K.: | My eyes are hurtin' okay? [walk to car] |
| AST Nelson: | Stay right where you're at. |
| Don K.: | My eyes hurt; okay? |
| AST Nelson: | Stay where you're at. |

Kubanyi was hostile towards Covey and refused to obey his commands.  Exh.

A, p. 23.  The order to "show your hands" was standard in these circumstances, to allow the

trooper to assess the threat level.  Exh. C, p. 33.  Kubanyi's obvious hostility and refusal to

cooperate with basic commands contributed to a tense situation: Covey already had his gun drawn and pointed at the ground, and Nelson came up with his Taser. Exh. A, pp. 23-24. The troopers still did not know if Kubanyi possessed a weapon; Kubanyi had taken an "aggressive combative stance" with his fists clinched. Exh. A, p 24; Exh. C, p. 42. Once Covey said "You're under arrest!" and Kubanyi once again replied "Fuck you," Nelson took over the commands. Exh. A, p. 30. He told Kubanyi to lay down or he would be controlled with 10,000 volts of electricity [the Taser]. Exh. E; ¶ 3; Exh. C, p. 43. When Kubanyi continued his hostility and refusal to cooperate, Nelson discharged the Taser. Exh. A, pp.24-31; Exc. C, p. 44. The Taser, which shoots two prongs on wires out of a cartridge, had no effect, presumably because one of the prongs missed Kubanyi as they spread out, or failed to penetrate his Carhartt's. Exh. C, pp. 49-50. Kubanyi started running backwards. Exh. A, p. 31; Exh. C, p. 46.

Even though he was backing away, Kubanyi still represented a potential threat because of his intoxication, his obvious hostility, his refusal to cooperate, and his previous threat to shoot someone. The troopers moved in on him; Kubanyi punched Nelson in the face, and all three collapsed in a heap on the ice as the troopers attempted to subdue him. Exh. A, p. 31; Exh. C, pp. 46-51; Exh. B, p. 34. During the struggle on the ice, Nelson applied the Taser in the drive-stun mode, directly to Kubanyi's back. Exh. C, p. 47.[1] Nelson used the Taser three or maybe four times in the contact mode, leaving red marks on

---

[1]    Once a Taser cartridge has been fired, the empty cartridge can be removed from the "gun" frame by simply pulling it off, leaving two electrodes exposed. The Taser can then be used in a contact mode by placing it against the body and pulling the trigger.

Kubanyi's back that were photographed the next day. Exh. C, p. 47. Because the electrodes of the Taser are only an inch or so apart, when it is used in the contact mode it does not lock up large muscle groups as it would when the prongs are fired from the cartridge and spread out in flight. Exh. C, p. 49. The Taser in drive-stun failed to subdue Kubanyi; he continued to resist and struggle, even though he was saying "I'm done." Exh. C, p. 47, 53. After a brief struggle on the ice, Covey was able to rise up on one knee and use his canister of pepper spray on Kubanyi. Exh. A, p. 31. Kubanyi then submitted and the troopers were able to subdue and handcuff him. Exh. A, pp. 33-34; Exh. C, p. 53.

The entire episode was fairly brief. The time lapse from "Here comes your guy now" to the sound of the first handcuff going on was about 1 minute and 43 seconds, with another 12 seconds to the clicking of the second cuff. Exh. D, ¶ 4; Exh. E, ¶ 4. From the initial discharge of the Taser, by cartridge, to the sound of the first cuff going on about 51 seconds elapsed; from the first Taser, by cartridge, to the last Taser, in drive-stun mode, only 27 seconds elapsed. Exh. D, ¶ 4; Exh. E, ¶ 4.

