IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DON M. KUBANYI, JIMMY KUBANYI, AILEEN WELTON, ELIZABETH TUZROYLUK, DORIS KUBANYI, VICTOR KUBANYI, BOBBY KUBANYI, ARLETTE KUBANYI and BRIAN BAGGETT,

Plaintiffs,

v.

GOLDEN VALLEY ELECTRIC ASSOCIATION, DAVE CRUZ, individually, and d/b/a CRUZ CONSTRUCTION, BLACK & VECH CORPORATION, JAKE COVEY, and PATRICK NELSON,

Defendants.

Case No. F04-0026 CI

**DEPOSITION OF PATRICK STEVEN NELSON**

**January 24, 2006**

APPEARANCES:

FOR THE PLAINTIFFS: **MICHAEL J. WALLERI**
Attorney at Law
330 Wendell Street, Suite E
Fairbanks, Alaska 99701

FOR THE DEFENDANTS: **VENABLE VERMONT, JR.**
Assistant Attorney General
STATE OF ALASKA DEP'T OF LAW
Civil Division
Special Litigation Section
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501-5903

Exhibit C
Page 1 of 28



-2-

APPEARANCES (cont.):

FOR THE DEFENDANTS:

**DANIEL T. QUINN**
RICHMOND & QUINN
360 K Street, Suite 200
Anchorage, Alaska 99501

**CHRISTINE E. TAVARES**
PREG, O'DONNELL & GILLETT
1800 Ninth Avenue, Suite 1500
Seattle, Washington 98101-1340

**CORY R. BORGESON**
BORGESON & BURNS
100 Cushman Street, Suite 311
Fairbanks, Alaska 99701

* * * *

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit C
Page 2 of 28

A Basically, the use of the taser at the time was on the use of force continuum right about the same place as OC spray.

Q And what's OC spray?

A The oleoresin capsicum. Is that what you're asking?

Q Yeah, sometimes called mace?

A No, it's totally different than mace.

Q Totally different. Okay. So that's a pepper spray, this OC spray?

A Yes.

Q Okay. And the -- under what conditions is force such as a taser authorized in your mind?

A To control a subject that is not following your basic verbal commands. You got a force continuum, basically, that starts off with your officer presence, just by me showing up in uniform. You got verbal commands, soft hand techniques, basically, controlling the subject using arm bars, wrist locks, that sort of thing. If that doesn't work, then proceed to the next level which would be OC or electronic devices such as the taser.

Q And what is the purpose of using a taser?

A To gain compliance, to get the subject into custody.

Q Okay. And after the subject has -- is in custody or is complying with your demands, that's -- is force of the taser authorized after that?

that the Indian wasn't armed but he was threatening?
A I don't recall that, no.
Q Well, do you have any recollection of being concerned about whether or not Mr. -- the person known to you at that time as the Indian might have a valid concern about people trespassing on his land?
A Rephrase that again for me real quick.
Q Do you have any current recollection that you -- of concern by you at that time that the person referred to as the Indian was concerned about people trespassing on his land?
A At the time, my concern was that there was a complaint made about a firearm, there was a complaint made of threats to shoot people with that firearm and that the person was intoxicated. Those three things combined, you know, based on my experience, are a recipe for disaster. Certainly, I don't want to get hurt myself but, on the other hand, I want to ensure that no one else at the site gets hurt either.
Q But.....
A My main focus was to ensure that no one gets hurt. That's my main focus.
Q You were also aware that Mr. Kubanyi was not armed at the time though, according to Mr. Cruz?
A No, I wasn't aware of that. I wasn't aware that he

wasn't armed.

Q Okay. Now, after your conversation with Mr. Cruz, did -- what -- you headed back -- you followed him back into the allotment?

A Yes, we drove down an ice road or a snow road down the Rex Trail, I believe it was.

Q Okay. And -- now, Mr. -- do you remember that Mr. Cruz's light was out in his truck?

A I don't recall. I think I may have said something to him about it.

Q Okay. He actually -- he may have said something to you about it, actually, right, not to give him a ticket for his light being out -- or Mr. -- or Trooper Covey?

