|    |   |                                                                              |
|----|---|------------------------------------------------------------------------------|
| 1  |   | operating procedure to tell somebody to get down on the                      |
| 2  |   | ground immediately?                                                          |
| 3  | A | Depends on the circumstances.                                                |
| 4  | Q | Okay. And what would cause you to do that?                                   |
| 5  | A | If there's weapons involved, firearms involved, a person                     |
| 6  |   | has already shown that they're violent, tumultuous.                          |
| 7  | Q | Okay. Did Mr. Kubanyi approach Trooper Covey in a                            |
| 8  |   | violent and tumultuous manner?                                               |
| 9  | A | He -- when he started walking up and he was told to show                     |
| 10 |   | his hands and what not, I believe he said fuck you. That                     |
| 11 |   | to me makes your intentions clear that you know that                         |
| 12 |   | we're state troopers, you know that we're police and                         |
| 13 |   | either you have a dislike for us or you have some other                      |
| 14 |   | reason that you don't want to comply with what we're                         |
| 15 |   | asking you to do.                                                            |
| 16 | Q | That's pretty standard to say show your hands, right?                        |
| 17 | A | Absolutely.                                                                  |
| 18 | Q | And why is it that you want somebody to show their hands? |
| 19 | A | See, make sure that they have nothing that's going to                        |
| 20 |   | harm me or harm anybody else in their hands.                                 |
| 21 | Q | And you -- and you'd been told by the intertie workers                       |
| 22 |   | that this man possibly could be armed, right? He had not                     |
| 23 |   | been armed previously but he could be armed now?                             |
| 24 | A | We were told that he threatened to shoot the intertie                        |
| 25 |   | workers and that there was a firearm on one of the snow                      |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 10 of 28

| | | |
|---|---|---|
| 1 | | machines in his party. |
| 2 | Q | Did you see a firearm? |
| 3 | A | Where? |
| 4 | Q | On Mr. Kubanyi. |
| 5 | A | No. |
| 6 | Q | Okay. Did you later find out whether or not he had a |
| 7 | | firearm on him? |
| 8 | A | After he was taken into custody, we did a pat-down search |
| 9 | | him and we didn't find one. |
| 10 | Q | Okay. Now, are you sure that Trooper Covey said show |
| 11 | | your hands? |
| 12 | A | I believe so. |
| 13 | Q | Could it be that Trooper Covey said get down on the |
| 14 | | ground? |
| 15 | A | Like I said, he either said show his hands or turn around |
| 16 | | or get on the ground, something to that effect. I know |
| 17 | | specifically that I told him to show his hands and to get |
| 18 | | on -- get down on the ground. |
| 19 | Q | Did Mr. Kubanyi respond? |
| 20 | A | By saying fuck you. |
| 21 | Q | Say anything else? |
| 22 | A | Yes, I think -- believe he said why. |
| 23 | Q | Okay. And what'd you tell him? |
| 24 | A | To -- I think I told him to get down on the ground. |
| 25 | Q | Okay. You didn't tell him why, did you? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 11 of 28

```
 1            had an allegation that someone had showed up intoxicated
 2            and threatened to shoot people.  That was why I was
 3            there.  I wasn't there to solve any trespassing problems.
 4    Q       But did -- Mr. Cruz told you that there was a dispute
 5            about trespass, that Ms. -- that -- correct?
 6    A       Mr. Cruz didn't tell me anything.  He to -- may have told
 7            Trooper Covey that.
 8    Q       But you were standing right there.
 9    A       I was standing within the general area, yes.
10    Q       So you knew when you went out there that there was a
11            dispute about trespass, right?
12    A       Like I said, my concern going out there was to prevent
13            any violence or to make an arrest if a crime had been --
14            occurred involving that violence.  I didn't want anybody
15            to get hurt and I didn't want anybody to get further hurt
16            if they've already been hurt.  My reason for going out
17            there was not to solve the trespassing issue, it was to
18            prevent violence.
