| | | |
|---|---|---|
| 1 | Q | (By Mr. Walleri) So what'd he do after that? |
| 2 | A | Like I said, he started back-ped -- back-pedaling a |
| 3 | | little bit. Myself and Trooper Covey moved in to place |
| 4 | | him in some sort of restraints. At some point I got |
| 5 | | struck in the face by Mr. Kubanyi and we all fell to the |
| 6 | | ground. |
| 7 | Q | Are you sure he wasn't turned away from you? |
| 8 | A | When? |
| 9 | Q | When you tased him. |
| 10 | A | Yes. |
| 11 | Q | And so how -- so you physically grabbed him and put him |
| 12 | | on the ground? |
| 13 | A | No, we kind of all fell down together. |
| 14 | Q | Okay. Before you tased him? |
| 15 | A | No, this was after I'd discharged the cartridge off the |
| 16 | | taser. |
| 17 | Q | Okay. But that would have hit him in the front, correct? |
| 18 | A | What's that? |
| 19 | Q | That taser would have hit him in the front. |
| 20 | A | Not necessarily. |
| 21 | Q | Where did it hit him? |
| 22 | A | The actual prongs? |
| 23 | Q | Yeah. |
| 24 | A | I don't recall where, I think one was in the upper area |
| 25 | | up here somewhere up by the shoulder area on the -- I |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 19 of 28

|    |   |   |
|----|---|---|
| 1  |   | don't recall specifically. |
| 2  | Q | In front in -- as if he was facing you? |
| 3  | A | I don't recall if it did or didn't. |
| 4  | Q | Okay.  So what happened after that? |
| 5  | A | Kind of all fell to the ground.  I applied the taser directly on a -- a drive stun method, I believe, three times if I'm not mistaken and it wasn't having the desired effect.  Trooper Covey deployed his Cap-stun and after a short while -- excuse me, after a short while, we got handcuffs on him. |
| 11 | Q | Okay.  Did he ever say I'm done? |
| 12 | A | Yes. |
| 13 | Q | And was that before or after the Cap-stun? |
| 14 | A | I believe that was after the Cap-stun. |
| 15 | Q | Okay.  Was he on the ground at the time? |
| 16 | A | Yes. |
| 17 | Q | Okay.  So you had him on the ground.  He says I'm done, I'm done. |
| 19 | A | Well, he kind of had all of us on the ground. |
| 20 | Q | Okay. |
| 21 | A | We were all on the ground in a big pig pile together. |
| 22 | Q | Okay.  And after he said I'm done, I'm done, you continued to tase him, correct? |
| 24 | A | Yes, his -- he was saying I'm done but he was still actively resisting. |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska  99501
(907) 276-3876

Exhibit C
Page 20 of 28

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | His body was tense. He was using his muscles to try and |
| 3 | | get us off of him or get out from under us to get away or |
| 4 | | continue as an assault -- his assault on us. He was |
| 5 | | saying I'm done but still very much actively resisting. |
| 6 | Q | Now, you're saying he assaulted you? |
| 7 | A | Yes. |
| 8 | Q | Did he hit you? |
| 9 | A | Yes. |
| 10 | Q | When? |
| 11 | A | At some point when we moved in to take direct control of |
| 12 | | him. |
| 13 | Q | Okay. But he never hit you before you moved in on him? |
| 14 | A | No. |
| 15 | Q | Okay. So if I'm -- if I read this right, you told him |
| 16 | | get down on the ground. He didn't. He bladed off |
| 17 | | against you which you took as a threatening action. You |
| 18 | | fired a taser at him. That didn't work. Then you |
| 19 | | wrestled him down, got him on the ground and started |
| 20 | | tasing him in the back. Is that a summary of what |
| 21 | | happened? |
| 22 | A | A very vague summary. |
| 23 | Q | Okay. Well, did he -- did you tase him when he -- the |
| 24 | | que -- were you aware that he had burn -- taser burns on |
| 25 | | his back? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 21 of 28

```
1   A    Am I aware now?
2   Q    Yeah.
3   A    I'm aware now, yes.
4   Q    Okay.  Do you know how he got those taser burns on his
5        back?
6   A    I assume they're from -- direct tracks from on the taser.
7        It leaves marked like that.  I had them left on me
8        before.
