|   |   |   |
|---|---|---|
| 1 |   | poaching.  I issued them summonses to appear in court for |
| 2 |   | the poaching.  The Native tribe was also present and I |
| 3 |   | told them that I wasn't going to deal with the |
| 4 |   | trespassing issue, that was a civil matter.  I -- I did |
| 5 |   | assist them in giving them the -- the contact information |
| 6 |   | for the two defendant so they could give it to their |
| 7 |   | attorney. |
| 8 | Q | Mm-hmm (affirmative).  Have you ever -- that's actually |
| 9 |   | pretty standard in practice, isn't it, to -- this -- the |
| 10 |   | idea of telling people who are complaining to the |
| 11 |   | troopers about trespass that it's really a civil matter? |
| 12 | A | It depends on the situation.  If it's -- let's say, a |
| 13 |   | hypothetical situation, somebody's in your house, you |
| 14 |   | tell them to leave.  I know that's your house.  I know, |
| 15 |   | you know, your boundaries.  It was wall to wall, maybe |
| 16 |   | you have a fence around your yard.  You can say this is |
| 17 |   | my property and I can say, you know, I agree with you.  I |
| 18 |   | -- you know, you pay the mortgage on this house, you have |
| 19 |   | the right to tell people to leave.  In that situation, I |
| 20 |   | would deal with it differently than I would a situation |
| 21 |   | where -- let's say Native land where, you know, the |
| 22 |   | boundaries are sometimes creeks or high water marks or |
| 23 |   | treelines, whatever, that -- that I'm not familiar with. |
| 24 | Q | Okay.  What about posting, does that change the |
| 25 |   | situation? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska  99501
(907) 276-3876

EXHIBIT 7
PAGE 1 OF 11

| | | |
|---|---|---|
| 1 | A | Post as in..... |
| 2 | Q | When the lands are posted as to private property. |
| 3 | A | It would be -- to me, it would be more a definitive this is private property. |
| 5 | Q | Okay. In fact, that's a legal distinction, isn't it? |
| 6 | A | Yeah. |
| 7 | Q | The idea that the -- there's a difference between the legal implications of trespassing on unposted property as opposed to posted property. |
| 10 | A | That's one of the things that we advise private landowners do is post on their property no trespassing or private property or something to that effect. |
| 13 | Q | And so that's actually consistent with the policy that we discussed yesterday, isn't it? |
| 15 | A | That's correct. |
| 16 | Q | Okay. So when you were -- why don't we go ahead and we'll start off and if you could tell me how it is that you ended up at the Kubanyi allotment on March 1st of 2003? |
| 20 | A | Okay. Patrick Nelson and I were returning from the Nenana Tripod Days which are, obviously, held in Nenana. We were approximate -- we were south of the -- the area, the -- the 281. We were down in the 260 mile marker range. Dispatch called us up and they told -- I can't remember verbatim what they said but it was something to |

