```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF ALASKA

 3   DON M. KUBANYI, JIMMY KUBANYI,      )
     AILEEN WELTON, ELIZABETH            )
 4   TUZROYLUK, DORIS KUBANYI,           )
     VICTOR KUBANYI, BOBBY KUBANYI,      )
 5   ARLETTE KUBANYI and BRIAN           )
     BAGGETT,                            )
 6                                       )
                    Plaintiffs,          )
 7                                       )
          v.                             )
 8                                       )
     GOLDEN VALLEY ELECTRIC              )
 9   ASSOCIATION, DAVE CRUZ,             )
     individually, and d/b/a             )
10   CRUZ CONSTRUCTION, BLACK &          )
     VECH CORPORATION, JAKE COVEY,       )
11   and PATRICK NELSON,                 )
                                         )
12                  Defendants.          )
                                         )  Case No. FO4-0026 CI
13   _____ )

14             DEPOSITION OF JACOB STEWART COVEY

15                     January 25, 2006

16   APPEARANCES:

17        FOR THE PLAINTIFFS:    MICHAEL J. WALLERI
                                 Attorney at Law
18                               330 Wendell Street, Suite E
                                 Fairbanks, Alaska  99701
19
          FOR THE DEFENDANTS:    VENABLE VERMONT, JR.
20                               Assistant Attorney General
                                 STATE OF ALASKA DEP'T OF LAW
21                               Civil Division
                                 Special Litigation Section
22                               1031 West Fourth Avenue,
                                 Suite 200
23                               Anchorage, Alaska  99501-5903

24

25
```



METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska  99501
(907) 276-3876



```
 1   APPEARANCES (cont.):

 2        FOR THE DEFENDANTS:     DANIEL T. QUINN
                                  RICHMOND & QUINN
 3                                360 K Street, Suite 200
                                  Anchorage, Alaska   99501
 4
                                  CHRISTINE E. TAVARES
 5                                PREG, O'DONNELL & GILLETT
                                  1800 Ninth Avenue, Suite 1500
 6                                Seattle, Washington   98101-1340

 7                                CORY R. BORGESON
                                  BORGESON & BURNS
 8                                100 Cushman Street, Suite 311
                                  Fairbanks, Alaska   99701
 9

10

11

12                         * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   PURSUANT TO NOTICE, the deposition of **JACOB STEWART COVEY**

2   was taken on behalf of the Plaintiff, before Sharon Wilcox,

3   Notary Public in and for the State of Alaska and Court

4   Reporter for **Metro Court Reporting** at their offices at 745

5   West Fourth Avenue, Suite 425, Anchorage, Alaska, on the 25th

6   day of January, 2006, commencing at the hour of 9:12 o'clock

7   a.m.

8

9                        **TABLE OF CONTENTS**

10  Direct Examination by Mr. Walleri . . . . . . . . .   5
    Cross Examination by Mr. Borgeson . . . . . . . .  45
11  Cross Examination by Mr. Quinn . . . . . . . . .  49
    Cross Examination by Ms. Tavares . . . . . . . .  51
12  Cross Examination by Mr. Vermont . . . . . . . .  51

```
                      P R O C E E D I N G S
1
2         (On record)
3              COURT REPORTER:  We're on record.  My name is Sharon
4    Wilcox.  I'm a court reporter for Metro Court Reporting, 745
5    West Fourth Avenue, Suite 425, Anchorage, Alaska.  Today's
6    date is January 25th, 2006.  The time is approximately 9:17
7    a.m.  We're at the offices of Metro Court Reporting for the
8    deposition of TROOPER JAKE COVEY.  This case is in the United
9    States District Court for the District of Alaska, Don M.
10   Kubanyi, et al., Plaintiff versus Golden Valley Electric
11   Association, et al., Defendant, case number F04-0026 Civil.
12   Sir, would you please raise your right hand?
13        (Oath administered)
14             OFFICER COVEY:  I do.
15             COURT REPORTER:  Thank you.
16                      JACOB STEWART COVEY
17   having first been duly sworn under oath, testified as follows
18   on examination:
19                       DIRECT EXAMINATION
20             COURT REPORTER:  Please state your full name and
21   spell your last for the record.
