```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF ALASKA

 3   DON M. KUBANYI, JIMMY KUBANYI,    )
     AILEEN WELTON, ELIZABETH          )
 4   TUZROYLUK, DORIS KUBANYI,         )
     VICTOR KUBANYI, BOBBY KUBANYI,    )
 5   ARLETTE KUBANYI, and BRIAN        )
     BAGGETT,                          )
 6                                     )
              Plaintiffs,              )
 7                                     )
         vs.                           )
 8                                     )
     GOLDEN VALLEY ELECTRIC            )
 9   ASSOCIATION, DAVE CRUZ,           )
     Individually and d/b/a CRUZ       )
10   CONSTRUCTION, BLACK & VEATCH      )
     CORPORATION, JAKE COVEY and       )
11   PATRICK NELSON,                   )
                                       )
12            Defendants.              )
     _____)
13   Case No. F04-0026 CIV (RRB)

14

15                  DEPOSITION OF PAUL MAYO

16             Taken Friday, October 6, 2006

17       From the Hour of 10:32 a.m. to 2:13 p.m.

18           Pages 1 through 171, inclusive
                        Volume 1
19
             Taken by Counsel for Defendant GVEA
20
                              at
21
           Offices of Heartland Court Reporters
22           100 Cushman Street, Suite 308
                Fairbanks, Alaska 99701
23

24   Reported by:
     CAROL A. McCUE, RMR
25   Heartland Court Reporters
```

COPY

```
 1        A.    Yes.
 2        Q.    -- with the exception of that three months.
 3   And what is your current position with TCC?
 4        A.    Officially, I'm called a Realty Director, also
 5   Natural -- Acting Natural Resource Director.
 6        Q.    How long have you been in that position?
 7        A.    Oh, acting, three years, and then for the
 8   Realty Director since 1998.
 9        Q.    Okay.  And what were your -- before -- before
10   you became the Realty Director, what was your -- what
11   was your job there?
12        A.    Real estate appraiser.
13        Q.    And how long did you have that position?
14        A.    '94 to '98.
15        Q.    Okay.  And so before -- before becoming a real
16   estate appraiser, what did you do?
17        A.    Realty specialist.
18        Q.    Is that what you got hired on as a realty
19   specialist?
20        A.    Yes.
21        Q.    So that would have been '90 to '94?
22        A.    Yes.
23        Q.    Okay.  Tell me -- so you've essentially been
24   in the realty division, I guess, is that what you would
25   call it?  Is there a division of TCC that's the realty
```

1  division?

2  A.  Yeah, specifically the realty program at
3  Tanana Chiefs, we have a contract with the Borough of
4  Indian Affairs to manage trust property.  And trust
5  property is divided as Native allotments and Native
6  restricted townsites.  And the TCC program manages
7  about 2500 parcels of Native allotments and 500
8  townsites.

9  Q.  So when there's issues having to do with real
10 estate on any of these 2500 allotments or the 500
11 townsites, you guys get involved?

12 A.  Yes.

13 Q.  All right.  And you say you have a contract
14 with BIA.  What's that -- what's that contract
15 authorize you guys to do?

16 A.  Provide -- it just -- it's basic.  Provide
17 real estate services to Native owners who own such
18 property.

19 Q.  Okay.  And as I understand it, the BI -- the
20 BIA has fiduciary responsibilities over these lands?

21 A.  Yes.

22 Q.  And -- and they contract with you to provide
23 those BIA functions?

24 A.  Yes.  And there's more to it so I can give you
25 background.  There's realty services.

1   think, Greg Wyman.
2       Q.   Okay.
3       A.   Yeah.  And then actually, Greg knows the
4   family, too, so I think that's when it became a
5   fairness issue, and then I believe he -- the company
6   made an offer.
7       Q.   Okay.  All right.  And we'll talk about some
8   of those issues.
9            During your investigation, did -- did -- did
10  you understand that there was a dispute whether a
11  trespass had even occurred, or did you just kind of
12  take that as a given that there was a trespass?
13      A.   From my perspective, there was a trespass.
14      Q.   All right.  Did anybody suggest to you that
15  the precise boundaries of the lake, for example, the
16  high water mark of the lake or the width of the
17  easement were matters of disagreement or dispute?
18      A.   Disagreement.  I -- I went on the Internet and
19  checked for the RS-2477, it wasn't even defined yet for
20  the Rex Trail.  And then I thought the use, the
21  construction use went beyond the original intent of
22  the -- just the easement issue.
23           So I thought, well, given that much activity,
24  it was beyond an RS-2477, so I figured that Stipulation
25  Number 7 in the permit was something that I needed to