IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

DON M. KUBANYI, JIMMY KUBANYI,          )
AILEEN WELTON, ELIZABETH TUZROYLUK,)
DORIS KUBANYI, VICTOR KUBANYI,          )
BOBBY KUBANYI, ARLETTE KUBANYI,         )
And BRIAN BAGGETT,                      )
                                        )
          Plaintiffs,                   )
                                        )
     vs.                                )
                                        )
GOLDEN VALLEY ELECTRIC ASSOCIATION,)
DAVE CRUZ, individually and d/b/a   )
CRUZ CONSTRUCTION, BLACK & VEATCH   )
CORPORATION, JAKE COVEY, and        )
PATRICK NELSON,                     )
                                        )
          Defendants.                   )
_____ )

Case No. F04-0026 CIV

DEPOSITION OF MARK SHERMAN

Taken Tuesday, February 13, 2007

From the hour of 2:51 p.m. to 4:48 p.m.

Pages 1 through 91, inclusive

Volume I

Taken by Counsel for Defendant

at

Offices of Heartland Court Reporters

100 Cushman Street, Suite 308

Fairbanks, Alaska 99701

Reported by:
Crystal Scotti
Heartland Court Reporters

1      Q.    For you, yes.

2      A.    No.

3      Q.    Okay.  Do you have such a thing?

4      A.    I do have a resume, yes.

5      Q.    Okay.  Is that something you could get to

6 Mr. Walleri and have him produce to us?  Would you have

7 any objection to that?

8      A.    No, not at all.

9      Q.    Okay.  And let me just -- you've been, as I

10 understand it, retained by Mr. Walleri to serve as an

11 expert on damages in this lawsuit.  Am I correct about

12 that?

13      A.    That's correct.

14      Q.    All right.  Have you ever, in the past, done any

15 expert work for Mr. Walleri?

16      A.    No, I haven't.

17      Q.    Okay.  How about have you done any expert work

18 for anyone in a litigation?

19      A.    No.

20      Q.    Okay.  This is the first time you've ever been

21 hired to serve as an expert in litigation?

22      A.    Yes, that's correct.

23      Q.    Okay.  Have you been hired as an expert in

24 something other than litigation?

25      A.    No.

1      Q.    All right.  What -- I see the --

2      A.    Well, I am a -- I am a professional civil

3 engineer, and people do hire me for my expertise.

4      Q.    All right.  Gotcha.  All right.

5      A.    Not necessarily for litigation, though.

6      Q.    All right.  And I see the stationery that your

7 report is on lists Summit Consulting Services, Inc.  Is

8 that your employer?

9      A.    Yes, it is.

10     Q.    Okay.  And how long have you worked for them?

11     A.    For approximately 3 and a half years.

12     Q.    Okay.  And you're in their Fairbanks office, I

13 gather?

14     A.    That's correct.

15     Q.    All right.  Is that the main office?

16     A.    The main office is actually in Tok.

17     Q.    Okay.  And generally speaking, what kind of work

18 does Summit do?

19     A.    Summit Consulting specializes in rural force

20 account construction projects for municipalities and

21 villages.  Primarily water and sewer, but we also do

22 vertical construction such as community buildings,

23 clinics.

24     Q.    Okay.  And is it an engineering company?  Or is

25 it a construction company?  Or what would you describe it

 1 as?

 2      A.    It's both.

 3      Q.    Both.  Okay.

 4      A.    We do both the engineering and the planning and
 5 design.

 6      Q.    All right.

 7      A.    And then once it goes to construction, we manage
 8 the construction.

 9      Q.    Okay.

10      A.    We're not contractors in the sense that we
11 provide laborers and equipment to construct projects.

12      Q.    Okay.  And let me ask you this -- let's just
13 start generally speaking with Summit Construction.  Maybe
14 you know the answer to this, maybe you don't.  But to your
15 knowledge, has Summit Construction done --

16      A.    Excuse me.  Summit Consulting.

17      Q.    I'm sorry.  Thank you.  Summit Consulting.

18            Have they done work with ice roads?

19      A.    To my knowledge, very limited extent.

20      Q.    Okay.  And how about yourself personally?  Have
21 you done any work with ice roads?

22      A.    No.

23      Q.    Okay.  The underlying project here is what they
24 call the Northern Intertie project.  Are you familiar at
25 all with that project?

1      Q.   Okay.  All right.  Now, you said that you

2 reviewed materials, and you reached the conclusion you're

3 talking about after reviewing those materials.  So let's

4 ask you this question:  You have brought a box of

5 materials, and then you've also got a notebook with some

6 materials, and it looks like a copy of your report and a

7 few other things.

8           And what I'd like to do is let me just ask you,

9 first of all, is what we've got here that you brought with

10 you on the table the complete universe of everything that

11 you received in connection with this project?

12     A.   In essence, yes.

13     Q.   Okay.

14     A.   There are some specifics that I didn't bring.

15 There were some AutoCAD files, for instance.

16     Q.   Okay.

17     A.   Some photographs.  I used bits and pieces of

18 those to put together a -- an exhibit, Figure 1, which is

19 attached to my report.  But the underlying documents, I

20 didn't print them out and bring them.  I --

21     Q.   All right.  So the materials that you brought

22 with you, then, include both materials that were provided

23 to you, and would they all have come from Mr. Walleri?

24     A.   That's correct.

25     Q.   Okay.  And then also documents or some records

1      A.    I had a conversation with Christy Everett with

2 the U.S. Army Corps of Engineers in their Northern Region

3 Office here in Fairbanks.

4      Q.    Okay.  This was one conversation?

5      A.    Yes.

6      Q.    All right.  And did you make any notes on that

7 conversation?

