Borgeson & Burns, PC
100 Cushman Street, Suite 311
Fairbanks, AK 99701
(907) 452-1666
(907) 456-5055 – facsimile

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| Don M. Kubanyi, Jimmy Kubanyi,<br>Aileen Welton, Elizabeth Tuzroyluk<br>Doris Kubanyi, Victor Kubanyi,<br>Bobby Kubanyi, Arlette Kubanyi and,<br>Brian Baggett,<br><br>     Plaintiffs,<br><br> vs.<br><br>Golden Valley Electric Association,<br>Dave Cruz, individually and d/b/a<br>Cruz Construction<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. F04-0026 CIV

**DEFENDANT GVEA'S OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE:
EVIDENCE INCONSISTENT WITH BLM MANUAL**

Defendant, Golden Valley Electric Association, Inc. ("GVEA"), through counsel, opposes Plaintiffs' Motion In Limine to exclude any and all evidence, or argument that may be offered by GVEA regarding the location and width of the Rex Trail based upon survey techniques and conclusions that are inconsistent with the Bureau of Land Management ("BLM") *Manual of Instructions for the Survey of the Public Lands of the United States*. Plaintiffs' argument is misplaced because it fails to recognize that a Native allottee's rights as a riparian owner must be determined

by the law of the State, and not by the federal BLM Manual.

## ARGUMENT

I. **Plaintiffs' Authority Does Not Support The Contention That The BLM Manual Controls.**

Plaintiffs contend that since the land in question is a Native allotment, federal law requires that survey techniques and conclusions on Native allotments must be consistent with the BLM Manual. Specifically, Plaintiffs claim that 25 U.S.C. § 176 requires the determination of the mean high water mark on Indian lands be conducted in conformance with federal survey instructions. Specifically, the statute provides,

> Whenever it becomes necessary to survey any Indian or other reservations, or any lands, the same shall be surveyed under the direction and control of the General Land-Office [Bureau of Land Management], and as nearly as may be inconformity to the rules and regulations under which other public lands are surveyed.

The statute makes no mention of surveying a "mean high water mark on Indian lands," or of riparian ownership surveys. Plaintiffs cite to *United States v. Mackey*.[1] Indeed, the statute is mentioned in the case. However, the issue in *Mackey* was whether the Oklahoma Territory Legislature had the power to legislate with regard to rights of land owners within the territory bordering on navigable streams. The court held that although the "defining of rights of riparian owners in the beds of navigable [waters] is not a rightful subject of *territorial legislation*, since the territorial Legislature "is but a creature of Congress, and can have no greater power

---

[1] 214 F.137, 148 (D.Okla.1913).

**Opposition to Plaintiffs' Motion In Limine: BLM Manual**
Kubanyi v. GVEA, et al.
Case No. F04-0026 CIV
Page 2 of 9

of legislation than Congress,"[2] "the allottee's rights as a riparian owner [in a state admitted to the Union] must be determined by the law of the state."[3]

Plaintiffs also cite to *Pueblo of Taos v. Andrus*,[4] in support of the proposition that the Secretary of the Interior has the exclusive authority to determine the methods and means to survey Indian lands. The facts of *Pueblo of Taos*, however, are distinguishable from the facts in this case. The case in *Pueblo of Taos* was not a quiet title action, and instead involved two parcels of land, both of which belonged to the United States.[5] Because it was federal land, and not state land involved in the dispute over the river boundary, unlike the lake boundary in this case which involves Native land and State land, it was not necessary to consider state law.

Additionally, Plaintiffs cite to *Keller v. United States*,[6] and *Alaska v. United States*,[7] claiming that because the BLM Manual is recognized by the BLM as "the Bible" of government "resurveys," independent surveys that are not conducted in accordance with the BLM Manual are not significant. *Keller* can be distinguished from this case by the fact that the land resurveyed involved uplands, and there was no dispute over riparian ownership. In *Alaska v. United States*, the question did not involve BLM's determination of riparian ownership, rather, the issue entailed BLM's authority to determine whether bodies of water located within Native allotments are

---

[2] *Id.* at 149.
[3] *Id.* at 148 (citing *Packer v. Bird*, 137 U.S. 661, 669 (1891) (emphasis added)).
[4] 475 F.Supp. 359, 366 (D.D.C. 1979).
[5] *Id.* at 365.
[6] 6 Cl.Ct. 724, 725 (1984).
[7] 754 F.2d 851 (9th Cir.1985).

**Opposition to Plaintiffs' Motion In Limine: BLM Manual**
Kubanyi v. GVEA, et al.
Case No. F04-0026 CIV
Page 3 of 9

navigable for title purposes.[8]

Accordingly, the authority that the Plaintiffs cite to does not support their contention that the BLM Manual controls.