**D.    The confrontation with Brian Baggett.**

The troopers washed and wiped the pepper spray from Kubanyi's eyes, and were placing him in a patrol car, when one of the construction workers said that someone else was "coming across the lake." Exh. C, p. 35. Nelson stayed with Kubanyi while Covey advanced out onto the lake to confront that incoming person, Exh. C, p. 35. Again he held his handgun in the low guard position because he did not know who it was that was coming, or whether he was armed or intoxicated, or what sort of threat he presented. Exh. C, p. 35,

37. Once again Covey shouted "State Troopers" and gave similar commands as those he had

given to Kubanyi. Exh. A, p. 36. The individual was Brian Baggett, Kubanyi's brother-in-

law; unlike Kubanyi, he complied with the orders. Exh. A, p. 36. Once again Covey's tape

recorder was running and he recorded the following:

| | |
|---|---|
| AST Covey: | State Troopers…Get on your knees…Put your hands over your head…What's your name? |
| B.B.: | Brian Baggett…I have another buddy over there too…Nate (indecipherable) |
| AST Covey: | How much you had to drink tonight? |
| B.B.: | Maybe 3 beers…We were out here calming all this down, believe me…We talked to the guys, you know?...They already told you, I'm sure, it wasn't me…That's my brother-in-law… |
| AST Covey: | Okay…I'm just going to pat you down also okay?...You don't have anything on you that's going to poke me do you ? |
| B.B.: | Nope. |
| AST Covey: | Who else is over at the house? |
| B.B.: | My buddy Nate. |
| AST Covey: | Would you stand up for me, please?...What's the problem tonight? |
| B.B.: | They're crossing our property, supposedly. All they have is a map of it. [discussion ensues regarding map and earlier conversation with Don Kubanyi] |

Exh. D, ¶ 10.

        Covey patted down Baggett for weapons, both while Baggett was kneeling and

once he stood up. Exh. A, p. 36. Once it was clear that Baggett had no weapons, was

cooperative, and not a threat, the conversation at once shifted in tone and content; they

rejoined the others near the vehicles and a conversation ensued about maps, rights of way,

and trespass issues. Exh. A, p. 36. The troopers' intent at this point was to defuse the

situation and make sure that there were no further confrontations or threats or actual violence while the trespass issues were resolved. Exh. A, p. 38.

The contact between Covey and Baggett, from "State Troopers" through pat down, to "What's the problem tonight?" lasted about 1 minute and 5 seconds. Exh. D., ¶ 11. No physical force was used against Baggett; he was touched only lightly for a routine weapons pat down; he was never arrested. He was not restrained, except by verbal command. Exh. D, ¶ 12.

### E.    Compliance with training and policy.

The trooper activities depicted above were consistent with and in compliance with both training and policy relating to the use of force. Exh. D, ¶ 13; Exh. E, ¶ 9.

Covey used a sequence of commands that he had been trained to use, in order to investigate the threat level of an unknown but potentially violent situation, and ultimately to control it. Exh. A, pp. 25-26; Exh. D, ¶ 6. The command to show the hands allows an officer to assess the immediate threat situation by determining if there is a weapon already in the hands. Exh. D, ¶ 6. If there is no compliance, the next step is to give the order to turn around, so that the "suspect" cannot see the officer and the officer has a chance to approach safely and assess the threat level without himself being directly threatened. Exh. D, ¶ 6. In the absence of compliance with the order to turn around, the next step is to order the suspect to get on the ground, where the suspect has less chance of assaulting the officer and the officer has greater ability to control him. Exh. A, pp. 25-26; Exh. D, ¶ 6. During the whole

sequence, Covey was verbally engaged with Kubanyi, which allowed him to determine intoxication, hostility, intent, and potential threat. Exh. D, ¶ 6. As long as a suspect is talking, and not acting, the officer remains safe. Exh. D, ¶ 6. This sequence, and these strategies for assessing and neutralizing a potential threat of violence, are all shown in the tape of this actual confrontation. Exh. D, ¶ 3.