A That -- that sounds vaguely familiar. I don't recall the specifics of it though.

Q Now, after you got down, what did you do when you got to the allotment? Oh, that's.....

A The.....

Q That's before I.....

A Can you explain to me what you're referring to as the allotment or show to me or.....

Q Okay. To the -- well, let's.....

A I want to make sure we're talking about the same thing here.

Q Let me help you out -- yeah, I know, sometimes my

A Trooper Covey started interviewing some of the witnesses again.
Q Did you interview any witnesses?
A Not that I recall, no.
Q Okay. And what did you see -- was he the ranking officer on site?
A Not necessarily the ranking officer but it was kind of his call -- his case type deal and usually on situations like that with the exception of domestic violence, one officer usually interview as many of the people as he can. That just keeps it easier when it comes time to write a report.
Q Okay.
A Like me personally, if I'm handling a case, I like to do all my own interviews myself. That way I know exactly what to write in the report and I don't have to rely on any other statements.
Q Okay. Did -- and were you listening to the interviews?
A Not listening to the point where I was making notes or that sort of thing but I heard the essentials of the interviews, yes.
Q Okay. And what -- how would you summarize the information that you learned in the interviews?
A Basically, that Mr. Kubanyi was upset that some intertie workers were crossing some land that he believed was his

and that at some point, he returned intoxicated with a fire -- or returned intoxicated without a firearm but threatened to shoot workers and that there was a firearm on one of the snow machines.

Q Okay. And -- but it was -- was it on his snow machine?

A The statements by the witnesses stated that there was a firearm on the second snow machine, on the Scandic.

Q That's the snow machine with the white guy on it, right?

A I don't know, I.....

Q Okay. When you got there, you -- Mist -- or Trooper Covey interviewed an Ed? Do you remember that?

A The -- I don't remember the name specifically.

Q Okay. This would have been the first guy. He was a rather large guy? Do you remember a ra -- interviewing a rather large guy?

A No. I mean, I really don't.

Q Okay. Why don't you tell me what you remember then? What happened after you got there?

A Like I said, Trooper Covey continued to interview the witnesses. At some point, someone said well, there's your guy right there and pointed out towards the large open area that I assume was the lake and from that point, we went out and contacted Mr. Kubanyi.

Q So how many people were there?

A At the actual scene?

Q Mm-hmm (affirmative).

A Including myself and Trooper Covey, I believe six or seven.

Q Those were intertie workers?

A I assume so.

Q Okay. And was Mr. -- and you -- I take it the person that was approaching you later you learned was Mr. Don Kubanyi?

A The person that came walking off the lake, yes.

Q Okay. And he -- you didn't have to go after him, right, he just started -- when he saw you guys come up, he walked over?

A Well, when they pointed out, said there's your guy there, he actually was coming out of the darkness and it was still pretty dark outside and Trooper Covey went out to meet with him, I guess, and I came shortly thereafter and at that point, I could hear Mr. Kubanyi yelling obscenities at Trooper Covey and Trooper Covey, I think, telling him to turn around or show his hands or something to that effect.

Q Okay. And who -- what happened after that?

A Basically.....

Q Well, first of all, how far away from you -- how far away were you from the discussion between Mr. Kubanyi and Trooper Covey?

A Not so far that I couldn't hear them.
Q How close were you to Trooper Covey?
A Not so far that I couldn't hear him. I mean, I don't know where.....
Q How about distance? I usually like feet, yards.
A Well, I can't give you that because I don't know.
Q Five yards?
A I'm not going to say because I don't know.
Q Okay.
A I could hear him, I could see him. I could see Trooper Covey clearly anyway.
Q So was it -- was -- were you as close as you are to me right now?
A No, we were farther than that.
Q Oh, okay. Twice as far?
A I'm not going to give a distance because I -- I just don't know.
Q Okay. Any estimate?
A I'm not going to give a distance because I don't know.
Q Okay. Now, so what did Trooper Covey say, from your recollection?
A To Mr. Kubanyi?
Q Mm-hmm (affirmative).
A Show your hands, turn around, maybe get on the ground.
Q Okay. When you're making an arrest, is it standard