19    Q       Well, I have a question about that.  Why didn't you tell
20            the intertie workers to back off and go out and sort out
21            the land control issue?
22    A       Rephrase the que -- or.....
23    Q       Why didn't you tell the intertie workers to back off,
24            withdraw from the area and sort it out in the morning
25            when everybody -- when Mr. Kubanyi was sober?
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 12 of 28

| | | |
|---|---|---|
| 1 | A | At the point when we'd gone out to the area where all the |
| 2 | | intertie workers were at, we were still in the process of |
| 3 | | the investigation when we -- when Mr. Kubanyi came to the |
| 4 | | scene. |
| 5 | Q | Well, you didn't -- you weren't investigating whether or |
| 6 | | not they had a right to be there, right? |
| 7 | A | No, we weren't. |
| 8 | Q | You didn't care about whether or not they had a right to |
| 9 | | be there, is that right? |
| 10 | A | It's not that I didn't care. At that particular point, I |
| 11 | | was concerned about the threat of violence and the |
| 12 | | potential for more violence. |
| 13 | Q | Well, if you were so concerned about the violence, why |
| 14 | | didn't you tell the intertie workers to back off and get |
| 15 | | out of there? |
| 16 | A | Because, like I said, we were there conducting the |
| 17 | | interviews to determine whether or not a crime had been |
| 18 | | committed. I had no -- like I said, I wasn't familiar |
| 19 | | with the area. I had no -- I wasn't aware that Mr. |
| 20 | | Kubanyi's cabin was so close to the scene and that he |
| 21 | | could just walk right through this short open area and be |
| 22 | | right upon us. I wasn't aware of that. I didn't -- |
| 23 | | wasn't familiar with the area. |
| 24 | Q | Okay. So you were investigating whether or not a crime |
| 25 | | had been committed but you weren't investigating whether |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 13 of 28

```
 1            or not a criminal trespass was committed?
 2      A     Our concern was with the threat of violence and a
 3            firearm.  That was my main concern and we were
 4            investigating the fact of whether or not someone had
 5            threatened someone else with a firearm and could
 6            potentially come back and carry out those threats.
 7      Q     Isn't it true that you were assuming that Mr. Kubanyi was
 8            wrong because he was a drunk Indian?
 9      A     No, I made no assumptions whatsoever whether one party
10            over the other was right or wrong.
11      Q     Why didn't you think he could be right about them
12            trespassing on his land?
13      A     He wasn't a complainant that said they were trespassing
14            on the land, the complaint came from one of the intertie
15            workers to our dispatch in reference to an intoxicated
16            person with a firearm threatening to shoot.
17      Q     So you're trying to tell me that when you showed up on
18            that scene, you had no idea whatsoever that Mr. Kubanyi
19            believed that people were trespassing on his land?
20      A     No, I'm not going to say that.  What I said was our
21            complaint that was made was of someone that was
22            intoxicated and made a threat of violence with a firearm.
23            That was our main focus when we got to the scene, to
24            prevent any violence, to prevent any harm against the
25            intertie workers and especially to prevent any harm
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 14 of 28

```
 1   Q    In the Healey area.
 2   A    I've been working the Healey area for quite awhile but
 3        not the Clear Sky area.  Like I said, I wasn't too
 4        familiar with the Rex Trail area here.  That's the first
 5        time I've been down the Rex Trail.
 6   Q    So you -- as you approach him, now, did Mr. Kubanyi
 7        threaten you or Trooper Covey?
 8   A    Not in the sense of saying something along the lines I'm
 9        going to shoot you or I'm going to hurt you or, based on
10        his demeanor, the words that were coming out of his mouth
11        and his stance and posture, I believed him -- excuse me
12        -- to be a threat, yes.
13   Q    Was he advancing on you in a threatening manner?
14   A    He wasn't -- he wasn't advancing but he definitely took
15        up a -- a aggressive stance and a combative stance.