9   Q    Okay.  Now, when you get tased -- you've been tased,
10       right?
11  A    Yes.
12  Q    Okay.  Does your body involuntary spasm?
13  A    It involuntarily locks.
14  Q    Okay.  But does it -- does a person flail at all?
15  A    No.
16  Q    Okay.  So he just -- he's -- locks?
17  A    That -- that's the whole purpose of the taser is it locks
18       up large muscle groups when it's -- when you get an
19       optimum spread on the prongs, when you -- it gets
20       deployed, in a perfect world, in a perfect day with the
21       sun shining in a perfect spread, it will lock up the
22       whole muscle group so that they can't move at all, they
23       just become ri -- rigid and fall over.
24  Q    So he had been tased and he was rigid?
25  A    No, the prongs didn't work like -- well, like I stated
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska  99501
(907) 276-3876

Exhibit C
Page 23 of 28

| | | |
|---|---|---|
| 1 | | earlier, when I shot him with the prongs, either one |
| 2 | | missed or one didn't through his Carhartts or whatever |
| 3 | | the case might be, it didn't work the way it's supposed |
| 4 | | to work. |
| 5 | Q | Mm-hmm (affirmative). When that happens, how many burn |
| 6 | | marks should there be on a person? |
| 7 | A | When you get shot with just the prongs? |
| 8 | Q | Mm-hmm (affirmative). |
| 9 | A | I assume you'd have one where each prong hit. |
| 10 | Q | Okay. So you have two. |
| 11 | A | Yes. |
| 12 | Q | And they -- those would have been in the front? |
| 13 | A | Depending on where the prongs hit, yes. |
| 14 | Q | Okay. How did he get multiple taser wounds on his back? |
| 15 | A | Those are from me when I applied it directly in a drive |
| 16 | | stun method. |
| 17 | Q | Okay. And how many ti -- how many marks were they -- |
| 18 | | each time that you did it, you'd leave a mark? |
| 19 | A | If it's not -- depending on how much of the current |
| 20 | | actually got through into the skin. I mean, you can hold |
| 21 | | it out here and still feel it through your jacket but not |
| 22 | | actually have direct contact enough to leave a mark. |
| 23 | Q | Mm-hmm (affirmative). But you've seen the pictures of |
| 24 | | the -- of his burn marks? |
| 25 | A | I've seen pictures of someone's back with marks on it. |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 23 of 28

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | And it wasn't there when the pictures got taken so I |
| 3 | | can't say whether they're his or not. |
| 4 | Q | Okay. |
| 5 | A | Can we stop for just a second so I can get some water? |
| 6 | Q | Go right ahead. |
| 7 | | MR. VERMONT: Would you hand us that pitcher that's |
| 8 | | right behind? Seems to be the only water in here. |
| 9 | | COURT REPORTER: We're off record. |
| 10 | | (Off record) |
| 11 | | (On record) |
| 12 | | COURT REPORTER: Back on record. |
| 13 | | MR. VERMONT: Can the record show we were just off |
| 14 | | for 30 seconds or so, just to get some more water? Thank you. |
| 15 | Q | (By Mr. Walleri) When he struck you, do you think that |
| 16 | | Mr. Kubanyi intended to strike you? |
| 17 | A | Yes. |
| 18 | Q | And why is that? |
| 19 | A | Based on his demeanor and his tumultuous attitude towards |
| 20 | | us from the moment we got there. |
| 21 | Q | Well, tell me this, can you describe how he struck you? |
| 22 | A | Not specifically, no. I know I got struck in the face by |
| 23 | | Mr. Kubanyi. Whether it was his elbow or his fist, I |
| 24 | | don't know specifically. |
| 25 | Q | When he was on the ground? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 24 of 28

| | | |
|---|---|---|
| 1 | A | He has a taser. He didn't have it with him. |
| 2 | Q | Okay. Did you have any chemical spray? |
| 3 | A | Yes. |
| 4 | Q | And did you use your chemical spray? |
| 5 | A | No. |
| 6 | Q | And Officer Covey did use his chemical spray, correct? |
| 7 | A | Yes, he used his OC. |
| 8 | Q | Okay. And this is when Mr. Kubanyi was standing in his defiant stand in front of Mr. -- or..... |
| 10 | A | No, I believe this was when we were all on the ground is when he got sprayed. |
| 12 | Q | Okay. Well, after you arrested Mr. Kubanyi, what happened next? |
| 14 | A | Basically, we got him into custody, put the handcuffs on him, walked him back to the patrol vehicle. We got -- got his face washed off as best we could and then he was transported back to Fairbanks, I believe. |
| 18 | Q | Why did you tase him after he said -- after he surrendered to you, after he said I -- I'm done? |
| 20 | A | He didn't surrender. He can say I'm done but if you're still actively resisting, your words aren't going to hurt but your flailing arms and legs and your defiance to comply with my orders to stop resisting are what's going to hurt me. My main interest is not getting hurt myself and making sure no one else gets hurt. |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 25 of 28

-54-

1   Q   Now, you indicated that when the person is stunned, that
2       they lock up.