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 7
PAGE 2 OF 11

| | | |
|---|---|---|
| 1 | A | They have that right. |
| 2 | Q | Okay. And do they -- what kind of force do they -- from |
| 3 | | your understanding, would they have to -- what kind of |
| 4 | | force would they have to enforce that? |
| 5 | A | Well, from the -- from the point of view of the state |
| 6 | | troopers, we encourage them not to use any force. |
| 7 | Q | I understand that that's actually part of the policy but |
| 8 | | from your understanding, let's say you were out there and |
| 9 | | somebody was trying to make a civil arrest and -- for |
| 10 | | somebody trespassing on their property. Would you arrest |
| 11 | | them if they used force at all to make the -- to |
| 12 | | accomplish the civil arrest? |
| 13 | A | It -- it would really vary depending on the situation. I |
| 14 | | mean, if -- you know, if somebody is three or 400 feet, |
| 15 | | you know, a distance away from their house and they're |
| 16 | | not threatened, you know, I would -- I would -- my |
| 17 | | distinction would be if -- if you threaten somebody, |
| 18 | | everybody's got the -- the right in Alaska to defend |
| 19 | | themselves but if they're not being threatened, people |
| 20 | | don't have the right to just grab a gun and point it and |
| 21 | | shoot at somebody to get off their land. |
| 22 | Q | Well, I'm not asking -- we're not talking about a gun |
| 23 | | but, I mean, do they have the right to physically grab |
| 24 | | the person and restrain them if they're affecting a civil |
| 25 | | arrest? |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 3 OF 11

```
 1         threatened to shoot his -- his employees.
 2   Q    And that was primary -- that's primarily what you took
 3         away from that conversation?
 4   A    Correct.
 5   Q    Okay.  Have you ever -- in your experience as a trooper,
 6         have you ever been -- let's -- I don't know how best to
 7         put this but have you ever felt used by people?
 8   A    I've felt at time that people have attempted to use the
 9         troopers to -- to -- or the law, let's say, to -- to kind
10         of get what they want.
11   Q    Okay.  Did you have a -- any sense that that's what was
12         going on in this case?
13   A    Not at all.
14   Q    I'm cur -- now, when you were driving in, you were in
15         front of Trooper Nelson's car.
16   A    Correct.
17   Q    Okay.  And you were behind Mr. Cruz.....
18   A    Correct.
19   Q    .....in his truck.
20   A    Mm-hmm (affirmative).
21   Q    Okay.  Did you see any signs?
22   A    I don't remember seeing any signs.
23   Q    Okay.  Were you looking for signs?
24   A    No, I wasn't.
25   Q    Okay.  So is it fair to say a -- I'm getting the
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 4 OF 11

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | impression and I know I'm repeating myself but I just                |
| 2  |   | want to make this clear that in your response to the                 |
| 3  |   | situation, you weren't really concerned so much about any            |
| 4  |   | alleged trespasses but you were really focusing on the               |
| 5  |   | question of whether or not Mr. Kubanyi was threatening               |
| 6  |   | somebody with killing them?                                          |
| 7  | A | I'd say it's fair to say that I was prioritizing the                 |
| 8  |   | issues.  I knew there was a underlying trespass                      |
| 9  |   | issue.....                                                           |
| 10 | Q | Mm-hmm (affirmative).                                                |
| 11 | A | .....but at the time, what was occupying me and -- at the            |
| 12 |   | time was the -- the threat of the use of force -- or the             |
| 13 |   | -- the firearm.                                                      |
| 14 | Q | Now, it wasn't just Mr. Cruz that told you there was a               |
| 15 |   | trespass issue, right?                                               |
| 16 | A | To the.....                                                          |
| 17 | Q | I mean, do you know how many people told you that the                |
| 18 |   | underlying conflict was over trespass before you                     |
| 19 |   | encountered Mr. .....                                                |
| 20 | A | I couldn't give you a definitive number.                             |
| 21 | Q | Sou -- would four sound about right?                                 |
| 22 | A | I -- I couldn't tell you, to be honest with you.                     |
| 23 | Q | Okay.  So -- and you -- when you arrived at the scene,               |
| 24 |   | the -- you went up to the -- you -- well, tell me how you            |
| 25 |   | came to encounter Mr. Kubanyi.                                       |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 5 OF 11

-23-

| | | |
|---|---|---|
| 1 | A | Well, I was -- I was conducting some interviews and |
| 2 | | somebody in the background kind of said oh, here he comes |
| 3 | | now or something to that effect. I looked out onto the |
| 4 | | lake. It was dark but I could see a -- a figure walking |
| 5 | | towards me and the thought in my mind was he threatened |
| 6 | | to come back with a firearm so I walked out onto the |
| 7 | | lake. I -- because it was an unknown threat to me |
| 8 | | whether he had a firearm or not -- I could not tell by |