22   A    Jacob Stewart Covey.  Last is C-o-v as in Victor e-y.
23             COURT REPORTER:  Thank you.  Could I have a mailing
24   address, sir?
25   A    P. O. Box 170, Cantwell, Alaska, 99720.
```

```
1              COURT REPORTER:  Thank you.  And day time or message
2   phone number?
3   A    768-2202.
4              COURT REPORTER:  2202?
5   A    Yes.
6              COURT REPORTER:  Thank you.  Would counsel please
7   identify themselves for the record?
8              MR. WALLERI:  Michael Walleri on behalf of
9   plaintiffs.
10             MR. BORGESON:  Cory Borgeson for Golden Valley.
11             MR. QUINN:  Dan Quinn for Dave Cruz and Cruz
12  Construction.
13             MS. TAVARES:  Chris Tavares for Black and Vech.
14             MR. VERMONT:  Venable Vermont from the attorney
15  general's office for Troopers Covey and Nelson.
16             COURT REPORTER:  Thank you.  You may proceed.
17  BY MR. WALLERI:
18  Q    Trooper Covey, how long have you been employed with the
19       Alaska State Troopers?
20  A    Same as Patrick Nelson, coming on eight years.
21  Q    Okay.  And prior to your employment with the troopers,
22       were you employed in the public safety area?
23  A    No, I wasn't.
24  Q    Okay.  And have you had any training in addition to your
25       basic academy training?
```

1   A   We attend in-services every year -- or every other year,
2       I'm sorry.
3   Q   And have you been subject to any internal investigations
4       or investigations for disciplinary actions with the
5       troopers?
6   A   I've never been the subject of an actual investigation.
7       I've received one reprimand and two letters of
8       instruction.
9   Q   And what was the reprimand for?
10  A   The reprimand was for myself and another lady who decided
11      to back into each other in the FMH parking lot.  I was in
12      a patrol car.  So.....
13  Q   And the letters of instruction?
14  A   One was for running over por -- or my preliminary breath
15      test, PBT, machine and the other one was for arresting a
16      17-year-old who I thought was quite a bit older.
17  Q   And could you go over your stations?
18  A   I started in Fairbanks.  That's where I did my field
19      training, officer program.  I was in Fairbanks for
20      approximately a year and a half.  Then I transferred to
21      Kotzebue and I was in Kotzebue for two years.  I then
22      transferred to Cantwell where I'm -- where I'm currently
23      stationed.  I've been there three years.
24  Q   Okay.  And so in 2003, that was -- you'd only been there
25      for a little less than a year in Cantwell?

| | | |
|---|---|---|
| 1 | A | That is correct. |
| 2 | Q | Okay. The -- have you had any training in the use of |
| 3 | | chemical spray? |
| 4 | A | Yes, I have. |
| 5 | Q | And can you tell me when -- what the conditions are for |
| 6 | | the use of the chemical spray? |
| 7 | A | Do you mean when do we -- when do we use it? Is that |
| 8 | | what you're asking me? |
| 9 | Q | Mm-hmm (affirmative). |
| 10 | A | You use it when you have a combative subject. Basically, |
| 11 | | it's -- it's used to control that subject. It's -- it's |
| 12 | | -- on the use of force continuum, it's before, you know, |
| 13 | | like say the baton. It's before that. It's the -- yeah, |
| 14 | | basically, that's -- that's the answer. |
| 15 | Q | Okay. Any level of force less than the -- in terms of |
| 16 | | your standard operating procedures, less than a chemical |
| 17 | | spray? |
| 18 | A | Yes, there is a soft -- there's officer presence, then |
| 19 | | you have soft hands and then you have the -- the bato -- |
| 20 | | or the -- I'm sorry, the OC and the taser. |
| 21 | Q | And what's the soft hands? |
| 22 | A | Soft hands would be let's say an arm bar, just grabbing |
| 23 | | somebody and taking them down to the ground. |
| 24 | Q | Okay. And what conditions would you use in a soft hands |
| 25 | | approach? |

1   A   If -- if I knew a subject wasn't armed, if I -- let's say
2       I told a subject to show me his hands and he showed me
3       his hands, I told him to put his hands up or, you know,
4       comply with me and he wasn't complying, I knew he wasn't
5       armed, I might then -- and depending on circumstances but
6       I might then move in to try to do a soft arm -- or a -- a
7       -- a arm take down.