8      A.    I did.  I left my daily phone log an hour

9 behind.  I don't have those notes with me.

10     Q.    All right.  And then we've got a report dated

11 February 9 of 2007.  Did you do any initial drafts of this

12 report?

13     A.    Yes.  I mean, in -- in producing a report, you

14 know, I go through it 2 or 3 times to make sure it's --

15 it -- it represents my thought -- my thinking on a

16 process --

17     Q.    Okay.

18     A.    -- and my researches.  But the drafts are simply

19 overwritten by this.

20     Q.    Okay.  So you don't have copies --

21     A.    There are no other electronic copies of that,

22 no.

23     Q.    All right.

24     A.    I don't -- I don't bother saving earlier drafts.

25     Q.    Okay.  And did you have discussions with

 1    Q.    Okay.  All right.  And so as I understand it,

 2 the initial task was to come up with an estimate of the

 3 cost of this little spur ice road to get around to the

 4 northern side of the lake.

 5          You started looking through these documents, and

 6 decided that's not feasible.  And I gather this had to do

 7 with permitting issues; is that right?

 8    A.    Not specifically the permitting issues, but the

 9 effect of acquiring a permit on the schedule.

10    Q.    Okay.  So just the amount of time it would take

11 to get a permit to do that?

12    A.    That's correct.

13    Q.    Okay.  All right.  So then what was Plan B,

14 then, if you -- once you reached that conclusion?

15    A.    Quite frankly, I struggled with it.

16    Q.    Okay.

17    A.    I spent a lot of time trying to figure out if --

18 it didn't appear to me as if building the road was

19 feasible.  I couldn't figure out how to build the road and

20 have it make sense in the context of constructing an ice

21 road for the Intertie project.

22    Q.    Okay.

23    A.    So I struggled with that concept for a while,

24 and actually interviewed -- I've forgotten to mention

25 this.  I did interview a gentleman who was an ice road

1 that -- but that the value of the water from Seven Mile

2 Lake had an impact on the project.  The ability of the

3 contractor to use that water had a monetary value.

4     Q.    Okay.

5     A.    And I considered that to be equivalent to the

6 cost of building the road.

7     Q.    All right.  Is that -- is there necessarily a

8 correlation between those two?

9     A.    Let me back up a step.

10    Q.    All right.

11    A.    In order for the contractor to use the water

12 from Seven Mile Lake, he either had to use it from the

13 southern end of the lake, or if that wasn't available, he

14 would have had to build a road to the north end of the

15 lake.

16    Q.    Okay.

17    A.    And I was originally focused on how much is it

18 going to cost him to build that -- that road.  I figured

19 that if he had known from the beginning, when he initially

20 submitted his bid, fixed-priced bid, that he would have

21 had to adjust his bid upwards in order to use water from

22 Fish Creek rather than Seven Mile.

23    Q.    Okay.

24    A.    And I further examined the papers and the

25 information that was available, and came to the conclusion

1 that, from a construction point of view, regardless of the

2 schedule, it would make no sense to build an ice road from

3 the Rex Trail to the north end of Seven Mile Lake.

4    Q.    Why is that?

5    A.    Because the water to build that ice road, the

6 only available place for that water to come from was Fish

7 Creek, which was 6 miles, 7 miles down the pipe -- down

8 the Intertie.

9          So in order to build this road, you would've had

10 to drive all the way to Fish Creek, come all the way back,

11 build the road, and then you would have water that you

12 could use to build the road from Fish Creek back to the

13 Rex Trail.  It would make no sense to try and get that

14 source of water.

15    Q.    Okay.

16    A.    You would have already traveled the area anyway,

17 so you might as well build the road from Fish Creek.

18    Q.    Okay.

19    A.    As it was, in fact, constructed.

20    Q.    All right.  Let me back up.  As I understand it

21 from the report, you don't claim to have any expertise,

22 and you're not expressing any opinions on issues of

23 whether a trespass occurred, whether access -- whether the

24 access that, in fact, was gained to Seven Mile Lake was

25 appropriate or not appropriate; am I correct about that?

Page 28

1    A.    Yes.

2    Q.    Okay.  All right.  So let me see, then, if I
3 understand what your project morphed into, for lack of a
4 better term.

5         You were trying to compare the expenses to Cruz
6 Construction between using Seven Mile Lake as a source, as
7 they, in fact, did, at least for a period of time until
8 they left, against another option, which was not using
9 Seven Mile Lake as a source, but using, instead, Fish
10 Creek as a source.  Am I on target here?

11    A.    Yes.

12    Q.    All right.  So you're just comparing,
13 essentially, the costs to Cruz under Option A, which was
14 what, in fact, they did using Seven Mile Lake, and
15 Option B, which was strictly using Seven Mile Lake for
16 that stretch of the ice road?

17    A.    Using Fish Creek.

18    Q.    Fish Creek.  What did I say?

19    A.    "Seven Mile Lake."

20    Q.    Seven.  I'm sorry.  Fish Creek, yes.  Okay.  All
21 right.  So I think we're on the same wavelength.

22         All right.  Now, let me ask you this:  In terms
23 of coming up with a number, as I understand it, you came
24 up with a dollar figure per day that it was more expensive
25 by X dollars per day to use water from Fish Creek than it

1 had originally intended to do.

2     Q.    All right.  In other words, it's more expensive

3 for him to use Fish Creek than Seven Mile Lake because

4 he's got to travel a longer distance with his trucks,

5 essentially, right?

6     A.    That's correct.

7     Q.    All right.  And so that comprises this daily

8 number, right?

9     A.    That's the daily number, that's correct.

10     Q.    That's the daily number.  Okay.  Good.

11          All right.  So am I correct, then, that you

12 would apply that number to the actual days that Cruz, in

13 fact, extracted water from Seven Mile Lake?  Because under

14 the other scenario, he would have been extracting that

15 water from Fish Creek?