## II. State Law Controls Riparian Property Boundaries

"[A]bsent an overriding interest, the laws of the several States determine the ownership of the banks and shores of waterways."[9] It is up to "the States to establish for themselves such rules of property as they deem expedient with respect to the navigable waters within their borders and the riparian lands adjacent to them."[10] Thus, the question of land ownership within or adjacent to the lake is "best settled by reference to local law even where Indian [allotment] land, a creature of federal law, is involved."[11]

In *Wilson*, the Omaha Indian Tribe and the United States sued to quiet title to land which had been affected by movements of the Missouri River on the interstate boundary between Nebraska and Iowa. The United States Supreme Court recognized that the Tribe's right to the property depended on federal law, "wholly apart from the application of state law principles which normally and separately protect a valid right of possession."[12] However, the Court recognized that federal law as applied in boundary cases does not necessarily furnish the appropriate rules to determine whether the changes in the banks of a waterway are avulsive or

---

[8] *Alaska v. United States*, 754 F.2d at 852.
[9] *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 669 (2979) (citing *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977)).
[10] *See id.* at 675-676 (quoting *Arkansas v. Tennessee*, 246 U.S. 158, 175-176 (1918).
[11] *Id.*
[12] *Wilson*, 442 U.S. at 670 (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 677 (1974)).

accretive in nature.[13]  Thus, the Court held that state law should be borrowed as the federal rule of decision.[14]

In coming to this conclusion, the Court reasoned that riparian land ownership is "an area in which the States have substantial interest in having their own law resolve controversies such as these."[15]  Thus, the Court held that there was no need for a uniform national rule to determine whether changes in a waterway affecting riparian land owned or possessed by the United States or by an Indian tribe have been avulsive or accretive.[16]  The Court recognized that, "[o]n some occasions, Indian tribes may lose some land because of the application of a particular state rule of accretion or avulsion, but it is as likely on other occasions that the tribe will stand to gain."[17]  But, the same would be the case under a federal rule.[18]  Consequently, the Court held that given the equitable application of state law, there would be little likelihood of injury to federal trust responsibilities or to tribal possessory interests.[19] The Court felt that due to federal court jurisdiction over Indian lands, adequate

---

[13] *Id.* at 672.  *See also Omaha Indian Tribe, etc. v. Wilson*, 614 F.2d 1153, 1158-59 (8th Cir.1980), *cert. denied*, 449 U.S. 825 (1980); *Honsinger v. State*, 642 P.2d 1352, 1353 (Alaska 1982) ("Accretion refers generally to the gradual and imperceptible increase in land area beside a body of water.  In this context, it should be distinguished from 'avulsion,' which refers to a sudden and imperceptible shoreline.").

[14] *Id.* at 673.  *See Wilson*, 442 U.S. at 672 n. 19 (quoting P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's, The Federal Courts and the Federal System 768 (2d ed. 1973) ("The federal 'command' to incorporate state law may be a judicial rather than a legislative command; that is, it may be determined as a matter of choice of law, even in the absence of statutory command or implication, that, although federal law should 'govern' a given question, state law furnishes an appropriate and convenient measure of the content of this federal law.").

[15] *Id.* at 674.

[16] *Id.* at 673.

[17] *Id.*

[18] *Id.*

[19] *Id.*

means are available to insure fair treatment of tribal and federal interests.[20]

In this case, the court must apply Alaska state law, rather than the federal BLM Manual to determine "rules of property as they deem expedient with respect to the navigable waters within [state] borders and the riparian lands adjacent to them." In other words, this court must use Alaska state law to determine the ordinary high water mark of Seven Mile Lake.

Both sides agree that the State has title to the bed of its navigable waters, such as Seven Mile Lake, up to the ordinary high water mark (OHM). Alaska law recognizes the State has title of the lakeshore up to the OHM, but the OHM can be modified by accretion.[21]

In Alaska, accretion "refers generally to the gradual and imperceptible increase in land area beside a body of water."[22] In other words, accretion is a process by which an area of land along a waterway is expanded by the gradual deposit of soil due to the action of contiguous waters.[23] The increase in land due to accretion generally inures to the shoreline owner.[24] The burden of proving accretion rests with the party claiming the benefit thereof.[25] Alaska law and federal law on the burden of proving accretion are in accord.[26]

The Alaska Administrative Code defines "ordinary high water mark" as

---

[20] *Id.* at 674.
[21] *See State v. Pankratz*, 538 P.2d 984, 988 (Alaska 1975).
[22] *Honsinger v. State*, 642 P.2d 1352, 1353 (Alaska 1982) (citing *Omaha Indian Tribe, etc. v. Wilson*, 614 F.2d 1153, 1158-1159 (8th Cir.1980), *cert. denied*, 449 U.S. 825 (1980)).
[23] *Id.* at 1354 (citing *Schafer v. Schnabel*, 494 P.2d at 806).
[24] *Id.* at 1353.
[25] *See Schafer v. Schnabel*, 494 P.2d 802, 807 (Alaska 1972).
[26] *See Honsinger v. State*, 642 P.2d at 1353; *State v. Pankratz*, 538 P.2d at 989.