The Taser and the pepper spray were both equivalent in the "use of force continuum" taught to troopers at the Academy and in constant retraining on force techniques. Exh. D, ¶ 7. The progression is as follows, from lesser to greater use of force: presence, verbal command and control, soft (open) hand techniques, Taser and pepper spray, closed hand (clinched fist) techniques, baton, firearm. Exh. D, ¶ 7. Because of the situation here – intoxication, previous threat to shoot, access to a weapon, darkness, unknowns intentions, refusal to comply – this situation quickly escalated past the verbal control stage to the intermediate levels of force – Taser and pepper spray. Exh. D, ¶¶ 3, 6. Because of the potential that Kubanyi possessed and was going to use a firearm, the lower levels of hand control techniques were not used; given the distance between the troopers and Kubanyi, he could use a firearm on them before they could reach him with their hands. Exh. E, ¶ 7.

In the event, the discharge of the cartridge from the Taser failed to immobilize Kubanyi. Exh. E, ¶ 8. Follow-up use of the Taser in drive-stun mode is appropriate if the subject is close enough to reach, as he was here after the troopers ran to him to neutralize the threat. Exh. E, ¶ 8. When the Taser in drive-stun failed to work, pepper spray was

appropriate, and was ultimately successful.  Exh. D, ¶ 5.  Both the Taser and pepper spray

cause only temporary irritation and incapacity.  Exh. D, ¶ 8.

On the actual use of force described here, the Taser followed by pepper spray, also

complied with training and policy.  Exh. E, ¶ 8.  The M-26 Taser, used here by Nelson, fires

two prongs on electrical wires that are 25 feet long.  Exh. E, ¶ 6.  The optimal range is about

19 feet, which allows the prongs to separate far enough to immobilize large muscle groups,

and yet stay close enough together to both hit the intended target.  Exh. E, ¶ 6.  The pepper

spray has a much shorter effective range; it sprays a fog and is best used at 2 to 3 feet.  Exh.

D, ¶ 5.

On these facts plaintiffs have claimed a § 1983 violation; the officers now

move for summary judgment on the basis of qualified immunity.

## II.    SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a "party against whom a

claim…is asserted…may…move with or without supporting affidavits for a summary

judgment in the party's favor as to all or any part thereof."  Fed. R. Civ. P. 56(b).  Summary

judgment is appropriate if the court finds that "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits…show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The court will construe all evidence and draw all

evidentiary inferences in favor of the non-moving party.[2]

A dispute over a genuine material fact exists if the evidence would allow a reasonable fact-finder to return a verdict for the non-moving party.[3] "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise proper motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[4] The non-moving party may defeat a summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial.[5] To produce sufficient evidence, the non-moving party cannot rest solely on the allegations in the pleadings and other legal memoranda, but he must present affidavits or other admissible evidence to carry his burden.[6]

Where an official has moved for summary judgment on the basis of qualified immunity, the issue of whether the law governing the conduct at issue is clearly established is an issue of law for the court.[7]

---

[2]    10 A Charles Alan Wright, et al., *Federal Practice & Procedure* § 2727 at 459 & n.5 (3d. ed. 1998).

[3]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4]    *Id.* at 247-48 (emphasis in original).

[5]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[6]    *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974).

[7]    *Trevino v. Gates*, 99 F.3d 911, 917 (9th Cir. 1996).

13

### III.    ARGUMENT

**A.    Section 1983 excessive force claims.**

*Graham v. Connor*[8] established that the Fourth Amendment is the exclusive standard to analyze all claims that law enforcement officers have used excessive force during arrests, investigative stops or other seizures of free citizens.[9]    That means that the key standard for this analysis is "objective reasonableness."[10]

The *Graham* Court reached this conclusion because the Court's "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."[11]    But there is no exact formula for the test – a court must examine "the facts and circumstances of each particular case."[12]    Among those facts to be considered are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[13]    A court reviewing a particular use of force must use

---

[8]         490 U.S. 386 (1989).