16   Q    Okay.  And how would -- and spread his legs apart?
17   A    Yes, he, you know, kind of spread his legs apart, bladed
18        off towards us, had his hands down in -- kind of at his
19        sides with his fists closed in a classic fight or flight
20        posture.
21   Q    Okay.  And then he advanced towards you?
22   A    No, I don't recall that.
23   Q    Okay.  What'd he do?
24   A    Basically, I told him get down on the ground, get down on
25        the ground, you're under arrest, get down on the ground.
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 15 of 28

```
 1           He kept saying fuck you, fuck you, why, fuck you.  I told
 2           him if he didn't get down on the ground, that he would be
 3           controlled with 10,000 volts of electricity.  I think he
 4           said fuck you again and I deployed the taser.
 5   Q       Why were you arresting him?
 6   A       The complaint had been made he'd threatened violence
 7           against the intertie workers.  The intertie workers,
 8           based on their statements that they gave, it fit the
 9           statute for, basically, an assault-IV.
10   Q       Okay.  And so you approached him.  He -- did you ask him
11           whether or not he had threatened the intertie workers?
12   A       At that particular point, I wanted to insure that he
13           wasn't a threat to me, that he didn't have a firearm on
14           him.
15   Q       Okay.  And.....
16   A       From the very beginning of contacting him, he was
17           belligerent, he was not cooperating with simple commands
18           like show your hands and it -- you know, he didn't
19           cooperate with that.  Show me your hands is a simple
20           command.
21   Q       Were you polite to him?
22   A       What's that?
23   Q       Were you polite to him?
24   A       Show me your hands is, you know, pretty simple and
25           polite, you know?  Show me your hands.
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 16 of 28

```
1   Q    Mm-hmm (affirmative).  And you say that you told him to
2        show his hands.
3   A    I don't recall whether I said it specifically.  I believe
4        I did, show me your hands or get down on the ground,
5        something to that effect.
6   Q    Well, that's a big difference, isn't it?
7   A    Not necessarily, no.
8   Q    Well, somebody comes up to you and yells at you and says
9        something like get down on the ground as opposed to show
10       me your hands, wouldn't you see that as more threatening?
11  A    Not given that context, no.
12  Q    Okay.  So what did Mr. Kubanyi do after you told him to
13       get down on the ground?
14  A    I believe he said fuck you.
15  Q    Do anything else?
16  A    Like I said, he had his combative stance or his
17       aggressive posture.
18  Q    Did you like it when he told you to fuck you?
19  A    No, I don't care either way.  I hear it all the time.
20  Q    Okay.  So what did he do after that?
21  A    I believe -- like I said, I told him several times to get
22       down on the ground.  I told him he would be controlled
23       with 10,000 volts of electricity if he didn't.  I believe
24       he said fuck you again or something to that effect and
25       deployed the taser at which point he started back-
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 17 of 28

1  pedaling. The taser didn't have the desired effect with
2  the cartridge and at that point, myself and Trooper Covey
3  moved in to place him in restraints.
4  Q  So you fired the taser at him while he was still standing
5  and looking at you?
6  A  Yeah, he was kind of bladed off towards us, yes.
7  Q  Okay. What do you mean by bladed off? I'm not familiar
8  with that term.
9  A  Kind of at a stance like this, a -- a classic fighter
10  stance, you know, fight or flight. He's making a
11  conscious decision in his mind whether he wants to turn
12  and run or whether he wants to meet the confrontation and
13  fight.
14  Q  Okay. And.....
15     MR. VERMONT: Just for the record, counsel, would
16  you describe his stance so the record's clear or may I?
17     MR. WALLERI: Go right ahead.
18     MR. VERMONT: Well, it -- he's -- the trooper was
19  standing about six or seven feet from counsel and with his --
20  leading with his left leg and facing toward the right,
21  essentially, is that correct? And with the right side of his
22  body angled away from you. I just want the record to be clear
23  how he was standing.
24     MR. WALLERI: That's right.
25     MR. VERMONT: Thank you.

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 18 of 28