3   A   When the person is shot with the probes and, like I said,
4       on a perfect day with sun shining and a perfect probe
5       displacement where you get a large area to cover between
6       the two probes, the taser works as -- say you get a probe
7       -- a probe in the thigh and a probe in the upper shoulder
8       area, it'll immobilize everything between that. When you
9       apply direct pressure with the drive stun, your spread is
10      only about an inch wide so you're not immobilizing
11      anything. It turns into more of a pain compliance tool
12      than a immobilization device.
13  Q   So when you were stunning him directly, was he flailing
14      around?
15  A   Yes.
16  Q   Okay. So.....
17  A   He's still actively resisting.
18  Q   Well, are you sure he was actively resisting or
19      responding to this pain stimuli?
20  A   He was still actively resisting.
21  Q   Okay. And in your mind, it's absolutely clear that after
22      you directly applied the taser, that none of his bodily
23      functions were involuntarily flailing?
24  A   Say that again for me?
25  Q   None of his arms or legs were involuntarily flailing

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 26 of 28

```
1   Q    Okay.  Were you there?
2   A    Well, I assume I was still there.
3   Q    Okay.  After you.....
4        MR. VERMONT:  Well, let's define there.  You mean
5   the scene generally or.....
6   Q    (By Mr. Walleri)  Yeah, you were in the -- you were at
7        the scene, correct?
8   A    I was still around where the intertie workers were.
9   Q    What happened after you picked -- after you subdued Mr.
10       Kubanyi?
11  A    Like I said, we walked him back to the car.  He washed
12       his face off.  I gave him a couple bottles of water out
13       of my patrol car and some napkins.  I washed off his face
14       on Trooper Covey's -- the hood of Trooper Covey's car and
15       then he was taken out to the road where he was picked up
16       by, I believe, Trooper Hartson (ph) and, I guess, taken
17       to Fairbanks.
18  Q    Okay.  And then what did you do after that?
19  A    After he was taken out to the road?
20  Q    Yeah.
21  A    Went home.
22  Q    Okay.  Did you do any further investigation?
23  A    That night?
24  Q    At all.
25  A    Compiled the police report.
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit C
Page 27 of 28

```
1              MR. VERMONT:  I've got a couple I want to ask.
2                          CROSS EXAMINATION
3    BY MR. VERMONT:
4    Q    Your trooper report shows 2222 for the time.  Put that in
5         civilian time for us.
6    A    10:22.
7    Q    10:22?  Was it light or dark that time of year out there?
8    A    Very dark.
9    Q    Okay.  Were there any lights, any visible street lights
10        or anything like that down this ice road that you went to
11        to get to the scene?
12   A    There weren't street lights or anything down the ice
13        road.
14   Q    All right.  So your only illumination was your headlights
15        as you drove down there?
16   A    As we drove there, yes.
17   Q    Okay.  And then when you got to where the construction
18        workers were and these interviews were occurring, was
19        there illumination of any kind other than the headlights
20        from your vehicles?
21   A    They had some sort of mobile construction light things in
22        the area.
23   Q    Describe that, what you recall of it.
24   A    They're six or eight feet tall with lights on top of them
25        that you kind of fold up or I don't know exactly how they
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska  99501
(907) 276-3876

Exhibit C
Page 28 of 28