| 9 | | looking at him -- I drew my -- my handgun out to what is |
| 10 | | a low guard and ordered Mr. Kubanyi to show me his hands |
| 11 | | and this was to make -- for me to see that he didn't have |
| 12 | | any weapons. |
| 13 | Q | Mm-hmm (affirmative). |
| 14 | A | I ordered Mr. Kubanyi to show me his -- his hands. He |
| 15 | | said something to the effect of fuck you. I asked him to |
| 16 | | turn around or I ordered him to turn around. He -- I |
| 17 | | couldn't remember if he said fuck you again or why or |
| 18 | | something to that effect but he was definitely hostile |
| 19 | | towards me. He -- he stopped advancing on me. I had my |
| 20 | | gun out to a low guard, like I said, and I kept giving |
| 21 | | him orders to comply with me and he kept saying fuck you |
| 22 | | or -- or why or something like that. Trooper Nelson |
| 23 | | arrived on -- was on, I'd say, 10 seconds behind me. He |
| 24 | | arrived on -- where -- where I was with Mr. Kubanyi and |
| 25 | | Trooper Nelson got his taser out and the -- the taser has |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 6 of 11

| | | |
|---|---|---|
| 1 | | reason why you wanted your world to be safe? |
| 2 | A | Well, I like to go..... |
| 3 | Q | Or you had concern. Let's put it this way -- strike |
| 4 | | that. Is that the reason why you felt that you were -- |
| 5 | | had a heightened sense of wanting to make your world |
| 6 | | safe? |
| 7 | A | Yes, the threat was that he was going to come back with a |
| 8 | | firearm. I saw him coming back. I didn't know if he had |
| 9 | | a firearm or not. I need to make my world safe, make |
| 10 | | sure nothing bad's going to happen. |
| 11 | Q | Okay. And you were also concerned about the -- were you |
| 12 | | also concerned about the other people there? |
| 13 | A | Yes. |
| 14 | Q | Okay. And that's because they had reported to you that |
| 15 | | he had threatened to kill them? |
| 16 | A | Yes. |
| 17 | Q | Now, once Mr. Kubanyi -- let's -- one other -- had you |
| 18 | | ever -- in talking to Cruz at -- prior to Mr. Kubanyi, |
| 19 | | did you ever suggest to Mr. Cruz -- or you or Officer |
| 20 | | Nelson suggest to Mr. Cruz that he pull he crew out of |
| 21 | | there and reso -- and try and sort out the title issue |
| 22 | | later on? |
| 23 | A | Not at the time. My -- my -- my main concern was -- was |
| 24 | | just getting to the scene and controlling the scene. |
| 25 | Q | Wouldn't it have been controlling the scene to tell Mr. |

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 7
PAGE 7 OF 11

| | | |
|---|---|---|
| 1 | | Cruz to withdraw? |
| 2 | A | I -- I -- you know, to be honest with you, I didn't know |
| 3 | | where his guys were. I didn't know if they were still on |
| 4 | | the lake. I didn't know where they were. I mean, |
| 5 | | hindsight 20/20, it probably would have been. |
| 6 | Q | Now, it was rather obvious -- well, as you approached, |
| 7 | | there was an awful lot of equipment there, right? |
| 8 | A | Yes. |
| 9 | Q | Okay. And you were aware that this was part of the GVA |
| 10 | | intertie project, correct? |
| 11 | A | Just vaguely. Just basically off what Mr. Cruz had told |
| 12 | | me. |
| 13 | Q | Okay. Given the sheer size of the equipment, number of |
| 14 | | people there and its connection with the GVA intertie, |
| 15 | | did you draw any conclusions as to the probability of |
| 16 | | legitimacy of those people being there properly? |
| 17 | A | Didn't concern me at the time. |
| 18 | Q | Okay. The -- when you talked to Mr. Cruz initially and |
| 19 | | he started talking about -- do you remember him talking |
| 20 | | about -- telling you that there's an Indian out there |
| 21 | | getting wild? |
| 22 | A | Something to that effect. I can't remember his words |
| 23 | | verbatim. |
| 24 | Q | What did you think about that comment? |
| 25 | A | I just considered the -- the fact that somebody was |

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 8 of 11

|   |   |   |
|---|---|---|
| 1 |   | threatening to shoot somebody. |
| 2 | Q | Okay. You disregarded the obvious ethnic implications of |
| 3 |   | the comment? |
| 4 | A | When people get excited, people say a lot of things. I |
| 5 |   | don't take that -- I take that at face value. You know, |
| 6 |   | we all say things. It didn't concern me at the time. I |
| 7 |   | was more concerned about the -- the threat of the use of |
| 8 |   | the firearm. |
| 9 | Q | Okay. The -- now, when you -- and I'm curious about when |
| 10 |   | you actually made the arrest. When do you consider the |
| 11 |   | fact -- when do you consider that Mr. Kubanyi was under |
| 12 |   | arrest? |
| 13 | A | The first time he said fuck you. That's disorderly |
| 14 |   | conduct. At that point, I was -- when Mr. Kubanyi came |
| 15 |   | out, I was still conducting my investigation. I |
| 16 |   | determined that the individuals felt threatened. At that |
| 17 |   | point, I didn't know if Mr. Kubanyi was going to go to |
| 18 |   | jail or if he was going to receive a summons to appear in |
| 19 |   | court because there was no firearm. When I went out and |
| 20 |   | -- and confronted Mr. Kubanyi and his attitude was fuck |
| 21 |   | you, at that point, I knew that he was going to go to |
| 22 |   | jail. |
| 23 | Q | So if anybody tells an officer to fuck you, that that's a |
| 24 |   | -- that's disorderly conduct? |
| 25 | A | It depends on the situation. You know, everybody's |

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

EXHIBIT 7
PAGE 9 of 11