8   Q   Okay.  You were here for the deposition of Trooper
9       Nelson, right?
10  A   That is correct.
11  Q   Okay.  And you heard us talk about the poli -- trooper
12      policies about trespass also, right?
13  A   That is correct.
14  Q   Okay.  Have you ever -- other than the Kubanyi matter,
15      have you ever been involved in a situation where there
16      was a controversy over trespass on Native lands?
17  A   Yes, I have.
18  Q   Could you describe that for me?
19  A   Excuse me.  Last year, I had the -- the Native tribe out
20      of Cantwell show up at my office and report some -- some
21      poachers trespassing on Native land.  I -- I responded --
22      they were -- they were poaching caribou, shooting caribou
23      out of season.  I responded to the area.  The two
24      individuals were just coming back out on -- onto the
25      Denali Highway.  I contacted them.  I dealt with the

| | | |
|---|---|---|
| 1 | | poaching.  I issued them summonses to appear in court for |
| 2 | | the poaching.  The Native tribe was also present and I |
| 3 | | told them that I wasn't going to deal with the |
| 4 | | trespassing issue, that was a civil matter.  I -- I did |
| 5 | | assist them in giving them the -- the contact information |
| 6 | | for the two defendant so they could give it to their |
| 7 | | attorney. |
| 8 | Q | Mm-hmm (affirmative).  Have you ever -- that's actually |
| 9 | | pretty standard in practice, isn't it, to -- this -- the |
| 10 | | idea of telling people who are complaining to the |
| 11 | | troopers about trespass that it's really a civil matter? |
| 12 | A | It depends on the situation.  If it's -- let's say, a |
| 13 | | hypothetical situation, somebody's in your house, you |
| 14 | | tell them to leave.  I know that's your house.  I know, |
| 15 | | you know, your boundaries.  It was wall to wall, maybe |
| 16 | | you have a fence around your yard.  You can say this is |
| 17 | | my property and I can say, you know, I agree with you.  I |
| 18 | | -- you know, you pay the mortgage on this house, you have |
| 19 | | the right to tell people to leave.  In that situation, I |
| 20 | | would deal with it differently than I would a situation |
| 21 | | where -- let's say Native land where, you know, the |
| 22 | | boundaries are sometimes creeks or high water marks or |
| 23 | | treelines, whatever, that -- that I'm not familiar with. |
| 24 | Q | Okay.  What about posting, does that change the |
| 25 | | situation? |

...

| | | |
|---|---|---|
| 1 | A | Post as in..... |
| 2 | Q | When the lands are posted as to private property. |
| 3 | A | It would be -- to me, it would be more a definitive this is private property. |
| 5 | Q | Okay. In fact, that's a legal distinction, isn't it? |
| 6 | A | Yeah. |
| 7 | Q | The idea that the -- there's a difference between the legal implications of trespassing on unposted property as opposed to posted property. |
| 10 | A | That's one of the things that we advise private landowners do is post on their property no trespassing or private property or something to that effect. |
| 13 | Q | And so that's actually consistent with the policy that we discussed yesterday, isn't it? |
| 15 | A | That's correct. |
| 16 | Q | Okay. So when you were -- why don't we go ahead and we'll start off and if you could tell me how it is that you ended up at the Kubanyi allotment on March 1st of 2003? |
| 20 | A | Okay. Patrick Nelson and I were returning from the Nenana Tripod Days which are, obviously, held in Nenana. We were approximate -- we were south of the -- the area, the -- the 281. We were down in the 260 mile marker range. Dispatch called us up and they told -- I can't remember verbatim what they said but it was something to |

|   |   |   |
|---|---|---|
| 1 |   | the effect that, you know, respond to Mile 281, you're |
| 2 |   | going to meet a complainant there reference somebody |
| 3 |   | threatening to shoot some people.  So we -- we turned our |
| 4 |   | cars around and I got there -- I was behind Patrick so |
| 5 |   | when we turned our cars around, I was in front of Trooper |
| 6 |   | Nelson.  It took us 10, 15 minutes to get there.  We |
| 7 |   | respo -- we got to the scene, 281, 281.5, somewhere in |
| 8 |   | there.  We -- I noticed the -- the vehicle that Mr. Cruz |
| 9 |   | was in sitting out kind of -- not on the Parks Highway |
| 10 |   | but out at the edge of the Rex Trail. |