16     A.    That number is applied towards every day that he

17 was hauling water to construct the ice road.

18     Q.    Every day?

19     A.    Sure.

20     Q.    You mean for the entire season?

21     A.    For the entire time that he was hauling water --

22 that he intended to haul water from Fish -- from Seven

23 Mile Lake.  Instead, he had to haul water from Fish Creek.

24     Q.    Okay.

25     A.    So every -- every day that he hauled water from

1 Fish Creek instead of Seven Mile Lake cost him additional
2 money.

3      Q.   Okay.  But the days that he actually hauled
4 water from Fish Creek instead of Seven Mile Lake, he's not
5 gaining anything on those days, is he?  He's, in fact,
6 incurring the expense?

7      A.   He is incurring zero additional cost to haul all
8 water from Fish Creek -- excuse me -- from Seven Mile
9 Lake, down the Rex Trail, and up the Intertie.  But
10 that -- the use of the water from Seven Mile Lake provided
11 a benefit to him every day he got to haul water from Seven
12 Mile Lake rather than Fish Creek.

13     Q.   Right.  That's what I'm saying.

14     A.   Yes.

15     Q.   So days that he, in fact, in reality, hauled
16 water from Fish Creek, he's not gaining any benefit from
17 Seven Mile Lake?  He's not using Seven Mile Lake.

18     A.   He is not getting any benefit from using Seven
19 Mile Lake, but it is costing him more money.

20     Q.   Right.

21     A.   Yes.

22     Q.   And he's, in fact, incurring that additional
23 expense?

24     A.   That's correct.

25     Q.   Okay.  But it wouldn't be fair to count those

Page 32

1 days in your evaluation of benefit that he received from

2 using Seven Mile Lake, because he wasn't using Seven Mile

3 Lake on those days?

4    A.    The benefit he gained was what he was

5 compensated for by Golden Valley.

6    Q.    All right.  So you're puzzling me here.

7          You're saying that he gains benefit from using

8 Seven Mile Lake, even though he's not using Seven Mile

9 Lake?

10    A.    Can I back up a little bit --

11    Q.    Go ahead.

12    A.    -- and -- and rephrase the question slightly.

13    Q.    All right.

14    A.    If CCI had not had the ability to use Seven Mile

15 Lake to provide water for their ice road, their bid to

16 Global Power & Communications would have been higher by a

17 certain amount every day, plus an initial mobilization

18 cost, and that would have been a part of his base bid, his

19 lump-sum cost.  That would have been an upfront cost that

20 he would have been paid to use only Fish Creek to provide

21 water for his ice road.

22    Q.    All right.  Now, let me ask you this question --

23    A.    And so what I -- what I came -- I decided that

24 was the value of the water from Seven Mile Lake.

25    Q.    Okay.  But does he get value from the water from

1 Intertie right-of-way.

2    Q.   All right.  So these are days when water was
3 being extracted from some source?

4    A.   One source or another.

5    Q.   All right.  And let me just ask you, as between
6 those two dates, the February and the March dates that are
7 listed there, on which days was the source of the water
8 Seven Mile Lake?

9    A.   I believe it was the 26th, 27th, and 28th.

10    Q.   Okay.  So on those 3 days, Cruz Construction
11 extracted water from Seven Mile Lake, and on those days,
12 what you're saying is they benefited from using Seven Mile
13 Lake because they, in fact, used it?

14    A.   That's correct.

15    Q.   Okay.  Now, on March 7, 8, 9, and 10, what's
16 your understanding of the source of the water on those
17 days?

18    A.   Fish Creek.

19    Q.   Okay.  So, in fact, they've been essentially
20 booted off of Seven Mile Lake at that stage, they
21 remobilized and trekked off to Fish Creek, and started
22 using that source of water, right?

23    A.   That's right.

24    Q.   And at that -- for those -- let's focus on those
25 4 days.  For those 4 days, am I correct that he's 7 miles

1 away from the Kubanyi allotment, right?

2    A.    Well, he's -- that -- Fish Creek is about

3 7 miles away from --

4    Q.    All right.

5    A.    -- from Seven Mile Lake.

6    Q.    So at least in terms of accessing water --

7    A.    Right.

8    Q.    -- they're not impacting the Kubanyis in any

9 way, they're not bothering the Kubanyis, they're not even

10 within eyesight or earshot of the Kubanyis, and they're

11 right off their property, right?

12    A.    Again, I don't know where they were specifically

13 on those days.

14    Q.    All right.  And I'm not asking so much where

15 they -- what they then did with the water, but in terms of

16 the actual extraction process from Fish Creek, they're

17 nowhere near the Kubanyis, right?

18    A.    That's correct.

19    Q.    All right.  And so is what you're trying to say

20 is that even though they are not using Fish Creek, they're

21 nowhere near the Kubanyis, but somehow the Kubanyis should

22 get some money from Cruz Construction for those days?

23    A.    I haven't been asked that question.

24    Q.    Okay.

25    A.    This is the first time somebody has asked me

1 that.

2      Q.   All right.  All right.

3      A.   I don't -- that would speak to the Kubanyis'

4 right to restrict access to the lake, and I don't have any

5 opinion on it.

6      Q.   All right.  All right.  But that nobody is

7 contending that they have a right to restrict them from

8 Seven Mile Lake, right?  I mean, the Kubanyis don't have

9 any interest in Seven Mile Lake, to your knowledge, do

10 they -- I'm sorry -- Fish Creek?

11     A.   They -- to my -- the best of my knowledge, they

12 have no interest in Fish Creek.