**Opposition to Plaintiffs' Motion In Limine: BLM Manual**
Kubanyi v. GVEA, et al.
Case No. F04-0026 CIV
Page 6 of 9

> [T]he mark along the bank or shore up to which the presence and action of the *nontidal* water are so common and usual, and so long continued in all ordinary years, as to leave a natural line impressed on the bank or shore and indicated by erosion, shelving, changes in soil characteristics, destruction of terrestrial vegetation, or other distinctive physical characteristics.[27]

The Code also provides technical surveying standards. Under these standards, the ordinary high water mark "is to be determined by observing and marking the place on the bank or shore up to which the presence and action of water are so prolonged as to impress on the bank or shore a character distinct from the bank or shore with respect to vegetation and the nature of the soil."[28] Looking at the vegetation and the nature of the soil, the OHM rests at the point below which the value of the soil for agricultural purposes has been destroyed.[29] "This does not mean that all vegetation is absent below the mark, but rather that terrestrial vegetation will not grow there."[30]

If the BLM Manual was used in this case, the surveying standards would confuse the process of determining the OHM, and certainly, would not be consistent with Alaska state law. The BLM Manual contains no definition of, and provides little detail on determining the "ordinary high water mark," and instead, the Manual frequently uses "mean high water" for purposes of determining meander lines in

---

[27] 11 AAC § 53.900 (23) (emphasis added).
[28] 11 AAC § 53.120 (2).
[29] *See State v. Pankratz*, 538 P.2d at 989 (citing *Howard v. Ingersoll*, 54 U.S.381, 415 (1851); *Borough of Ford City v. United States*, 345 F.2d 645, 648 (3rd Cir.1965), *cert. denied*, 382 U.S. 902 (1965)).
[30] *Id.* (citations omitted).

**Opposition to Plaintiffs' Motion In Limine: BLM Manual**
Kubanyi v. GVEA, et al.
Case No. F04-0026 CIV
Page 7 of 9

navigable waters.[31] However, federal law "clearly establishes that the 'meander line' normally does not constitute the high water mark."[32] Under Alaska law, the terms "mean high water" and "mean high water line" do not apply when surveying inland bodies of water like Seven Mile Lake. Rather, they are used for purposes of surveying tidal waters as they are defined as follows:

> (14) "mean high water" means the tidal datum plane of the average of all the high tides, as would be established by the National Geodetic Survey, at any place subject to tidal influence;
>
> (15) "mean high water line" means the intersection of the datum plane of mean high water with the shore.[33]

Because Alaska law determines riparian ownership in disputes involving Native allotments, it would be illogical to use the BLM Manual because it contains standards that are inconsistent with Alaska surveying standards. Alaska state surveying standards are appropriate and provide a sound basis for determining the OHM of Seven Mile Lake.

## CONCLUSION

For the foregoing reasons, GVEA respectfully requests that the court DENY Plaintiff's Motion In Limine to exclude any and all evidence, or argument that may be offered by GVEA regarding the location and width of the Rex Trail based upon survey techniques and conclusions that are inconsistent with the BLM Manual. It is

---

[31] See BLM Manual at 93, § 3-115.
[32] *State v. Pankratz*, 538 P.2d at 991 n.12 (citations omitted).
[33] 11 AAC § 53.900.

well established that State law determines the rule of law regarding riparian ownership. An order is lodged.

DATED this 14th day of September, 2007, at Fairbanks, Alaska.

BORGESON & BURNS, PC

By: _____
    Cory R. Borgeson
    ABA # 9405009

CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2007,
a true and correct copy of the foregoing document was
provided to the following attorneys/parties of record:

☐ Mail  ☐ Hand Delivery  ☐ Courier  ☐ Telefax

Michael Walleri
330 Wendell Street, Suite E
Fairbanks, AK  99701

☐ Mail  ☐ Hand Delivery  ☐ Courier  ☐ Telefax

Daniel T. Quinn
Richmond & Quinn
360 K Street, Suite 200
Anchorage, AK  99501-2028

By: _____

**Opposition to Plaintiffs' Motion In Limine: BLM Manual**
Kubanyi v. GVEA, et al.
Case No. F04-0026 CIV
Page 9 of 9