[9]         *Id.* at 395 ("Today we…hold that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]") (emphasis in original).

[10]        *Id.* at 397.

[11]        *Id.* at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22-27 (1968)).

[12]        *Id.*

[13]        *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

"the perspective of a reasonable officer on the scene, rather than…20/20…hindsight."[14]  This

perspective takes into account the inherent difficulty of police work of this nature:

> The calculus of reasonableness must embody allowance for the
> fact that police officers are often forced to make split-second
> judgments – in circumstances that are tense, uncertain, and
> rapidly evolving – about the amount of force that is necessary in
> a particular situation.[15]

*Saucier v. Katz*[16] is the latest and most complete Supreme Court case showing

the methods and standards to be used in analyzing excessive force claims under 42 U.S.C. §

1983, and the application of the *Graham* "objective reasonableness" analysis.

For a court examining a qualified immunity issue, the initial inquiry must be

whether or not the facts, taken in the light most favorable to the party alleging the injury,

show that an officer's conduct violated a constitutional right.[17]  If there is no violation of a

constitutional right, then the case is over, in the officer's favor.[18]  If there is arguably a

constitutional violation, then the second inquiry is "to ask whether the right was clearly

established."[19]  The second inquiry is not a general one.  The right violated must have been

"clearly established in a more particularized, and hence more relevant, sense: The contours of

---

[14]     *Id.*

[15]     *Id.* at 396-97.

[16]     533 U.S. 194 (2001).

[17]     *Id.* at 201.

[18]     *Id.*

[19]     *Id.*

15

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[20]  Put another way: would it "be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"?[21]  If the right was not clearly established, or did not put the officer on notice that his conduct would be clearly unlawful, then the officer is entitled to summary judgment based on qualified immunity.[22]

For these propositions, *Saucier* was mostly recapitulating previous Supreme Court holdings from *Graham* and other cases.  *Saucier's* primary original contribution is to establish that the Fourth Amendment "objective reasonableness" test applies separately to both inquiries.[23]  For example, during the initial inquiry about whether a constitutional right has been violated, a court might find that "an officer reasonably, but mistakenly, believed that a suspect was likely to fight back…and therefore 'would be justified in using more force than in fact was needed.'"[24]  *Saucier* reemphasized *Graham's* focus on the facts and circumstances of each particular case, including the severity of the crime, the immediate threat posed by the suspect, and whether or not he is actively resisting or attempting to evade arrest.[25]

---

[20]     *Id*. at 202 (quoting *Graham*, 483 U.S. at 640) (internal quotations omitted).

[21]     *Id*. (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

[22]     *Id*. at 202.

[23]     *Id*. at 204 ("The inquiries for qualified immunity and excessive force remain distinct, even after *Graham*.").

[24]     *Id*. at 205.

[25]     *Id*.

On the other hand, turning to the qualified immunity inquiry, the court needs to recognize that "reasonable mistakes can be made as to the legal constraints on particular police conduct."[26]  Such reasonable mistakes do not deny the officer the protection of qualified immunity:

> An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.[27]

In the area of excessive force claims, qualified immunity operates, as it does in other areas, "to protect officers from the sometimes 'hazy border between excessive and acceptable force[.]'"[28]

Fundamentally, *Saucier* provides deference to officers' decisions on the amount of force to use in analyzing both whether a constitutional violation occurred, and whether qualified immunity applies in the event a mistaken belief about the force was reasonable.[29]

Finally, in *Saucier* the Court again reiterated the importance of "resolving immunity questions at the earliest possible stage in litigation."[30]  Issues concerning qualified

---

[26]     *Id.*

[27]     *Id.*

[28]     *Id.* at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919 (11th Cir. 2000).