```
 1           used excessive force?  Yes or no and -- or something to
 2           that effect.  It's -- it's common.  I've done it multiple
 3           times and -- and they said no, we -- we thought you guys
 4           acted reasonably.
 5     Q     Mm-hmm (affirmative).  Okay.  Now, when you were talking
 6           to Mr. Baggett, didn't you tell him that you didn't
 7           expect any more trouble?
 8     A     I don't remember saying those words exactly.
 9     Q     Okay.  Did you make a reference to the fact that Mr.
10           Kubanyi had gotten himself into trouble and that he --
11           you didn't expect any more trouble to the Cruz people
12           from Mr. Baggett?
13     A     I -- I don't remember saying that, no.
14     Q     Was that your intention?
15     A     My intention was to diffuse the situation and -- and not
16           have a repeat of what had just happened.  I would prefer
17           that -- you know, at the time, that that didn't happen,
18           that Mr. Kubanyi would come across the lake, we could
19           have a civil conversation with him and the Cruz people.
20           That was my preference.  That didn't happen and so I -- I
21           basically wanted diffuse the situation.
22     Q     Well, I have a question here at this point.  Once Mr.
23           Baggett came over and -- why didn't you investigate as to
24           whether or not there was, in fact, a trespass at that
25           point?
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 10 OF 11

```
 1         out on the lake if Mr. Kubanyi was out there with a
 2         weapon?
 3   A     Yes, it could have been.
 4   Q     Do you know if Mr. Kubanyi had weapons in his home?
 5   A     It's -- as far as I'm concerned, it's Alaska.  Every
 6         house in Alaska has a gun in it.....
 7   Q     Well.....
 8   A     .....but I was not aware that he did or did not.
 9   Q     Would it surprise you if he testified he had more than 30
10         firearms in his home out there at Seven Mile Lake?
11   A     In that part of the state, not in the slightest.
12   Q     And included that he had automatic weapons in his home?
13   A     I -- I wasn't aware of that but.....
14   Q     Could it have been dangerous if Mr. Kubanyi had gotten
15         back to his house in an intoxicated, excited state and
16         had all those weapons available to him?
17   A     Yes.
18   Q     Did anyone ever file a complaint against Cruz
19         Construction that they trespassed?
20   A     Not to me.  Not that I'm aware of.
21   Q     So did Mr. Baggett ever tell you that he wanted to file a
22         complaint of trespass when you talked to him that night?
23   A     No.
24   Q     Did Mr. Kubanyi ever tell you he wanted to file a
25         complaint of trespass that night?
```

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

EXHIBIT 7
PAGE 11 OF 11