| 11 | Q | Mm-hmm (affirmative). |
| 12 | A | I stopped there and I contacted him. |
| 13 | Q | Okay.  Now, in preparing for this deposition, did you |
| 14 |   | have an opportunity to review the tape that you made? |
| 15 | A | Yes, I did. |
| 16 | Q | Okay.  Now -- and you've also had an opportunity to |
| 17 |   | review your reports? |
| 18 | A | Correct. |
| 19 | Q | Okay.  The -- in terms of -- what's your recollection -- |
| 20 |   | let's put it this way -- what -- of what Mr. Cruz told |
| 21 |   | you? |
| 22 | A | Mr. Cruz told me that he -- he -- this was the first time |
| 23 |   | I'd heard Mr. Kubanyi's name -- that somebody named Mr. |
| 24 |   | Kubanyi was having issues with -- there's some -- I can't |
| 25 |   | remember verbatim but it was something to the effect of |

|    |   |                                                                      |
|----|---|----------------------------------------------------------------------|
| 1  |   | -- of, you know, he's -- he's having issues with us on --            |
| 2  |   | you know, there's some land issues and he's threatening              |
| 3  |   | to shoot some of my -- my workers out there.                         |
| 4  | Q | Okay. Have you ever heard people threaten to shoot                   |
| 5  |   | people before about it?                                              |
| 6  | A | About.....                                                           |
| 7  | Q | About one person threatening to shoot another person.                |
| 8  | A | Yes, I have.                                                         |
| 9  | Q | Okay. Is it always a credible threat?                                |
| 10 | A | I'd take personally when somebody -- when somebody --                |
| 11 |   | based on my -- my experience as a state trooper for the              |
| 12 |   | last 7-1/2 years, when somebody ele -- escalates to the              |
| 13 |   | point of threatening to shoot somebody, I always take                |
| 14 |   | that seriously.                                                      |
| 15 | Q | Okay. Have you ever heard people just simply say I think             |
| 16 |   | I will shoot that person and not really mean it?                     |
| 17 | A | Are you talking about have I had a conversation with                 |
| 18 |   | somebody?                                                            |
| 19 | Q | Mm-hmm (affirmative).                                                |
| 20 | A | I'm sure throughout my life, I've heard that before.                 |
| 21 | Q | But as a trooper, that's a different -- it's a -- it's               |
| 22 |   | different, you have to take those things serious,                    |
| 23 |   | correct?                                                             |
| 24 | A | Dead seriously.                                                      |
| 25 | Q | Okay. And that's more of a precaution, isn't it?                     |

| | | |
|---|---|---|
| 1 | A | It's -- it's required of my job, that's part of my job |
| 2 | | and -- and that's -- that's what I deal with, so..... |
| 3 | Q | So as far as you're concerned, whether or not it was |
| 4 | | meant or not is there -- is largely irrelevant, it's the |
| 5 | | fact that it was said that's important. |
| 6 | A | Once -- once somebody says bringing out a gun or shooting |
| 7 | | somebody, I take that -- that definitely escalates the -- |
| 8 | | the situation in my mind and I deal with it. |
| 9 | Q | Okay. It's much more -- it -- it's -- would you say that |
| 10 | | it's more -- in your experience as a trooper, it's better |
| 11 | | to be safe than sorry? |
| 12 | A | Yeah, that's probably the best way to say it, yes. |
| 13 | Q | Okay. Now, the -- did Mr. Cruz -- Mr. Cruz told you that |
| 14 | | he wasn't armed, that they hadn't actually -- he wasn't |
| 15 | | -- that Don Kubanyi wasn't armed, right? |
| 16 | A | I don't remember if it was at that point that he told me |
| 17 | | but at some point in the investigation, I found out that |
| 18 | | when Mr. Kubanyi made the threat, he was not -- he was |
| 19 | | not -- he didn't have a gun in his hand but a gun was -- |
| 20 | | or a gun case was viewed on one of the snow machines that |
| 21 | | were present at the scene. |
| 22 | Q | Okay. But not his snow machine? |