13     Q.   All right.  All right.  So I'm just puzzled,

14 then, why the inclusion of these 7, 8, 9, and 10 in your

15 analysis here.

16     A.   I was asked to provide -- and again, based on

17 the figures, it is my opinion that the value by their --

18 well, there's a typo there.  That should be "value" not

19 "vale."

20     Q.   Okay.

21     A.   The hazards of trusting a spell checker.

22     Q.   It's a word.  It's just the wrong one.

23     A.   It is a word, yes, it is.

24          The value of the Seven Mile Lake as a source of

25 water was equal to the number of days that were required

1     A.    And that was the 4,357.

2     Q.    All right.  But isn't that because he had to

3 depart from Seven Mile Lake unexpectedly and go back and

4 go to Fish Creek?

5     A.    It's my understanding, from reading Mr. Cruz's

6 testimony, and my understanding of how construction

7 projects work, is that the cost of mobilizing from the

8 Parks Highway to Fish Creek -- to Seven Mile Lake is a

9 sunk cost.  He's going to have to do that no matter which

10 water source he uses, the Parks Highway, Seven Mile Lake.

11          The additional cost was for him to mobilize from

12 this point, down the Rex Trail, and up the Intertie to

13 Fish Creek.

14    Q.    What do you understand the expenses of

15 mobilizing to Seven Mile Lake included?  Didn't you --

16    A.    Mobilizing to Seven Mile Lake?

17    Q.    Right.

18    A.    Getting his water trucks, his spreaders, his ice

19 shack, his maintenance trucks, all of the various light

20 power sources that he needs.

21    Q.    Okay.

22    A.    It was a cost for him to get that from the Parks

23 Highway to Seven Mile Lake.

24    Q.    But he wouldn't have to have incurred that

25 expense under Scenario A in which he uses -- in which he

 1 goes to -- in which he goes to Fish Creek; am I right?

 2     A.   No.

 3     Q.   All right.  You've lost me.

 4     A.   To go from Point A, which is the Parks Highway,

 5 to Point B, which is Seven Mile Lake --

 6     Q.   Okay.

 7     A.   -- is X dollars.

 8     Q.   Okay.

 9     A.   To go from Seven Mile Lake to Fish Creek is Y

10 dollars.

11     Q.   So you're saying it costs that much more to get

12 to Seven Mile Lake --

13     A.   From Fish --

14     Q.   I mean --

15     A.   To get to Fish Creek.

16     Q.   -- Fish Creek instead of Seven Mile Lake?

17     A.   That's correct.

18     Q.   All right.  But didn't this 4,000-some number

19 involve taking down the ice shack and things like that

20 from Seven Mile Lake, and then trekking it over to --

21 trekking it over to Fish Creek?

22     A.   I don't know.

23     Q.   All right.  That would be something he would not

24 have to do under Scenario A, right?  If he just went to

25 Fish Creek?

Page 42

 1          MR. WALLERI:  I'm going to object.  That assumes

 2 facts not in evidence.

 3 BY MR. QUINN:

 4     Q.   To set up a new base at Fish Creek, right?

 5          MR. WALLERI:  I'm going to object.  That assumes

 6 facts not in evidence.

 7 BY MR. QUINN:

 8     Q.   You can go ahead and answer, unless he instructs

 9 you not to.

10          I mean, if you're set up at Seven Mile Lake and

11 all of a sudden you're told, "Guess what, we've got some

12 news for you.  I know you thought you were going to be

13 able to stay here, but guess what, you've got to pick up

14 and move to a whole other location 7 miles away," that

15 cost some money, right?  That's mobilization costs?

16     A.   There is probably a portion of this mobilization

17 cost of the 4,357 that could be attributed to having to

18 re-hook up the generator and the light stands and the ice

19 shack to whatever equipment they were using to haul it

20 out.

21     Q.   Okay.  Not only re-hook it up, but also to

22 dismantle it?

23     A.   Probably some cost to -- I -- I don't know how

24 much dismantling is involved.  The -- the -- when -- when

25 Mr. Cruz came up with this 4,357, it wasn't clear from the

1 documentation exactly what he included in that cost.

2    Q.   All right.  Let me then ask you about the

3 '01-'02 construction season.  And on this day, you're

4 using this daily rate of 16,635, and you multiply that by

5 10 for 10 days, and then in parentheses you have

6 "assumed."

7         Let me just ask you, where does that assumption

8 come from?

9    A.   In -- in Mr. Cruz's testimony, I believe in his

10 deposition, and it may have been elsewhere in the

11 documentation, he noted that it was more work in the

12 2001-2002 construction season to build and construct the

13 ice roads, because they were in poorer condition when he

14 first started.

15        In the summer of 2002, he was able to get into

16 the Rex Trail and improve it, thereby increasing his

17 travel time -- or decreasing his travel times making it

18 less expensive and taking less time.

19        So I made an assumption.  And again, it's an --

20 it's clearly stated an assumption, that if he spent seven

21 days hauling water in 2003, in -- in February and March of

22 2003, that he would -- probably hauled a little bit more

23 than that in the previous year because the roads were in

24 more difficult condition.

25    Q.   All right.

1 Line 22, and then goes on to Page 17.  So just take a look

2 at that Line 22.  These depositions get printed in

3 different ways, and the numbering comes out a little bit

4 different.

5    A.   Okay.

6    Q.   All right.  Do you remember reading that at all

7 or seeing that before?

8    A.   Yes.

9    Q.   All right.  Now, if Dave Cruz is correct, that

10 they hauled water for 3 days, then you would have to

11 adjust your number downward to 3 instead of 10 days for

12 the '01-'02 season; am I correct?