[29]     *Id.*

[30]     *Id.* at 201 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotations omitted)).

immunity are issues of law.[31]

**B.    There were no constitutional violations here because the amount of force used was objectively reasonable.**

**1.    The troopers did not use excessive force against Don Kubanyi.**

The force used by the troopers to subdue and arrest Don Kubanyi was not excessive; it was "objectively reasonable" under the *Graham* test.  Thus the first inquiry – was there a constitutional violation – yields a "no" answer.

*Graham* teaches us to examine the facts from the perspective of a reasonable officer on the scene.[32]  These officers knew that Kubanyi had been intoxicated earlier, that he had made a threat to shoot these construction workers if they continued to cross his land, that he had access to a weapon that was seen on his brother-in-law's snow machine.  Because this was rural Alaska, it would be reasonable to expect that anyone living there had access to firearms, even without having seen one.  Once the troopers arrived at Seven Mile Lake, Cruz's report of these facts was confirmed by the eyewitnesses who had seen Kubanyi and had heard the threats.  As Kubanyi came out of the darkness toward the assembly of troopers and workers, it quickly became apparent to them that he was uncooperative, hostile, aggressive and still intoxicated.  What was not apparent was whether he was armed and whether he represented an immediate threat.  But given his prior and present behavior it was reasonable for the troopers to assume that he was a threat until they could determine

---

[31]    *Act Up!/Portland v. Bagley*, 971 F.2d 298, 301 (9th Cir. 1992).

[32]    490 U.S. at 396.

otherwise.  Thus it was objectively reasonable for Covey to approach him with his handgun in the low guard position; for Nelson to tell him he was under arrest when he continued to be hostile and uncooperative in the process of determining his threat level; and for Nelson to warn him that he would "be controlled with 10,000 volts of electricity" if he did not cooperate.

Kubanyi did not cooperate, and made it difficult if not impossible to determine what threat he currently represented.  The court does not need to be instructed on the volatility and danger represented by the mixture of guns and alcohol in Alaska, either urban or rural.  Neither did the troopers.  It was objectively reasonable for them to assume Kubanyi was a danger to them and the workers, and to act to investigate and neutralize that threat. They did so by use of a device – the Taser – that causes only momentary pain and immobilization, and no lasting damage.  It is the ideal method for subduing a suspect who is known or credibly thought to be armed and dangerous, when he is too far away to reach by hand.

In the event, the discharge of the Taser cartridge did not immobilize Kubanyi, and so the officers closed the distance and engaged him hand to hand as he attempted to evade them.  He escalated the encounter by striking Nelson in the face, and all three fell to the ground as Kubanyi struggled against the troopers.  Nelson continued the use of force by Taser in the direct contact mode.  It was fruitless, but again objectively reasonable, as it can yield results by immobilization or momentary pain compliance.  It did not, and Covey resorted to pepper spray, the same level of force as the Taser, which was successful.  From

19

the initial discharge of the Taser to the first cuff going on was about 51 seconds. During this entire time the troopers were actively engaged in subduing Kubanyi and neutralizing any threat he posed. For this they used only intermediate levels of force that produced no lasting injury to Kubanyi.

By the *Graham* analysis, the troopers' use of force was objectively reasonable. The severity of the crime certainly justified this intermediate level of force – threatening to shoot a person is a serious crime,[33] and actually shooting someone certainly is.[34] Whether Kubanyi represented an immediate threat here was exactly the question, but the troopers could reasonably believe he did given the reported earlier behavior and the hostility, aggression, and intoxication demonstrated on the scene. And once Nelson told him he was under arrest, and aimed the Taser at him, Kubanyi started backing quickly away – whether this was to evade, or to redirect his potential assault elsewhere was unknown. This 51 second incident demonstrates reasonable use of force under these circumstances.[35]

Officers using force do not need to use the least amount of force possible – they only need to use force within a range of conduct that the court conceives as reasonable

---

[33]    Recklessly threatening "imminent serious injury" with a weapon, a "dangerous instrument," is a Class C felony in Alaska. AS 11.41.220(a)(1)(A).