| 23 | A | They didn't say which snow machine, they just said a snow |
| 24 | | machine. |
| 25 | Q | Okay. And Mr. Cruz told you that there wasn't a dispute |

|   |   |   |
|---|---|---|
| 1 |   | over land, right? |
| 2 | A | It's the first time I'd heard something about a trespass |
| 3 |   | issue. |
| 4 | Q | Okay.  Had -- when you first met with Mr. Cruz? |
| 5 | A | Yes. |
| 6 | Q | Okay.  Did -- just looking at the situation, did you |
| 7 |   | think that the work crew had a right to be where they |
| 8 |   | were? |
| 9 | A | At the point when I was -- when I first met with Mr. Cruz |
| 10 |   | and at the point of going out to the scene, the trespass |
| 11 |   | issue was pretty much the last thing on my mind.  I |
| 12 |   | wasn't even considering that.  I was at the point -- at |
| 13 |   | that point, I was considering how we were going to deal |
| 14 |   | with the situation of somebody threatening to shoot |
| 15 |   | somebody and -- and leaving the scene and -- and |
| 16 |   | threatening to come back and -- and shoot somebody |
| 17 |   | because to me that shows -- when somebody leaves the |
| 18 |   | scene and can calm down and think about it but yet still |
| 19 |   | comes back, that -- in my mind, that tells me that |
| 20 |   | they're -- they're pretty serious about it. |
| 21 | Q | Well, how do -- you read -- you're aware of -- in our |
| 22 |   | discussion of yesterday that in the trooper policy, that |
| 23 |   | civilians have a right to make a civilian arrest on |
| 24 |   | somebody who's trespassing on their posted property, |
| 25 |   | correct? |

1  A   They have that right.
2  Q   Okay. And do they -- what kind of force do they -- from
3      your understanding, would they have to -- what kind of
4      force would they have to enforce that?
5  A   Well, from the -- from the point of view of the state
6      troopers, we encourage them not to use any force.
7  Q   I understand that that's actually part of the policy but
8      from your understanding, let's say you were out there and
9      somebody was trying to make a civil arrest and -- for
10     somebody trespassing on their property. Would you arrest
11     them if they used force at all to make the -- to
12     accomplish the civil arrest?
13 A   It -- it would really vary depending on the situation. I
14     mean, if -- you know, if somebody is three or 400 feet,
15     you know, a distance away from their house and they're
16     not threatened, you know, I would -- I would -- my
17     distinction would be if -- if you threaten somebody,
18     everybody's got the -- the right in Alaska to defend
19     themselves but if they're not being threatened, people
20     don't have the right to just grab a gun and point it and
21     shoot at somebody to get off their land.
22 Q   Well, I'm not asking -- we're not talking about a gun
23     but, I mean, do they have the right to physically grab
24     the person and restrain them if they're affecting a civil
25     arrest?

| | | |
|---|---|---|
| 1 | A | I -- I suppose if they thought the situation was |
| 2 | | necessary, they -- they could do that. |
| 3 | Q | And the troopers have a policy of encouraging people not |
| 4 | | to do that, right? |
| 5 | A | That is correct. |
| 6 | Q | Because of the potential for violence. |
| 7 | A | That is correct. |
| 8 | Q | So if you were -- in your experience, have you ever known |
| 9 | | anybody to make a civil arrest? |
| 10 | A | Yes. |
| 11 | Q | And how -- tell me about that. |
| 12 | A | The process that I've typically used is I carry a |
| 13 | | citizen's arrest form with me.  I have several in my car |
| 14 | | that -- when I deal with it mostly is in the park in the |
| 15 | | summer where you get some people -- see trespass issues |
| 16 | | or assault issues that -- that happen not in my presence |
| 17 | | and it's usually with a security, like let's say Princess |
| 18 | | security or Air Mark Security.  They call us to the scene |
| 19 | | because so and so did something, broke the law somehow |
| 20 | | and if it's a misdemeanor committed on my -- out of my |
| 21 | | presence, I, obviously, can't arrest him right there so |
| 22 | | the only way I can take -- I can either charge them, send |
| 23 | | the documents to the DA's office and -- for review or I |
| 24 | | can give them a summons to appear in court or if the |
| 25 | | person wants them to go to jail, they can fill out a |