13    A.   No.

14    Q.   And why is that?

15    A.   Because this presumes that -- this value

16 presumes that Seven Mile Lake wasn't available, and that

17 all of the water hauling that he had to do was from Fish

18 Creek.  Which if indeed he did haul water for 3 days --

19 and I wasn't able to verify that one way or another --

20 that the -- that it would have -- he would have spent

21 10 days hauling water.

22    Q.   All right.  You lost me completely there.

23 You're saying that -- you're saying that what?  That the

24 3 days at -- the 3 days at Fish Creek -- I'm sorry -- the

25 3 days at Seven Mile Lake would have been 10 days at Fish

Page 47

1 these days, right, 26, 27, 28 of February that, in fact,

2 he took water from Seven Mile Lake, right?

3      A.    Yes.

4      Q.    And you applied this 16,000 and some change per

5 day to those 3 days, right?

6      A.    That's correct.

7      Q.    All right.   How is that different in the prior

8 season?  He took water for 3 days from Seven Mile Lake,

9 but you're treating it entirely differently during one

10 season than the other; isn't that correct?

11     A.    No.

12           MR. WALLERI:  Objection.  Compound question.  Go

13 ahead.

14           THE WITNESS:  I estimated that in 2001 and 2002,

15 he spent 10 days building an ice road; hauling water for

16 this ice road.  I didn't have an exact number because it

17 wasn't in the -- in the evidence that was presented to me.

18           As near as I can tell, the evidence for the

19 2002-2003 construction season, he spent seven days hauling

20 water for the ice road.

21 BY MR. QUINN:

22     Q.    But here it says he -- here it says he spent

23 3 days, in his testimony.  Or at least he spent 3 days

24 hauling water from Seven Mile Lake.  Doesn't he say that

25 in his deposition?

Page 49

1 from some alternate water source?

2    A.    That's not correct.

3    Q.    No?  All right.

4    A.    That's not what I said.

5    Q.    All right.  You've lost me, then, completely.

6    A.    If he -- if Fish Creek -- or excuse me -- if

7 Seven Mile Lake hadn't been available to him as a water

8 source, he would have hauled water for 10 days.  Because

9 Fish Creek was available, he only had to haul water for

10 3 days.

11    Q.    Okay.  All right.

12    A.    That's the value of -- of Fish Creek -- of --

13 excuse me -- of -- of Seven Mile Lake.

14    Q.    All right.  But again, you didn't make any

15 adjustment like that for the days in the subsequent season

16 when he, in fact, hauled water from Seven Mile Lake?

17    A.    Well, in the subsequent season I know how many

18 days he hauled water.

19    Q.    Okay.

20    A.    Okay?  He said 7.  His testimony is that they

21 hauled water for 7 days.  I don't know exactly how many --

22    Q.    And we know 3 of them were from Seven Mile Lake,

23 and 4 of them were from Fish Creek, right?

24    A.    Accord -- according to that, yes.

25    Q.    All right.  All right.  I think I'm not going

1 to -- but really, during the earlier season, we know how

2 many days he hauled water, too, didn't he?  It was 3 days?

3    A.    He hauled -- according to this, he said

4 approximately.

5    Q.    Okay.

6    A.    Maybe 3.

7    Q.    All right.

8    A.    Again, I -- I -- I -- when I looked through this

9 looking for the daily records, those daily reports from

10 2002, there was brief mention in 2 or 3 of them that they

11 were at Seven Mile Lake.  I think he -- at that time he

12 called it Six Mile Lake.

13    Q.    Okay.

14    A.    But there was no indication later than that

15 exactly how many days he hauled water out.

16    Q.    And there may have been some days, for example,

17 when it was too warm to haul water, things like that,

18 there's --

19    A.    Yes.

20    Q.    All right.  Now, you would agree with me, also,

21 that the fact that he was forced to leave Seven Mile Lake,

22 and actually the fact that that decision took several days

23 cost Mr. Cruz money?  That is, he had days when he was

24 standing by waiting for a decision as to where he could

25 draw water from, whether he was going to leave the lake,

1    Q.    Okay.  And per hour, what is your rate?

2    A.    My total rate is -- I believe it's approximately

3 $140 an hour.

4    Q.    All right.  And tell me what you mean by "total

5 rate."  That is --

6    A.    We have an hourly rate that we bill for each

7 employee.

8    Q.    Okay.

9    A.    And in addition to that, there's a fixed cost

10 per hour that we add to that --

11    Q.    Okay.

12    A.    -- for office overhead.

13    Q.    All right.  Overhead.

14    A.    Okay.

15    Q.    So the total charge that would go to Mr. Walleri

16 or his client would be 140 an hour?

17    A.    Approximately 140 an hour.

18    Q.    All right.

19    A.    Maybe 130.

20    Q.    Okay.

21    A.    Something -- we -- we just changed too.  We just

22 had an increase.

23    Q.    All right.  Okay.  Now, in terms of opinions

24 that you've reached in connection with this case, is it

25 fair to say that we've got them all?  That your report

1      A.    I believe the finance -- I believe that term is

2 "financial benefit."

3      Q.    Okay.  So I see "advantage" here, but you say

4 that's mutually exchangeable with "financial benefit"?

5      A.    You're right.  Yeah, in -- in the last paragraph

6 I say it's "financial advantage."  In the conclusion at

7 the beginning, I use "financial benefit."

8      Q.    Okay.

9      A.    They're essentially the same.

10     Q.    Now, this financial advantage or financial

11 benefit to Cruz, are you saying that Cruz

12 Construction, Inc., actually put $291,509 in their pocket

13 that they otherwise wouldn't have been able to do had they

14 not used Seven Mile Lake?

15     A.    I'm going to answer no.

16     Q.    And I'll ask you a few more questions about that

17 in a minute.