[34]    Depending on whether the assault causes serious physical injury or merely physical injury, shooting someone is a Class A felony, AS 09.41.200(a)(1), or a Class B felony. AS 11.41.210(a)(1).

[35]    *Graham*, 490 U.S. at 396.

under the circumstances.[36]   And the standard is applied in a way that is deferential –
"comparatively generous" – to the officers.[37]  What this means is that "the Supreme Court
intends to surround the police who make these on-the-spot choices in dangerous situations
with a fairly wide zone of protection in close cases."[38]

Here, the use of non-lethal weapons – the Taser and pepper spray – that
inflicted no lasting injuries on Kubanyi was proportional to the threat that he posed.[39]  In
addition, use of the Taser and the pepper spray was in accord with both the training received
by these troopers and trooper policy generally.  In the absence of a showing that either the
training or the policy were deficient or unreasonable, compliance with both was reasonable
for these officers on the scene of an incident that had a serious potential for violence.

The court should find no constitutional violation on these facts.

**2.    The troopers did not use excessive force against Brian Baggett.**

The same standards and analysis used above for Don Kubanyi's arrest apply to
the investigatory stop of Brian Baggett.  That entire episode lasted just over a minute.  No

---

[36]     *See Billington v. Smith*, 292 F.3d 1177, 1188-89 (9th Cir. 2002) (examining a
warrantless arrest and a forcible entry to effect it, the court concluded : "Police officers need
not avail themselves of the least intrusive means of responding and need only act within the
range of conduct we identify as reasonable.").

[37]     *Roy v. City of Lewiston*, 42 F.3d 691, 695 (1st Cir. 1994) ("[T]he Supreme
Court's standard of reasonableness is comparatively generous to the police in cases where
potential danger, emergency conditions, or other exigent circumstances are present.").

[38]     *Id.*

[39]     *McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003)
(citing *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("[P]epper spray is a very
reasonable alternative to escalating a physical struggle with an arrestee.")).

physical force was used, only the threat of force represented by the troopers' presence, their weapons, and their takedown of Don Kubanyi moments before.  Given the circumstances – the darkness, the palpable threat represented by Kubanyi, and his intoxication and resistance just minutes earlier – it was reasonable for the troopers to investigate the potential threat represented by Brian Baggett walking onto the scene.  Covey did this quickly, unobtrusively, in a minimally disruptive manner, and without physical force.  Any momentary fear experienced by Baggett was simply that – and justified by the circumstances as seen from Covey's perspective on the scene.

The court should find no constitutional violation on these facts.

**C.    Even if there was a constitutional violation, the officers are entitled to qualified immunity.**

### 1.    Qualified immunity protects the troopers for their arrest of Don Kubanyi.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[40]  Covey and Nelson were neither.

Even if the Court finds a constitutional violation in these officers' brief use of non-deadly force to subdue an intoxicated, uncooperative individual who had earlier threatened to shoot people, and whose current level of potential danger was unknown, the officers are entitled to qualified immunity because their use of force, even if mistaken, was reasonable under the circumstances.  Once Kubanyi came out of the dark and approached the

---

[40]    *Rudebusch v. Hughes*, 313 F.3d 506, 514 (9th Cir. 2002); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

officers and workers, it was reasonable for them to believe they needed to defuse any potential for violence, given the earlier drunken threat. To do that, they needed to approach Kubanyi, speak with him, and visually and by pat down make sure that he was not armed, so that they and he and the others could discuss the trespass situation and make sure that it was sorted out without violence. Kubanyi's hostility and lack of cooperation made this impossible. With the potential for violence in the air, the officers needed to act. They did so, reasonably.