18     A.    Okay.

19     Q.    But first I want to clarify, you don't have an

20 opinion, do you, that GVEA -- that's Golden Valley

21 Electric Association -- received any type of economic

22 benefit or economic advantage as a result of Cruz using

23 water from Seven Mile Lake?

24     A.    Yes, I do.

25     Q.    You are?

1    A.   Yes.

2    Q.   Tell me about that.

3    A.   If Seven Mile Lake had been unavailable for the
4  entirety of the project, it's my opinion that if -- that
5  Cruz, by his own calculations, would have bid
6  approximately 291,500-some-odd dollars more in order to
7  accomplish the same amount of work.

8    Q.   How much?

9    A.   $291,509.

10   Q.   The same amount that you've identified as the --

11   A.   Yes.

12   Q.   -- economic advantage or financial advantage?

13   A.   Yes.  Now, that's making the assumption that
14  Seven Mile Lake was completely unavailable the entire
15  time.

16   Q.   Okay.  If we were to make that assumption, what
17  other information do you have that would lead you to
18  conclude or form the opinion that GVEA, Golden Valley
19  Electric, actually received a financial benefit?

20   A.   Nothing.  Because it was a bid that never
21  occurred.  You never saw that number because he never had
22  to develop it.  He always relied on Seven Mile Lake as his
23  water source.  So it wasn't reflected in his initial bid
24  to GP&C, Global Power.

25   Q.   Do you know when Cruz made his initial bid to

1    A.    I didn't read it for that, but I can look at it
2 quickly.  At a brief glance through it, I don't see in the
3 contract it specifically lays out Seven Mile Lake as a
4 water source.

5    Q.    What do you know about the contract between
6 Global and the owner of Golden Valley Electric?

7    A.    Nothing.  It's not in -- it was not in the
8 documents I was given.

9    Q.    Explain to me, then, how -- the basis of your
10 opinion that GVEA, Golden Valley Electric, received an
11 economic benefit.

12    A.    Knowing that it's referenced here a number of
13 times that Global Power & Communications is a contractor
14 to Golden Valley, along with Black & Veatch, to construct
15 the Intertie, that if Cruz, as a subcontractor to Global
16 Power, had included an extra $290,000 in their bid to
17 Global Power, that Global Power would have included that
18 additional cost in their contract, plus markup, with
19 Golden Valley.

20         So it's entirely possible that Golden Valley
21 actually received more benefit from this, or avoided more
22 cost, perhaps, would be a better term, than the actual
23 291,000.

24    Q.    You're making a lot of assumptions, aren't you,
25 Mr. Sherman, to get to that conclusion?  I mean, for

1 instance, you're assuming that Global and GVEA's contract

2 was not a fixed-price contract, correct?

3      A.    No, I'm not making that assumption.

4      Q.    You're assuming that Global's contract with

5 Golden Valley was entered into sometime after Global's

6 contract with Cruz in December 7th, '01?

7      A.    I don't know that either.

8      Q.    What assumptions are you making to get from the

9 Cruz-Global contract into an economic benefit to GVEA?

10      A.    I'm assuming that, at some point, Global Power

11 had to give a price to Golden Valley for doing the work.

12 Whether it's a time-and-expenses contract,

13 time-and-materials contract, fixed-fee, lump-sum, I mean,

14 it could be any kind of a contract, but I'm assuming --

15 making an assumption -- and it is an assumption, I grant

16 you that -- that Global Power had the ability to pass on

17 costs from their subcontractors to Golden Valley as part

18 of their overall costs for doing the work.

19      Q.    And if Global did not have the ability to pass

20 on additional costs from their subcontractors to Golden

21 Valley, then Golden Valley would not have received a

22 second amount of benefit, correct?

23      A.    Then Global Power wouldn't have bid on the

24 project, because they obviously aren't ice road

25 contractors.  And if they have to provide Cruz's services

1    A.    I don't know.  I know that there was a change

2 order issued.  I saw no indication that it had ever been

3 paid.  In fact, in here are numbers -- a number of

4 documents from 2004 and 2005, and I think possibly even

5 2006, where Cruz continues to send invoices to Global

6 Power for unpaid invoices.  And I don't know how many of

7 those were ever paid.  There are some checks in there, but

8 they don't reflect specifically that either Golden Valley

9 or Global Power actually ever paid Cruz any money for the

10 additional work.

11    Q.    Were you retained to give an opinion as to

12 whether Golden Valley received any economic benefit or

13 economic advantage as a result of Cruz's pumping water

14 from Seven Mile Lake?

15    A.    I was -- that's an interesting question.  I was

16 asked to provide an opinion as to the economic value that

17 Seven Mile Lake provided for the Intertie project.  Since

18 Cruz was the one that was primarily using that, that's

19 where the costs basis revolved around.

20         It's evident, from reading the documentation,

21 that Golden Valley agreed that there were additional costs

22 due to the contractor because of his inability to use

23 Seven Mile Lake, and he -- when he was forced to use Fish

24 Creek.  It's unclear to me exactly how much those costs

25 were and whether they were ever paid.

1    Q.    Well, Golden Valley is saying, in this lawsuit,

2 that the reason any additional costs, is because the

3 Kubanyis unlawfully restricted public access to the lake.

4         If it had indeed increased the project cost, or

5 caused an economic -- you know, decreased the financial

6 benefit to GVEA, Cruz, or Global, you would agree with me,

7 then, that the Kubanyis should be financially responsible

8 for that economic loss, correct?

9         MR. WALLERI:  Objection.  Beyond the scope of

10 the expertise.  Calls for legal speculation.  Go ahead and

11 answer if you can.

12        THE WITNESS:  I'm not sure.  Can you rephrase

13 the question again.