The approach with a drawn, but lowered handgun was a reasonable safety precaution. The first use of the Taser was a reasonable effort to subdue Kubanyi when he refused to let himself be examined, and refused to be arrested. The takedown after he punched Nelson in the face was reasonable. The 20-30 second struggle on the ground was a reasonable attempt to subdue Kubanyi and make sure that the officers and the workers would be safe. The three or four uses of the Taser in contact mode were reasonable, as Kubanyi continued to struggle. The use of pepper spray was reasonable when Kubanyi continued to struggle even through the Taser discharges. And of course handcuffing him for the arrest was absolutely reasonable given his assaultive and resistant behavior and lack of cooperation. Individually and as a whole, these were reasonable actions under the circumstances.

From the officers' viewpoint, it was reasonable for them to believe that they would not be violating the law if they applied non-deadly force in a manner consistent with

their training and AST policy.[41]  They did so.  Departmental training and policy permits an

officer to use both pepper spray and the Taser, which were co-equals in the use of force

continuum, on a person who is aggressively resisting arrest either verbally or physically.[42]

A final way to judge the reasonableness of these officers' actions, and any

mistake they made in the application of force here (which seems unlikely) is to ask about the

reasonableness of their behavior if they ignored Kubanyi, and he had been armed and was

returning to shoot the workers as he had earlier threatened to do.  At a time when drive-by

shootings are routine in our big cities, when occupants and drivers of cars routinely exchange

shots on our roadways, when school children are arrested for plotting to bring guns to school

to kill their teachers and fellow students – the takedown and arrest of Don Kubanyi was a

routine and defensible safety precaution.  Any mistakes in this procedure are well within the

zone of deference given by courts to police officers in tense, uncertain, rapidly evolving, and

potentially dangerous circumstances.

### 2.    Qualified immunity protects Trooper Covey for his investigative stop of Brian Baggett.

The same arguments made above apply to Covey's brief confrontation with

Brian Baggett.  Even though Baggett was not the person who had made the earlier threats, he

---

[41]    *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (a reasonable officer would not know that his conduct might be illegal if he followed established departmental procedures for dealing with non-cooperative arrestees by using pepper spray in 1-2 second bursts and complied with his training in the "use of force continuum").

[42]    *See id*.; *McCormick*, 333 F.3d at 1245 ("Given that pepper spray ordinarily causes only temporary discomfort, it may be reasonably employed against potentially violent suspects[.]").

was an "unknown" coming out of the dark just as Kubanyi had been.  And the officers had just had a struggle to subdue Kubanyi, who was clearly intoxicated.  It was reasonable to approach Baggett with caution, and to investigate his level of threat.  That is all that occurred, and it was over in a minute, without harm.  If Covey made a mistake, it is hard to imagine what it was, but easy to characterize it as reasonable.

## IV.   CONCLUSION

The Court should find no constitutional violation on these facts, and grant summary judgment to the officers.  If there was a constitutional violation, the officers are nonetheless entitled to summary judgment based on qualified immunity – any mistakes made were reasonable under the circumstances as viewed from the perspective of a reasonable officer on the scene.

DATED this 5th day of May, 2006 at Anchorage, Alaska.

DAVID W. MÁRQUEZ
ATTORNEY GENERAL

By:   s/ Venable Vermont, Jr.
Assistant Attorney General
Office of the Attorney General
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
Phone: (907) 269-5190
Fax:    (907) 258-0760
Venable_Vermont@law.state.ak.us
TWC_ECF@law.state.ak.us
Alaska Bar No. 8306067

This is to certify that on this date, a copy of the foregoing
Motion for Summary Judgment is being served electronically on:

**Michael J. Walleri**
walleri@gci.net; christen_woodward@yahoo.com

**Daniel T. Quinn**
dquinn@richmondquinn.com; cesary@richmondquinn.com

**Cory Borgeson, Esq.**
cborgeson@bnblaw.com; kday@bnblaw.com

**Eric P. Gillett**
egillett@pregodonnell.com; mmorgan@pregodonnell.com

<u>s/ Venable Vermont, Jr. 5/5/06</u>