14 BY MR. KRAMER:

15   Q.    Well, the basis of your written opinion here,

16 the underlying assumption that you made was that Cruz did

17 not have a right to use the water from Seven Mile Lake.

18 And by using the water, they incurred an economic

19 advantage of $291,000?  In other words --

20   A.    I -- I did not make an assumption that they

21 didn't have the right to use that water.  My assumption --

22 my -- my assumption was based on the fact that -- that --

23 excuse me.  It was based on the -- of them not being able

24 to use Seven Mile Lake for whatever reason.  Whether or

25 not they had a legal right to use it was beyond my scope.

1 it doesn't go into somebody's pocket, you know, who

2 benefits?  Where can that money be traced?  Where can I

3 find $291,000?

4          I mean, you said somebody saved money by pumping

5 water from Fish Lake.

6     A.    How much does -- I -- can I -- I'm going to

7 answer it with a question, and hopefully this will provide

8 some enlightenment.

9          How much money does it cost you to not fix your

10 car if it doesn't break down?  Nothing.  If your car does

11 break down, then it costs you something.

12          This is a very similar situation.  As long as

13 the contractor has the ability to use the water from Seven

14 Mile Lake, it doesn't cost him anything extra.  The minute

15 the car breaks down and he can't use the water from Seven

16 Mile Lake, it begins to cost him extra money.

17          If I make the assumption, from the beginning of

18 the project, that he was never able to use water from

19 Seven Mile Lake under any reasonable condition, then that

20 $290,000 -- $291,000 was what it would have cost him

21 extra.

22     Q.    Well, I'm confused that it cost Cruz extra money

23 to pump water from Fish Creek?

24     A.    Yes.  It cost Cruz $131,000, depending on which

25 document you read.  And that's apparently how much money

1 Golden Valley was willing to pay him, because he was no

2 longer able to extract water from Seven Mile Lake.

3     Q.   So if it cost Cruz $130,000 extra, it cost GVEA

4 $130,000 extra, because that's what we ultimately had to

5 pay Cruz, how do you turn that into a financial benefit, a

6 financial advantage to Cruz of $291,000?

7          Because now you're asking -- and let me ask

8 you --

9     A.   I mean, I guess I'm confused.

10    Q.   The purpose of your opinion here, this four-page

11 written opinion to Mr. Walleri, is to establish that Cruz

12 should pay his clients, the Kubanyis, your friends, the

13 sum of $291,000 because that's the amount of economic

14 advantage they theoretically gained.

15    A.   I don't believe I state anywhere in there

16 anybody should pay anyone anything.

17    Q.   If the Kubanyis show up in court and say We want

18 $291,000 because this is what Mr. Sherman says, you know,

19 they received as an economic advantage as a result of

20 pumping water from Seven Mile Lake, would you agree that

21 your opinion would support such a request?

22    A.   Yeah.

23    Q.   So again, explain to me why you believe if Cruz

24 incurred additional expenses of at least $130,000, that

25 GVEA clearly incurred additional expenses of 130,000,

1         However, throughout the documents there is

2 continual reference to $131,500, specifically in a letter

3 from Golden Valley Electric Association.  It's RFI

4 Response Number 127, dated 3/6/03.  Subject:  Seven Mile

5 Lake.

6         CCI 568, he notes -- GVEA notes that

7 remobilization in increased cycle time, not standby time,

8 but remobilization increased cycle time is $131,500.

9         There is also a change order request in here for

10 $131,500 between CCI and Global Power.  Again, Global

11 Power has the ability in -- to mark that cost up when it

12 sends it on the Golden Valley, but I don't know what those

13 costs were.  I didn't have that information.

14    Q.  And how do you know that Global has the ability

15 to mark anything up that it sends to Golden Valley?

16    A.  It's generally -- again, that's an assumption on

17 the contracts that I've seen where --

18    Q.  You've never seen a contract between Global and

19 Golden Valley?

20    A.  I've not seen that contract.

21    Q.  I'm sorry if I interrupted you.

22    A.  You didn't.

23    Q.  I may have.  I tend to do that sometimes.

24    A.  You're excused.

25    Q.  Thank you.

1 it?

2 BY MR. KRAMER:

3     Q.    March 7th, 8th, 9th, and 10th is what you

4 identified as days that Cruz pumped water from Fish Creek

5 when he otherwise would have pumped water from Seven Mile

6 Lake; isn't that correct?

7     A.    Yes.  According to his testimony, yes.

8     Q.    And they did so at an additional cost of

9 $16,635?

10     A.    Per day.

11     Q.    Mr. Quinn asked you this several times, and I

12 don't think I ever understood the answer either, but in

13 calculating damages -- and these are trespass damages for

14 the Kubanyis, right?  That is, these numbers that you're

15 giving?

16     A.    I don't know whether they're trespass numbers or

17 not.  I'm not sure what that term means.

18     Q.    You will be testifying to issues regarding

19 damages from trespass.  Is it your testimony that this

20 $291,509 figure that you've opined is not damages from

21 trespass due to the Kubanyis?

22     A.    I'd have to have an opinion on trespass at that

23 point, and I don't.

24     Q.    Is it your opinion that the Kubanyis suffered

25 damages in the amount of $291,509?

1    A.    I have no opinion on damages that the Kubanyis

2 may or may not have suffered.

3          MR. KRAMER:  That's all I have.

4                    REDIRECT EXAMINATION

5 BY MR. QUINN:

6    Q.    Let me just ask a couple of questions.

7          Going back to your opinion about this supposed

8 economic benefit or advantage that was gained by the

9 availability of Seven Mile Lake, your number for that is

10 291,509; am I correct?

11    A.    That's correct.

12    Q.    Does that assume that the lake was available for

13 the entire project?

14    A.    That number assumes the lake was unavailable,

15 and that's the extra costs the contractor bore in order to

16 finish the ice road.

17    Q.    All right.

18    A.    And that assumes the lake was unavailable for

19 the entire project.

20    Q.    All right.  If the road -- if the lake was

21 unavailable for the entire project, there was no economic

22 benefit for the availability of the lake, right?

23          If the lake's not available, there's no economic

24 benefit?

25    A.    There is a negative economic benefit.

Page 82

1    Q.   Okay.

2    A.   There is additional cost.

3    Q.   All right.  So but the 291, I think what you

4 characterized that as, as the economic benefit for the

5 availability of the lake; am I right about that?  Isn't

6 that how you characterized it?  This was a benefit to

7 Cruz, GVEA, et cetera, those interests of having the lake

8 available.

9    A.   If the lake had been available for the entire

10 time --

11    Q.   Okay.

12    A.   -- they've wouldn't have had to pay an

13 additional $290,000.

14    Q.   All right.  So that's the economic advantage to

15 those interests in the event that the lake -- Seven Mile

16 Lake is available for the entire time?

17    A.   Right.

18    Q.   Okay.  Now, in reality, the lake was not

19 available for the entire time.  Do you agree with that?

20    A.   Yes.

21    Q.   Okay.  So somehow that number would have to be

22 adjusted downward to reflect the unavailability of the

23 lake, at least for part of the project, right?

24          MR. WALLERI:  Objection.  Assumes facts not in

25 evidence.  And as to legal, and the scope of the

1 expertise.  Go ahead.

2 BY MR. QUINN:

3    Q.   You can answer, if you can.

4    A.   I'm not sure I can.

5    Q.   All right.  In any case, this number that you

6 came up with is based on the assumption that the lake

7 would be available for the entire project?

8    A.   At the beginning of the project.

9    Q.   Okay.

10    A.   Yes.

11    Q.   And in reality, that didn't pan out?

12    A.   It didn't pan out.

13    Q.   The lake was not available?

14    A.   That's correct.

15    Q.   Okay.  Good.  Now, let me ask you this:  I

16 understand you're a civil engineer?

17    A.   Yes.

18    Q.   All right.  And you have expertise in the area

19 of civil engineering?

20    A.   Yes, I do.

21    Q.   Do you consider yourself an expert in

22 accounting?

23    A.   No.

24    Q.   Okay.  And would you agree with me that, at

25 least based on the materials that you have reviewed, there

 1 was no damage to the Kubanyi property by the work of the

 2 Cruz Construction folks?

 3      A.    I would have to go back and look at the record

 4 again.  I didn't -- I -- I didn't look for any

 5 documentation of damage to his property.

 6      Q.    All right.

 7      A.    I skipped over large chunks of it, in fact.

 8      Q.    All right.  Let me see.  If you could pull

 9 out -- do you have the Dave Cruz deposition handy?

10           MR. WALLERI:  Mike's got it.

11           MR. QUINN:  It was in the stack -- in the

12 documents here somewhere that I -- I gave you.

13 BY MR. QUINN:

14      Q.    Here they are.

15      A.    I don't know if it's in there or not.

16           MR. KRAMER:  I was just looking at it, and I

17 thought it was in --

18           MR. QUINN:  Well maybe it is.

19 BY MR. QUINN:

20      Q.    Take a look in that document.

21      A.    I don't have it here.  Oh, here it is, here it

22 is.  It was hiding.

23      Q.    All right.  Now, we're going to -- we may run

24 into the same problem.  On my copy it's Page 57, but I

25 think it may be -- because the numbering is a little bit

Page 86

1 reason to disagree with that testimony that's in the

2 materials you have?

3    A.    I have no basis to agree or disagree with it.

4    Q.    All right.  Okay.  And in terms of anything that

5 might reduce the value of their property, are you aware of

6 anything that occurred out there that might in any way

7 reduce the value of their property?

8    A.    Well, I wasn't specifically asked to look for

9 that.

10    Q.    Okay.

11    A.    So my recollection is nothing jumps out at me as

12 someone saying "You tore this up or knocked this down."

13    Q.    All right.  And, in fact, Dave Cruz says

14 specifically there wasn't anything like that?

15    A.    That's his testimony, that's correct.

16    Q.    Okay.  That's all I have.  Thanks.

17    A.    You're welcome.

18                    RECROSS-EXAMINATION

19 BY MR. KRAMER:

20    Q.    I just have a couple follow-up on the terms of

21 your retention.

22         Do you have an engagement letter or any kind of

23 contract with Mr. Walleri or the Kubanyis?

24    A.    No, I don't.

25    Q.    Your initial meeting was at a grocery store, and

Page 88

1      A.    No, I did not.

2      Q.    Have you talked to Don Kubanyi himself -- that's

3 your friend, right?

4      A.    I know Don, yes.

5      Q.    Okay.  And then Doris you went to school with?

6      A.    Yes.

7      Q.    Have you talked to either of them about payment

8 for your services?

9      A.    I haven't talked to Don or Doris in years.

10      Q.    Would you expect payment on this case whether

11 the Kubanyis won money from GVEA or Cruz or not?

12      A.    Yes.

13            MR. KRAMER:  That's all I have.  Thanks.

14            MR. WALLERI:  I have just a couple of questions.

15                    CROSS-EXAMINATION

16 BY MR. WALLERI:

17      Q.    Do you -- in your opinion, do you offer -- you

18 come up with an estimated -- this $291,509 in terms of

19 estimated project cost avoidance; is that correct?

20      A.    Yes.

21      Q.    Okay.  Do you have an opinion as to the

22 apportions savings between the three, between GVEA, Cruz,

23 Global Power, as to which entities actually incurred

24 actual savings, and if so, how much?

25      A.    No.